# No. 21-56200

IN THE

U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

———————————

MITCH OBERSTEIN, ET AL.

*Plaintiffs-Appellants,*

v.

LIVE NATION ENTERTAINMENT, INC.

*Defendants-Appellees.*

———————————

*On Appeal From The United States District Court*
*For The Central District of California*
*Hon. George H. Wu*

## EXCERPTS OF RECORD
## VOLUME 2 OF 5 (ER21-ER202)

Warren D. Postman
Albert Y. Pak
KELLER LENKNER LLC
1100 Vermont Ave., N.W.
12th Floor
Washington, D.C. 20005
(202) 918-1123

Sanford I. Weisburst
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, NY 10010
(212) 849-7000
sandyweisburst@quinnemanuel.com

Kevin Y. Teruya
Adam B. Wolfson
William R. Sears
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
(213) 443-3000

February 7, 2022

# Declaration of Adam Wolfson Attachment 1

# FILED UNDER SEAL

| | |
|---|---|
| 1 | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
| 2 | Frederick A. Lorig (Bar No. 057645)<br>fredlorig@quinnemanuel.com |
| 3 | Kevin Y. Teruya (Bar No. 235916) |
| 4 | kevinteruya@quinnemanuel.com<br>Adam B. Wolfson (Bar No. 262125) |
| 5 | adamwolfson@quinnemanuel.com |
| 6 | William R. Sears (Bar No. 330888)<br>willsears@quinnemanuel.com |
| 7 | 865 South Figueroa Street, 10th Floor |
| 8 | Los Angeles, California 90017-2543<br>Telephone:  (213) 443-3000 |
| 9 | Facsimile:  (213) 443-3100 |
| 10 | (additional counsel listed on signature page) |
| 11 | Attorneys for Plaintiffs Mitch Oberstein, |
| 12 | Gary Matty, and Sophie Burke, on behalf<br>of themselves and all those similarly<br>situated |
| 13 | |

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| Mitch Oberstein, Gary Matty, and<br>Sophie Burke, on behalf of themselves<br>and all those similarly situated,<br><br>           Plaintiffs,<br><br>      v.<br><br>Live Nation Entertainment, Inc., and<br>Ticketmaster LLC,<br><br>           Defendants. | CASE NO. 2:20-cv-03888-GW-GJS<br><br>**PLAINTIFFS' OPPOSITION TO<br>DEFENDANTS' AMENDED<br>MOTION TO COMPEL<br>ARBITRATION**<br><br>The Honorable George H. Wu |

**PLAINTIFFS' OPPOSITION TO**

**DEFENDANTS' AMENDED MOTION TO COMPEL ARBITRATION**

1

# TABLE OF CONTENTS

2 **Page**

3 PRELIMINARY STATEMENT ........................................................................... 1

4 ARGUMENT ...................................................................................................... 3

5 I.  The Arbitration Agreement Does Not Identify Live Nation
      Entertainment, Inc. As a Party ............................................................... 3

6

7         A.    A Movant For Arbitration Must Prove That It Is "Plainly"
                Identified As A Party In The Arbitration Agreement ........................ 4

8         B.    The Terms Of Use Do Not Identify LNE As A Party ...................... 6

9         C.    Equitable Estoppel Does Not Apply .............................................. 7

10 II.  The Arbitration Agreement Does Not Identify Any Parties ......................... 9

11        A.    The ticketmaster.com And Ticketmaster Mobile Site Terms .............. 9

12        B.    The livenation.com Terms .......................................................... 11

13 III.  Plaintiffs Did Not Assent to Arbitration ............................................... 12

14        A.    Plaintiffs Did Not Have Actual Knowledge Of The Terms Of
                Use ..................................................................................... 13

15
          B.    Plaintiffs Did Not Have Constructive Notice Of The Terms Of
16              Use ..................................................................................... 13

17              1.    Legal Standard ............................................................. 13

18              2.    Factual Analysis ........................................................... 15

19              3.    Expert Analysis of Facts ................................................ 20

20              4.    Prior Cases .................................................................. 22

21 IV.  The Conditional License Exception to the Arbitration Clause Applies
       Here ....................................................................................... 25

22
          A.    Plaintiffs' Claims Involve The Conditional License ..................... 25

23        B.    The Court Determines Whether the Exception Applies .................. 26

24 V.  The Delegation and Arbitration Clauses Are Unconscionable ................... 29

25        A.    Procedural Unconscionability ..................................................... 30

26              1.    Adhesion .................................................................... 30

27              2.    Oppression .................................................................. 30

28

**ER24**

|  |  | 3. | Surprise ....................................................................... 31 |
| B. |  | Substantive Unconscionability......................................... 32 |
|  |  | 1. | Delegation Clause ...................................................... 32 |
|  |  | 2. | Arbitration Agreement as a Whole .......................... 34 |
| CONCLUSION........................................................................................ 35 |

**ER25**

# TABLE OF AUTHORITIES

Page

## Cases

*Ajamian v. CantorCO2e, L.P.,*
  203 Cal. App. 4th 771 (1st Dist. 2012)...........................................................27, 29

*Ajzenman v. Office of Comm'r of Baseball,*
  2020 WL 6031899 (C.D. Cal. Sept. 14, 2020) .....................................................23

*Archer & White Sales, Inc. v. Henry Schein, Inc.,*
  935 F.3d 274 (5th Cir. 2019) ................................................................................28

*Arista Films, Inc. v. Gilford Sec. Inc.,*
  43 Cal. App. 4th 495 (2d Dist. 1996) .....................................................................9

*Armendariz v. Found. Health Psychcare Servs.,*
  24 Cal. 4th 83 (Cal. 2000) ....................................................................................35

*Armor All/STP Prods. Co. v. TSI Prods., Inc.,*
  337 F. Supp. 3d 156 (D. Conn. 2018) ...................................................................28

*Bair v. Manor Care of Elizabethtown, Pa., LLC,*
  108 A.3d 94 (Pa. Super. Ct. 2015)........................................................................10

*Bakersfield College v. Cal. Community College Athletic Ass'n,*
  41 Cal. App. 5th 753 (3d Dist. 2019) ..............................................................34, 35

*Benaroya v. Willis,*
  23 Cal. App. 5th 462 (2d Dist. 2018) .....................................................................4

*Boucher v. All. Title Co.,*
  127 Cal. App. 4th 262 (2d Dist. 2005) ...................................................................8

*Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.,*
  2008 WL 3876341 (E.D. Cal. Aug. 20, 2008) .....................................................34

*Broadcom Corp. v. Amazon.com Inc.,*
  2017 WL 5125743 (C.D. Cal. Mar. 22, 2017) .......................................................5

*Carmona v. Lincoln Millennium Car Wash, Inc.,*
  226 Cal. App. 4th 74 (2d Dist. 2014) ...................................................................33

*Cerneka v. Russell No. 8 Santa Monica Props., LLC,*
  2018 WL 3154565 (2d Dist. June 28, 2018) ........................................................34

*Chango Coffee, Inc. v. Applied Underwriters, Inc.,*
  11 Cal. App. 5th 1247 (3d Dist. 2017) ..................................................................11

*City of Anaheim v. S. Cal. Edison Co.,*
  955 F.2d 1373 (9th Cir. 1992) ..............................................................................25

*Colgate v. JUUL Labs, Inc.,*
  402 F. Supp. 3d 728 (N.D. Cal. 2019).............................................................*passim*

*Complete Entm't Res. LLC v. Live Nation Entm't, Inc.*,
  2017 WL 6512223 (C.D. Cal. Oct. 16, 2017) ....................................................... 1

*Cordell Consultants, Inc. v. First Am. Title Ins. Co.*,
  2013 WL 12131273 (C.D. Cal. Aug. 26, 2013) .................................................... 3

*Crawford v. Beachbody, LLC*,
  2014 WL 6606563 (S.D. Cal. Nov. 5, 2014)........................................... 12, 19, 23

*Crow Tribe of Indians v. Racicot*,
  87 F.3d 1039 (9th Cir. 1996) ............................................................................ 14

*Cullinane v. Uber Techs., Inc.*,
  893 F.3d 53 (1st Cir. 2018)........................................................................*passim*

*DeLeon v. Verizon Wireless, LLC*,
  207 Cal. App. 4th 800 (2d Dist. 2012) .............................................................. 14

*Dennison v. Rosland Capital LLC*,
  47 Cal. App. 5th 204 (2d Dist. 2020) ................................................................ 27

*DeVries v. Experian Info. Sols., Inc.*,
  2017 WL 733096 (N.D. Cal. Feb. 24, 2017) ..................................................... 23

*Dickey v. Ticketmaster LLC*,
  2019 WL 9096443 (C.D. Cal. Mar. 12,
  2019) ..........................................................................................................*passim*

*Dohrmann v. Intuit, Inc.*,
  823 F. App'x 482 (9th Cir. 2020)................................................................*passim*

*Dougherty v. Roseville Heritage Partners*,
  47 Cal. App. 5th 93 (3d Dist. 2020) .................................................................. 35

*Druyan v. Jagger*,
  508 F. Supp. 2d 228 (S.D.N.Y. 2007) ..........................................................23, 24

*Eiess v. USAA Fed. Savings Bank*,
  404 F. Supp. 3d 1240 (N.D. Cal. 2019).............................................................. 29

*Ferguson v. Countrywide Credit Indus., Inc.*,
  298 F.3d 778 (9th Cir. 2002) ............................................................................ 32

*First Options of Chicago, Inc. v. Kaplan*,
  514 U.S. 938 (1995)........................................................................................... 27

*Fitz v. NCR Corp.*,
  118 Cal. App. 4th 702 (4th Dist. 2004) ............................................................. 33

*Flores v. Nature's Best Distrib., LLC*,
  7 Cal. App. 5th 1 (4th Dist. 2016) ...................................................................5, 10

*Flores v. Transamerica HomeFirst, Inc.*,
  93 Cal. App. 4th 846 (1st Dist. 2001).................................................................. 33

Case No. 2:20-cv-03888-GW-GJS

PLAINTIFFS' OPPOSITION TO DEFENDANTS' AMENDED MOTION TO COMPEL ARBITRATION

**ER27**

*Fteja v. Facebook, Inc.*,
   841 F. Supp. 2d 829 (S.D.N.Y. 2012) .......................................................19, 23, 24

*Geoffroy v. Wash. Mut. Bank*,
   484 F. Supp. 2d 1115 (S.D. Cal. 2007) .................................................................32

*Goza v. Multi-Purpose Civic Ctr. Facilities Bd. for Pulaski Cty.*,
   2014 WL 3672128 (W.D. Ark. July 23, 2014) .....................................................24

*Graf v. Match.com, LLC*,
   2015 WL 4263957 (C.D. Cal. July 10, 2015) .......................................................24

*Greenley v. Avis Budget Grp. Inc.*,
   2020 WL 1493618 (S.D. Cal. Mar. 27, 2020) ......................................................26

*Hansen v. Rock Holdings, Inc.*,
   434 F. Supp. 3d 818 (E.D. Cal. 2020) ..................................................................13

*Hansen v. Ticketmaster Entm't, Inc.*,
   2020 WL 7319358 (N.D. Cal. Dec. 11, 2020) .....................................................24

*Hart v. Charter Commc'ns, Inc.*,
   814 F. App'x 211 (9th Cir. 2020) .........................................................................12

*Himber v. Live Nation Worldwide, Inc.*,
   2018 WL 2304770 (E.D.N.Y. May 21, 2018) ......................................................24

*In re Holl*,
   925 F.3d 1076 (9th Cir. 2019) ........................................................................23, 24

*In re Wholesale Grocery Prods. Antitrust Litig.*,
   707 F.3d 917 (8th Cir. 2013) ...................................................................................8

*Ingle v. Circuit City Stores, Inc.*,
   328 F.3d 1165 (9th Cir. 2003) ........................................................................33, 34

*Jackson v. Grant*,
   890 F.2d 118 (9th Cir. 1989) ...................................................................................4

*Jarboe v. Hanlees Auto Grp.*,
   53 Cal. App. 5th 539 (1st Dist. 2020)......................................................................8

*Kaneko v. Okuda*,
   195 Cal. App. 2d 217 (2d Dist. 1961) ..................................................................11

*Kauders v. Uber Techs., Inc.*,
   159 N.E.3d 1033, 1055 (Mass. 2021)........................................................16, 17, 22

*Kramer v. Toyota Motor Corp.*,
   705 F.3d 1122 (9th Cir. 2013) .............................................................................4, 7

*Lakeside Nursing & Rehab. Ctr., Inc. v. Rufkahr*,
   572 S.W.3d 461 (Ark. App. 2019) ........................................................................10

*Laumann v. Nat'l Hockey League*,
   989 F. Supp. 2d 329 (S.D.N.Y. 2013) ....................................................... 8

*Lee v. Ticketmaster L.L.C.*,
   817 F. App'x 393 (9th Cir. 2020) ................................................... 12, 23

*M.K.N.S. Shipping S.A. v. Ravago PM PTE Ltd.*,
   423 F. Supp. 3d 41 (S.D.N.Y. 2019) ....................................................... 5

*Mahmoudiani v. Bartlett Care Ctr., LLC*,
   2019 WL 1450424 (Cal. App. 3d Dist. Apr. 2, 2019) ........................... 5

*Mazza v. Am. Honda Motor Co.*, Inc.,,
   666 F.3d 581 (9th Cir. 2012) ......................................................... 4, 16

*McGuire v. JP Morgan Chase Bank, N.A.*,
   2010 WL 11587069 (N.D. Cal. July 8, 2010) ...................................... 32

*McKee v. Audible, Inc.*,
   2017 WL 4685039 (C.D. Cal. July 17, 2017) ........................ 2, 4, 6, 11

*McLeod v. Ford Motor Co.*,
   2005 WL 3763354 (C.D. Cal. Apr. 14, 2005) ....................................... 9

*MediVas, LLC v. Marubeni Corp.*,
   741 F.3d 4 (9th Cir. 2014) .................................................................. 35

*Mercuro v. Superior Ct.*,
   96 Cal. App. 4th 167 (2d Dist. 2002) ................................................ 35

*Metter v. Uber Techs., Inc.*,
   2017 WL 1374579 (N.D. Cal. Apr. 17, 2017) ................................... 13

*MISR Ins. Co. v. M/V HAR SINAI*,
   480 F. Supp. 398 (S.D.N.Y. 1979) .................................................... 10

*Monster Energy Co. v. Olympic Eagle Distrib. & King Bev., Inc.*,
   2015 WL 12781213 (C.D. Cal. Sept. 29, 2015) ................................. 29

*Moule v. UPS*,
   2016 WL 3648961 (E.D. Cal. July 7, 2016) ....................................... 24

*Mundi v. Union Sec. Life Ins. Co.*,
   555 F.3d 1042 (9th Cir. 2009) ........................................................ 7, 8

*Naria v. Trover Sols., Inc.*,
   967 F. Supp. 2d 1332 (N.D. Cal. 2013) ............................................... 9

*NASDAQ OMX Grp., Inc. v. UBS Secs. Inc.*,
   770 F.3d 1010 (2d Cir. 2014) ....................................................... 27, 28

*Nevarez v. Forty Niners Football Co., LLC*,
   2017 WL 3492110 (N.D. Cal. Aug. 15, 2017) ................................... 23

iv     Case No. 2:20-cv-03888-GW-GJS

PLAINTIFFS' OPPOSITION TO DEFENDANTS' AMENDED MOTION TO COMPEL ARBITRATION

*Nguyen v. Barnes & Noble Inc.*,
  763 F.3d 1171 (9th Cir. 2014) .......................................................................*passim*

*Nicosia v. Amazon.com, Inc.*,
  834 F.3d 220 (2d Cir. 2016) .......................................................... 15, 16, 17, 18

*NLRB v. Vapor Recovery Sys. Co.*,
  311 F.2d 782 (9th Cir. 1962) ........................................................................ 14

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*,
  311 F. Supp. 2d 1048 (D. Colo. 2004) ........................................................... 3

*Nw. Portland Cement Co. v. Atl. Portland Cement Co.*,
  174 Cal. 308 (1917) ...................................................................................... 14

*O'Connor v. R.F. Lafferty & Co.*,
  965 F.2d 893 (10th Cir. 1992) ......................................................................... 7

*Oracle Am., Inc. v. Myriad Grp. A.G.*,
  724 F.3d 1069 (9th Cir. 2013) ....................................................................... 28

*OTO, L.L.C. v. Kho*,
  8 Cal. 5th 111 (2019),
  *cert. denied*, 141 S. Ct. 85 (2020) .............................................................*passim*

*Perez v. DirecTV Grp. Holdings, LLC*,
  251 F. Supp. 3d 1328 (C.D. Cal. 2017) ........................................................ 32

*Perez v. P & M Health Care Holdings, Inc.*,
  2019 WL 1578360 (Cal. App. 4th Dist. Apr. 12, 2019) ............................ 5, 10

*Pinela v. Neiman Marcus Grp.*,
  238 Cal. App. 4th 227 (1st Dist. 2015) .................................................... 32, 34

*Pittard v. Orange Cty. Homecare*,
  2009 WL 10672900 (S.D. Cal. Apr. 25, 2009) ............................................... 5

*Reading Int'l, Inc. v. Oaktree Capital Mgmt., LLC*,
  2003 WL 22928728 (S.D.N.Y. Dec. 10, 2003) .............................................. 3

*Rent-a-Center, West, Inc. v. Jackson*,
  561 U.S. 63 (2010) ........................................................................................ 27

*Rodriguez v. Experian Servs. Corp.*,
  2015 WL 12656919 (C.D. Cal. Oct. 5, 2015) ............................................... 23

*Rosendahl v. Bridgepoint Educ., Inc.*,
  2012 WL 667049 (S.D. Cal. Feb. 28, 2012) ................................................. 34

*S. Pac. Co. v. City & County of San Francisco*,
  62 Cal. 2d 50 (1964) ..................................................................................... 13

*Saizhang Guan v. Uber Techs., Inc.*,
  236 F. Supp. 3d 711 (E.D.N.Y. 2017) ........................................................... 23

*Schmidt v. Samsung Elecs. Am., Inc.*,
  2017 WL 2289035 (W.D. Wash. May 25, 2017) ....................................................5

*Scotti v. Tough Mudder Inc.*,
  97 N.Y.S.3d 825 (N.Y. Sup. Ct. 2019) .................................................................19

*Setty v. Shrinivas Sugandhalaya LLP*,
  986 F.3d 1139 (9th Cir. 2021) ...............................................................................8

*Sgouros v. TransUnion Corp.*,
  817 F.3d 1029 (7th Cir. 2016) .............................................................................14

*Shaker v. Nature's Path Foods, Inc.*,
  2014 WL 12560695 (C.D. Cal. Feb. 7, 2014) ........................................................3

*Sonner v. Premier Nutrition Corp.*,
  971 F.3d 834 (9th Cir. 2020) .................................................................................1

*Staley v. Gilead Scis., Inc.*,
  3:19-cv-02573-EMC, ECF No. 558 at 14 (N.D. Cal. Mar. 12, 2021)...................8

*Subcontracting Concepts (CT), LLC v. De Melo*,
  34 Cal. App. 5th 201 (1st Dist. 2019) .................................................................35

*Swain v. LaserAway Med. Grp., Inc.*,
  270 Cal. Rptr. 3d 786 (2d Dist. 2020) .................................................................33

*Swift v. Zynga Game Network, Inc.*,
  805 F. Supp. 2d 904 (N.D. Cal. 2011) .................................................................24

*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*,
  925 F.2d 1136 (9th Cir. 1991) .................................................................7, 11, 13

*Ticketmaster Corp. v. Tickets.com, Inc.*,
  2003 WL 21406289 (C.D. Cal. Mar. 7, 2003) .....................................................24

*Ticketmaster L.L.C. v. RMG Techs., Inc.*,
  507 F. Supp. 2d 1096 (C.D. Cal. 2007) ...............................................................20

*Vargas v. Delivery Outsourcing, LLC*,
  2016 WL 946112 (N.D. Cal. Mar. 14, 2016) .......................................................27

*Weckesser v. Knight Enters. S.E., LLC*,
  735 F. App'x 816 (4th Cir. 2018) .........................................................................10

*Westlye v. Look Sports, Inc.*,
  17 Cal. App. 4th 1715 (3d Dist. 1993) .............................................................5, 10

*Wilson v. Huuuge, Inc.*,
  944 F.3d 1212 (9th Cir. 2019) .......................................................................*passim*

**Additional Authorities**

11 Williston on Contracts § 32:2 (4th ed. May 2020 Update) .................................10

17 CORPUS JURIS SECUNDUM (CONTRACTS) § 46 (2021 update) ..............................5

N.Y. Attorney General, *Obstructed View: What's Blocking New Yorkers
from Getting Tickets* at 15 (2016),
https://ag.ny.gov/pdfs/Ticket_Sales_Report.pdf ...................................31

ER32

## PRELIMINARY STATEMENT

Defendants' liability is evident. Their anticompetitive scheme included exclusive dealing, *Complete Entm't Res. LLC v. Live Nation Entm't, Inc.*, 2017 WL 6512223, at *3 (C.D. Cal. Oct. 16, 2017) (denying Defendants' motion for summary judgment regarding their exclusive dealing with concert venues); violating a DOJ consent decree (by threatening to withhold and withholding events from concert venues if they did not choose Ticketmaster as their primary ticketing service provider), which led to a five-year extension of the decree; and abusing the agreement's conditional license (which allows users to use Defendants' websites) to coerce customers to resell tickets using only Defendants' services.

Defendants seek to avoid liability by compelling individual arbitration, and presume that their previous successes in non-precedential decisions, such as *Dickey* or *Lee*, control here. But the plaintiffs in those cases did not raise, and the courts did not address, dispositive questions raised here, such as whether the arbitration agreement identified any Ticketmaster or Live Nation entity as a party, or whether Plaintiffs' claims fall within a specific exception to the arbitration agreement. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 842 n.5 (9th Cir. 2020) (citations omitted). Defendants' motion should be denied.

*First*, since Defendants seek to deprive Plaintiffs of their right to a jury trial, Defendants were required to identify themselves by entity name in their arbitration agreement. Other companies,[1] and even Defendants' U.K. affiliates, do so. But

---

[1] *E.g.*, *Stubhub Marketplace Global User Agreement*, https://www.stubhub.com/legal/?section=ua ("[Y]ou are contracting with StubHub, Inc. (including its affiliate Last Minute Transactions, Inc.)."); *SeatGeek Terms of Use,* https://seatgeek.com/terms ("SeatGeek, Inc."); *Eventbrite Terms of Service,* https://www.eventbrite.com/support/articles/en_US/Troubleshooting/eventbrite-terms-of-service?lg=en_US ("'Eventbrite,' 'we,' 'us,' or 'our,' … refers to

1   Defendants here did not. *McKee v. Audible, Inc.*, 2017 WL 4685039, at *11 (C.D.
2   Cal. July 17, 2017).

3       *Second*, assent is lacking where, "[i]nstead of requiring a user to affirmatively
4   assent, [Defendant] chose to gamble on whether its users would have notice of its
5   Terms." *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1221 (9th Cir. 2019). Here,
6   Defendants gambled and lost by not sending users to a specific web-page with the
7   arbitration terms and not instructing them to click a box at the bottom of that page if
8   they assented to the Terms of Use including an arbitration provision.

9       Defendants' internal documents, which they were compelled to produce,
10  reveal that Defendants themselves believe the Terms of Use were not sufficiently
11  conspicuous. In 2020 (*i.e.*, after this suit was filed), they added a checkbox for users
12  to indicate agreement to the Terms of Use on the Place Order screen (but not the
13  Sign Up or Sign In screens), so users are focused on the textual notice of the Terms
14  of Use. As explained in the declaration of Plaintiffs' expert and Defendants'
15  documents, Defendants' prior website design was no accident: They intentionally
16  designed and coded their websites to make the text of the notice of the Terms
17  inconspicuous. Defendants' declarant, Ms. Tobias, confirmed at deposition that her
18  contrary conclusions are legal in nature and not based on any facts other than the use
19  of the word "agree" in the text of the notice.

20      *Third*, Defendants' arbitration agreement contains a carve-out for claims
21  involving the conditional license, and Plaintiffs allege such claims here.

22      *Fourth*, the agreement is unconscionable under *OTO, L.L.C. v. Kho*, 8 Cal.
23  5th 111, 125-38 (2019), which the dissent describes, *id.* at 146, as announcing a
24  "new rule."[2]

25  _____

26  Eventbrite, Inc. and its affiliates, and subsidiaries"); *Google Terms of Service*,
27  https://policies.google.com/terms?hl=en-US ("[Y]ou're contracting with Google
    LLC") (all last accessed Mar. 17, 2021).

28      [2] Plaintiffs notified Defendants of Plaintiffs' arguments before Defendants

---

2                                      Case No. 2:20-cv-03888-GW-GJS
PLAINTIFFS' OPPOSITION TO DEFENDANTS' AMENDED MOTION TO COMPEL ARBITRATION

**ARGUMENT**

**I.**     **THE ARBITRATION AGREEMENT DOES NOT IDENTIFY LIVE NATION ENTERTAINMENT, INC. AS A PARTY**

Defendant Live Nation Entertainment, Inc. ("LNE") is Defendant Ticketmaster LLC's ("Ticketmaster") parent and the puppet master of a multi-year monopolization scheme, as shown by its recently extended consent decree and as alleged in the complaint here. LNE independently participated in the scheme *and* directed and encouraged Ticketmaster's anticompetitive acts. Am. Compl. (ECF No. 81) ¶¶ 88-89, 98-99. Therefore, LNE is directly liable. *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1069-70 (D. Colo. 2004) (parent "directly liable" where it "controls, directs, or encourages the subsidiary's anticompetitive conduct"); *Reading Int'l, Inc. v. Oaktree Capital Mgmt., LLC*, 2003 WL 22928728 (S.D.N.Y. Dec. 10, 2003) (similar). As shown below, even assuming *arguendo* that Ticketmaster can compel arbitration, *LNE* cannot because it is not identified as a party in the arbitration agreement. LNE has *more than 500* subsidiaries, more than 80 with "Live Nation" in their names and more than 30 with "Ticketmaster." (Ex. B at Exhibit 21.1 (2021 Live Nation Entertainment, Inc. 10-K).) LNE is never mentioned in the Terms of Use as a party to the arbitration agreement. (*E.g.*, Tobias Exs. 41 & 42 (current Ticketmaster and

---

moved to compel arbitration. (ECF No. 17; Ex. A (meet and confer correspondence, dated May 28, 2020, regarding Defendants' intended motion).) Defendants should not be permitted to raise new arguments or issues on reply. *Shaker v. Nature's Path Foods, Inc.*, 2014 WL 12560695, at *3 n.2 (C.D. Cal. Feb. 7, 2014). Alternatively, Plaintiffs request leave to file a surreply. *Cordell Consultants, Inc. v. First Am. Title Ins. Co.*, 2013 WL 12131273, at *1 (C.D. Cal. Aug. 26, 2013). Citations to "Exs. A-S" refer to the exhibits attached to the Declaration of Adam B. Wolfson in Support of Plaintiffs' Opposition to Defendants' Amended Motion to Compel Arbitration.

---

LNE Terms of Use).)[3]

### A. A Movant For Arbitration Must Prove That It Is "Plainly" Identified As A Party In The Arbitration Agreement

"[T]he party seeking to compel arbitration[] must prove the existence of a valid agreement by a preponderance of the evidence" under "ordinary state-law principles that govern the formation of contracts." *Wilson*, 944 F.3d at 1219 (citations omitted). "[I]t is a relatively basic proposition that a party can only assent to a contract with notice of its essential terms, including, the actual parties to the contract." *McKee*, 2017 WL 4685039, at *11 (Washington law); *see also Jackson v. Grant*, 890 F.2d 118, 121 (9th Cir. 1989) (Calif. law) (same). Under California law, which is fully consistent with the law applied in *McKee*,[4] "[i]t is essential not only that the parties to the contract exist, but that it is possible to *identify* them." *Jackson*, 890 F.2d at 121 (emphasis added). Indeed, the requirement that a contract identify its parties is considered particularly important for arbitration agreements, which must be in writing for this exact reason. *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1126 (9th Cir. 2013) ("The strong public policy in favor of arbitration does not extend to those who are not parties to an arbitration agreement.") (citation omitted); *see also Benaroya v. Willis*, 23 Cal. App. 5th 462, 468-69 (2d Dist. 2018) (similar).

Courts "will not insert [party names] and do what the parties themselves

---

[3] Citations to "Tobias Exs." refer to the exhibits attached to the Declaration of Kimberly Tobias in Support of Defendants' Amended Motion to Compel Arbitration. (ECF Nos. 85-1 through 85-62.)

[4] *See, e.g.*, *McKee*, 2017 WL 4685039, at *5 n.2 ("While the parties dispute whether California or Washington law should apply to issues of formation, both concede there is no substantive difference in the states' law of contract formation."). Plaintiff Oberstein is a California resident and purchased tickets here. Am. Compl. ¶ 20. California law thus governs his claims as well as this broader dispute, absent a showing that other potentially relevant states' laws truly conflict with California law. *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 590 (9th Cir. 2012). While Plaintiffs Matty and Burke are, respectively, residents of West Virginia and

should have done," even if the party moving to compel arbitration argues the identity of entities was otherwise "clear" from context. *Mahmoudiani v. Bartlett Care Ctr., LLC*, 2019 WL 1450424, at *2 (Cal. App. 3d Dist. Apr. 2, 2019). Thus, it is not enough that the contract contains a term vaguely referencing the movant, or a term resembling the movant's name. It must identify the movant entity,[5] or at least use a term identifying all companies within a family, such as "parents" or "affiliates."[6] Trade names and terms not specifically defined to include the movant are insufficient.[7] Also inadequate are agreements that reference multiple entities with similar names, but fail to identify any particular entity as a counterparty.[8] Indeed, even arbitration agreements (unlike the Terms here) that explicitly state they apply to all companies within a corporate family may still be inadequate to pass this

---

Massachusetts, Am. Compl. ¶¶ 21-22, identification of parties is a basic requirement across jurisdictions. 17 CORPUS JURIS SECUNDUM (CONTRACTS) § 46 (2021 update) ("A valid contract must be specific as to its essential terms, … includ[ing] the identity of the parties").

[5] *E.g.*, *Perez v. P & M Health Care Holdings, Inc*., 2019 WL 1578360, at *4 (Cal. App. 4th Dist. Apr. 12, 2019) ("trial court correctly invalidated the agreement based on [the Defendant's] failure to identify itself as a party to the contract"); *Flores v. Nature's Best Distrib.*, *LLC*, 7 Cal. App. 5th 1, 9 (4th Dist. 2016) (denying arbitration where agreement stated only that "it is between 'employee and Company'"); *Westlye v. Look Sports, Inc.*, 17 Cal. App. 4th 1715, 1727-28 (3d Dist. 1993) (agreement "not even mention[ing]" movant entity is invalid); *Lee v. Intelius Inc.*, 737 F.3d 1254, 1260 (9th Cir. 2013) (similar under Washington law).

[6] *Compare Schmidt v. Samsung Elecs. Am., Inc*., 2017 WL 2289035, at *7 (W.D. Wash. May 25, 2017) (parent could enforce arbitration agreement stating it "applies to [subsidiary]'s 'affiliates'"), *with Broadcom Corp. v. Amazon.com Inc.*, 2017 WL 5125743, at *4 (C.D. Cal. Mar. 22, 2017) (entities cannot compel arbitration based merely on "belong[ing] to the same corporate family" as parties to agreement).

[7] *E.g.*, *Pittard v. Orange Cty. Homecare*, 2009 WL 10672900, at *2 (S.D. Cal. Apr. 25, 2009) (declining to compel arbitration because, *inter alia*, presence of "trade name" in agreement did not adequately identify contracting party).

[8] *M.K.N.S. Shipping S.A. v. Ravago PM PTE Ltd*., 423 F. Supp. 3d 41, 44 (S.D.N.Y. 2019).

1     strict requirement. *E.g.*, *McKee*, 2017 WL 4685039, at *11.

2         **B.**     **The Terms Of Use Do Not Identify LNE As A Party**

3        The post-June 2019 ticketmaster.com, livenation.com, and Ticketmaster

4 mobile site Terms of Use that contain the arbitration clause each begin with some

5 variation of "The following are the terms of use ('Terms') that govern your use of

6 Live Nation and Ticketmaster's sites and mobile applications," and list some

7 websites, none of which is livenationentertainment.com (LNE's). But the Terms

8 never identify an entity as a party; instead, they refer to "us," "we," and "our."

9 (Tobias Exs. 41-45, 53-55.)

10        None of the website locations where users allegedly received notice of the

11 Terms indicates that LNE is a party. Ticketmaster.com and the Ticketmaster mobile

12 site include the "Ticketmaster" logo, Tobias Exs. 6 & 23, and ticketmaster.com's

13 only link to "Live Nation" is to livenation.com (not livenationentertainment.com),

14 Tobias Ex. 19 at 77 (showing link to "Live Nation," which directs to the "Live

15 Nation" website). On livenation.com is a link "About Live Nation Entertainment,"

16 but livenation.com is run by Live Nation Worldwide, Inc. (a separate subsidiary),[9]

17 and the livenation.com Terms contain a copyright reference to "Live Nation

18 Worldwide, Inc.," a different entity from LNE. (Tobias Ex. 42 at 160.) Prior

19 versions suffered from the same defect. (*E.g.*, Tobias Exs. 55-62.) Within the Terms,

20 no link leads to LNE's website. (Tobias Ex. 42.)[10]

21

22        [9] Ex. C (Live Nation website registration and domain statistics); Ex. D

23 (Declaration of Kimberly Tobias, *Himber v. Live Nation Worldwide, Inc.*, 16-cv-

24 05001-JS-GRB, ECF No. 34 (E.D.N.Y. Sept. 11, 2017) (defining "Live Nation" as
"Live Nation Worldwide, Inc. and Live Nation Marketing, Inc." and stating that

25 "Live Nation operates a website, livenation.com. Live Nation's parent company,

26 Live Nation Entertainment, Inc., owns Ticketmaster L.L.C….").)

27        [10] For example, an "Email" link to contact "us" leads to the *Ticketmaster*
Customer Service page. Ex. E (customer service page). If LNE were "plainly" a

28 party, these links would go to an LNE webpage.

1    The Terms' only mention of "Live Nation Entertainment, Inc." concerns

2 sending notices and asking questions. (Tobias Ex. 41 at 145 (current

3 ticketmaster.com Terms); Tobias Ex. 42 at 160.) Defendants have not argued that

4 this identifies LNE *as a party*. It does not. Parents often act in such ministerial roles

5 for their subsidiaries and, absent language expressly making LNE a party, these

6 references fall short. *O'Connor v. R.F. Lafferty & Co.*, 965 F.2d 893, 902 (10th Cir.

7 1992) ("[t]hrough the Courtesy of R.F. Lafferty & Co." did not make it a party).

8    Indeed, before June 2019, the Terms' scope reached only "Ticketmaster"

9 sites. Although the June 2019 amendment expanded this to "Ticketmaster and Live

10 Nation sites," Ex. F (redline), there was still no clear reference to LNE as a party to

11 the Terms. At best for LNE, the few references to "Live Nation" on the websites and

12 the single reference to LNE in the Terms vaguely suggest that LNE might be a

13 party; they do not plainly identify LNE as a party. This is especially problematic

14 because LNE has over 500 subsidiaries, including more than 80 with "Live Nation"

15 in their names. LNE's motion must therefore be denied because Plaintiffs receive

16 "the benefit of all reasonable doubts and inferences that may arise." *Three Valleys*

17 *Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991)

18 (citation omitted). Ms. Tobias confirmed the websites that are the subject of her

19 declaration – livenation.com and ticketmaster.com – are different from the website

20 of Live Nation Entertainment, Inc., which is not the subject of her declaration. (Ex.

21 G, Tobias Dep. Tr. 205:11-207:7.)

22    **C.   Equitable Estoppel Does Not Apply**

23    Defendants incorrectly argue (at 19) that LNE may enforce the arbitration

24 agreement under equitable estoppel, which "precludes a party from claiming the

25 benefits of a contract while simultaneously attempting to avoid the burdens that

26 contract imposes." *Kramer*, 705 F.3d at 1128. The doctrine applies only where the

27 claims against the nonsignatory are inextricably intertwined with the agreement in

28 which the arbitration clause appears. *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d

1   1042, 1045-46 (9th Cir. 2009).[11]

2       Here, they are not so intertwined. Instead, Plaintiffs' claims arise from LNE's

3   violations of antitrust law and exist "independent of" the Terms. *Id.* at 1047 (claim

4   not intertwined with agreement because it did not "arise out of or relate to" the

5   agreement, and resolution of the claim "d[id] not require the examination of any

6   provisions of the [] agreement" (citation omitted)); *In re Wholesale Grocery Prods.*

7   *Antitrust Litig.*, 707 F.3d 917, 923 (8th Cir. 2013) (equitable estoppel inapplicable

8   where plaintiffs bought "antitrust conspiracy claims against the non-signator[ies]");

9   *Laumann v. Nat'l Hockey League*, 989 F. Supp. 2d 329, 340 (S.D.N.Y. 2013)

10  (similar); *see also* Ex. H, *Staley v. Gilead Scis., Inc.*, Case 3:19-cv-02573-EMC,

11  ECF No. 558 at 14 (N.D. Cal. Mar. 12, 2021) ("the mere fact that Plaintiffs allege a

12  conspiracy to restrain trade . . . is insufficient to invoke equitable estoppel" where

13  the agreements "containing the arbitration provisions are not a part of the core

14  conduct comprising the conspiracy"); *Jarboe v. Hanlees Auto Grp.*, 53 Cal. App. 5th

15  539, 555 (1st Dist. 2020) (claims not "intimately founded in and intertwined with

16  the Arbitration Agreements," even though plaintiff "treat[ed] all defendants as a

17  single enterprise").

18      Defendants' cases (at 19-20) are not to the contrary. In *Hart v. Charter*

19  *Commc'ns, Inc.*, the plaintiff sued both the parent and its subsidiary based on a

20  contract the plaintiff entered with the subsidiary that contained an arbitration clause.

21  814 F. App'x 211, 214 (9th Cir. 2020). Here, as in the cases cited in the previous

22

23      [11] *See also Setty v. Shrinivas Sugandhalaya LLP*, 986 F.3d 1139, 1142 (9th 2021)

24  ("For equitable estoppel to apply, it is essential . . . that the subject matter of the
    dispute [is] intertwined with the contract providing for arbitration.") (citation

25  omitted); *Boucher v. All. Title Co.*, 127 Cal. App. 4th 262, 271 (2d Dist. 2005)

26  ("[U]nder both federal and California decisional authority, a nonsignatory defendant
    may invoke an arbitration clause to compel a signatory plaintiff to arbitrate its

27  claims when the causes of action against the nonsignatory are 'intimately founded in

28  and intertwined' with the underlying contract obligations.").

1  paragraph, Plaintiffs are suing under antitrust law, not under any provision of the

2  contract that contains the purported arbitration agreement. Defendants' other two

3  cases involved claims, unlike those here, with a clear nexus to the contractual terms.

4  *McLeod v. Ford Motor Co.*, 2005 WL 3763354, at *4 (C.D. Cal. Apr. 14, 2005)

5  (plaintiffs agreed with subsidiary to arbitrate any fraud claims stemming from

6  contractual disclosures, so parent was able to invoke that same arbitration agreement

7  for identical fraud claims against it); *Naria v. Trover Sols., Inc.*, 967 F. Supp. 2d

8  1332, 1339 (N.D. Cal. 2013) (same, where plaintiff's claims stemmed from whether

9  the defendants adequately disclosed in contract containing arbitration clause how it

10  would use customer's medical information).

11  **II.    THE ARBITRATION AGREEMENT DOES NOT IDENTIFY ANY**

12  **PARTIES**

13      The broader problem with the arbitration agreement is that it does not identify

14  *any* parties besides the customer. For this reason, too, it is invalid.

15      **A.    The ticketmaster.com And Ticketmaster Mobile Site Terms**

16      As discussed above, the ticketmaster.com and Ticketmaster mobile site Terms

17  do not identify the specific parties; instead, they use "us," "we," and "our." (*E.g.*,

18  Tobias Exs. 41-42.) These words are ambiguous, given that LNE has *over 500*

19  subsidiaries, more than 80 with "Live Nation" in their names and more than 30 with

20  "Ticketmaster." (Ex. B.) Plaintiffs had no way to know with which, if any, of these

21  entities Plaintiffs were supposedly agreeing to arbitrate.

22      Defendants could have easily avoided this ambiguity, as they did in the Terms

23  of Use on www.ticketmaster.co.uk, which explicitly state they are between the

24  customer and "Ticketmaster Corporation, Ticketmaster UK Ltd. and their respective

25  affiliates and subsidiaries …." (Ex. I.) Because the Terms here fail specifically to

26  identify any corporate entity as a party, they are invalid. *Arista Films, Inc. v. Gilford*

27  *Sec. Inc.*, 43 Cal. App. 4th 495, 502 n.5 (2d Dist. 1996) (arbitration agreement did

28  not cover broker; "if the parties had intended to benefit the broker, then the

1   Agreement would have said so") (citation omitted); *see also Perez*, 2019 WL

2   1578360, at *4; *Flores*, 7 Cal. App. 5th at 9; *Westlye*, 17 Cal. App. 4th at 1728;

3   *MISR Ins. Co. v. M/V HAR SINAI*, 480 F. Supp. 398, 404-05 (S.D.N.Y. 1979)

4   (general reference to "Gencon" charter insufficient to establish enforceable

5   arbitration agreement where there were multiple "Gencon" charters).[12]

6       Defendants may argue on reply that the Terms somehow cover *all* "Live

7   Nation" and "Ticketmaster" entities. But if Defendants had so intended, they could

8   have used the catch-all word "affiliates," as they did on the U.K. website and for

9   certain non-arbitration provisions of the Terms.[13] Defendants' decision *not* to extend

10  the Terms (or the arbitration clauses) explicitly to their "affiliates" confirms the

11  Terms must be limited to *some* (albeit undefined) entities, not *all* Ticketmaster or

12  Live Nation entities. 11 Williston on Contracts § 32:2 (4th ed. Nov. 2020 Update)

13  ("if parties to a contract omit terms … readily found in other, similar contracts, the

14  inescapable conclusion is that the parties intended the omission") (citation omitted).

15      Another reason why the arbitration clause cannot cover more than one entity

16  in Defendants' family is the provision that, "[i]f a claim involves the conditional

17  license granted to you … *either of us* may file a lawsuit in a federal or state court …

18  and we *both* consent to the jurisdiction of those courts." (Tobias Ex. 41 at 144

19  (emphasis added); Ex. 42 at 158.) "Either" and "both" convey that there is only *one*

20  other party besides the customer. Merriam-Webster Online Dictionary 2021

21

22  ─────────────────

    [12] *See also Weckesser v. Knight Enters. S.E., LLC*, 735 F. App'x 816, 820 (4th
23  Cir. 2018) (agreement referencing "Jeffry Knight, Inc." did not cover claims against
    "Knight Enterprises S.E., LLC"); *Lakeside Nursing & Rehab. Ctr., Inc. v. Rufkahr*,
24  572 S.W.3d 461, 466 (Ark. App. 2019) (denying arbitration where agreement did
    "not identify the parties"; rejecting argument that context made parties' identities
25  "apparent"); *Bair v. Manor Care of Elizabethtown, Pa., LLC*, 108 A.3d 94, 97-98
    (Pa. Super. Ct. 2015) (agreement "lacked … names of the contracting parties").
26

27  [13] For example, the indemnification provision in the current Terms refers to "us
28  and our *affiliated companies*." Tobias Ex. 41 at 144 (emphasis added).

1   ("either" means "the one and the other of two"); Oxford English Dictionary 2020

2   ("both" "refer[s] to two people or things, regarded and identified together"). If there

3   is only one other party, the arbitration clause cannot cover both Ticketmaster LLC

4   and LNE. *Chango Coffee, Inc. v. Applied Underwriters, Inc.*, 11 Cal. App. 5th 1247,

5   1251 (3d Dist. 2017) (noting trial court denied motion to compel arbitration in part

6   due to agreements' alternating use of "service" (singular) and "services" (plural)).

7          Defendants may argue that, even if the Terms do not identify them as parties,

8   consumers could somehow figure this out by reviewing Ticketmaster's various

9   linked websites and cross-referencing the Terms with other information. But

10  consumers are not required to search multiple webpages or LNE's voluminous SEC

11  filings—the relevant question is whether the *Terms themselves* satisfied this

12  requirement. *Wilson*, 944 F.3d at 1221 (disfavoring "hide-the-ball exercise[s]" by

13  website developers); *Kaneko v. Okuda*, 195 Cal. App. 2d 217, 230 (2d Dist. 1961);

14  *McKee*, 2017 WL 4685039, at *11. And, even if such an investigation were relevant,

15  it would not have provided Plaintiffs clear notice of their supposed counterparties,

16  because the websites in question are not even registered to Defendants. (Exs. C

17  (Live Nation domain statistics) & J (Ticketmaster domain statistics).) Again, all

18  doubts must be resolved in Plaintiffs' favor. *Three Valleys Mun. Water Dist.*, 925

19  F.2d at 1141.

20          **B.     The livenation.com Terms**

21          The livenation.com Terms are materially similar to the ticketmaster.com

22  Terms, and therefore invalid for the same reasons. But they also suffer from another

23  flaw: they at most suggest that the Terms cover "Live Nation Worldwide, Inc." (not

24  LNE), which is the only entity listed on livenation.com, is the actual entity that runs

25  that website, and is separate from LNE. *See supra* at 6.

26                              *     *     *

27          Defendants are sophisticated businesses that have spent over a decade

28  refining their Terms with the assistance of experienced counsel. (Tobias Decl. (ECF

Case No. 2:20-cv-03888-GW-GJS
PLAINTIFFS' OPPOSITION TO DEFENDANTS' AMENDED MOTION TO COMPEL ARBITRATION

No. 85) ¶¶ 2, 50-51.) Identifying Defendants as parties would have been easy—it is what countless other consumer-facing websites do, within this industry and without.[14] Defendants' own cases also involve companies that did the same thing. *See*, *e.g.*, *Crawford v. Beachbody, LLC*, 2014 WL 6606563, at *1 (S.D. Cal. Nov. 5, 2014) (terms and conditions specified that they covered "Beachbody, LLC"). Defendants' Terms are a clear outlier and do not offer the required specificity regarding the contracting parties. As such, they are invalid as a matter of law.

### III.   **PLAINTIFFS DID NOT ASSENT TO ARBITRATION**

At the outset, Plaintiffs acknowledge the Ninth Circuit's nonprecedential decisions in *Lee* and *Dohrmann v. Intuit*,[15] and this Court's decision in *Dickey*, which held that non-clickwrap websites the same as or similar to Defendants' (albeit based on different arguments and evidence) were sufficient to establish assent, a prerequisite to contract formation.[16] Plaintiffs respectfully submit, however, that those decisions did not consider the precedential decision in *Wilson*, which states

---

[14] *See* supra n.1; *see also*, *e.g.*, *AXS Terms of Use*, https://www.axs.com/about-terms-of-use_US_v1.html ("This website, mobile application and service is owned and operated by AXS Group LLC, and its affiliates AXS Digital LLC"); *Apple Website Terms of Use*, https://www.apple.com/legal/internet-services/terms/site.html (covering Apple and "its subsidiaries and affiliates"); *Amazon Services Terms of Use*, https://www.amazon.com/gp/help/customer/display.html?nodeId=202140280 (listing "Amazon Digital Services LLC" and explaining that references to "we" includes its affiliates); *Facebook Terms of Service*, https://www.facebook.com/terms.php ("entire agreement between you and Facebook, Inc.") (all last accessed Mar. 17, 2021).

[15] *Dohrmann v. Intuit, Inc*., 823 F. App'x 482 (9th Cir. 2020); *Lee v. Ticketmaster L.L.C.*, 817 F. App'x 393 (9th Cir. 2020).

[16] "Contracts formed on the Internet come primarily in two flavors: 'clickwrap' (or 'click-through') agreements, in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use; and 'browsewrap' agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175-76 (9th Cir. 2014).

that non-clickwrap approaches often do not suffice, and trigger a factual inquiry: "Instead of requiring a user to affirmatively assent, [the defendant] chose to gamble on whether its users would have notice of its Terms. The odds are not in its favor." *Wilson*, 944 F.3d at 1219; *see also id.* (mutual assent of the parties requires their actual or constructive notice of the terms of the agreement).

In that factual inquiry, inferences should be drawn in favor of the party opposing arbitration, *Three Valleys Mun. Water Dist.*, 925 F.2d at 1141, and any material dispute is to be resolved by a jury, *S. Pac. Co. v. City & County of San Francisco*, 62 Cal. 2d 50, 56-57 (Cal. 1964) ("Whenever particular proven circumstances are such that reasonable men could differ as to whether a prudent man would have been put "upon inquiry" by knowledge of them, the resultant question is one of fact to be determined by the fact-finding body.") (citation omitted).[17] This standard is especially significant here, where, unlike the other cases Defendants cite, there are new facts uncovered by discovery, investigation by Plaintiffs' counsel, and analysis of the facts by Plaintiffs' expert Dr. Anthony D. Andre, all of which show a lack of notice.[18]

### A.   Plaintiffs Did Not Have Actual Knowledge Of The Terms Of Use

Plaintiffs did not have actual knowledge of the Terms of Use. (Declarations of Mitch Oberstein, Gary Matty, and Sophie Burke ("Pls. Decls.") ¶¶ 4-6.) Defendants do not dispute this fact.

### B.   Plaintiffs Did Not Have Constructive Notice Of The Terms Of Use

#### 1.   Legal Standard

Constructive notice requires that a reasonably prudent consumer be put on inquiry notice of the terms of the contract. *E.g.*, *Nguyen v. Barnes & Noble Inc.*, 763

---

[17] *See Metter v. Uber Techs., Inc.*, 2017 WL 1374579, at *4 (N.D. Cal. Apr. 17, 2017); *Hansen v. Rock Holdings, Inc.*, 434 F. Supp. 3d 818, 826 (E.D. Cal. 2020).

[18] Citations to Dr. Andre's Declaration are abbreviated "Andre Decl."

1   F.3d 1171, 1177 (9th Cir. 2014); *Wilson*, 944 F.3d at 1219. This factual analysis

2   examines the conspicuousness and placement of the hyperlinks to the terms of the

3   agreement, the textual notice regarding those terms, and the design and content of

4   the website (or application) and the agreement's webpage (or application page).

5   *Nguyen*, 763 F.3d at 1177, 1179. As *Nguyen* explained:

6   > [W]here a website makes its terms of use available via a conspicuous
    > hyperlink on every page of the website but otherwise provides no notice
7   > to users nor prompts them to take any affirmative action to demonstrate
    > assent, even close proximity of the hyperlink to relevant buttons users
8   > must click on—without more—is insufficient to give rise to
    > constructive notice. … [T]he onus must be on website owners to put
9   > users on notice of the terms to which they wish to bind consumers.
    > Given the breadth of the range of technological savvy of online
10  > purchasers, consumers cannot be expected to ferret out hyperlinks to
    > terms and conditions to which they have no reason to suspect they will
11  > be bound.

12  *Id.* at 1179. Contrary to Defendants' suggestion (at 4), even repeated use of a site is

13  not sufficient where the notice and hyperlinks are not conspicuous. *Wilson*, 944 F.3d

14  at 1221 ("Only curiosity or dumb luck might bring a User to discover the Terms.").

15       As this Court has explained, where the "material evidence" concerning

16  constructive notice "is the subject of dispute, the issue of constructive notice is a

17  question of fact." ECF No. 46 at 4; *see also, e.g.*, *NLRB v. Vapor Recovery Sys. Co.*,

18  311 F.2d 782, 787 (9th Cir. 1962) (constructive notice is "an ordinary question of

19  fact"); *Nw. Portland Cement Co. v. Atl. Portland Cement Co.*, 174 Cal. 308, 312

20  (1917) (constructive notice is a "question[] of fact").[19]

21

22

---

23       [19] *See also, e.g.*, *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034-35 (7th Cir.

24  2016); *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 762 (N.D. Cal. 2019);
    *DeLeon v. Verizon Wireless, LLC*, 207 Cal. App. 4th 800, 813 (2d Dist. 2012).

25  *Dohrmann*'s conclusion that "conspicuousness is a question of law," 823 F. App'x

26  at 484 n.3, does not confront these cases and relies only on an inapposite decision
    holding that "interpretation of a contract is an issue of law," *Crow Tribe of Indians*

27  *v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996). At issue here is not contract

28  interpretation, but contract *formation*.

Case No. 2:20-cv-03888-GW-GJS

PLAINTIFFS' OPPOSITION TO DEFENDANTS' AMENDED MOTION TO COMPEL ARBITRATION

1          **2.     Factual Analysis**

2          Consumers did not have constructive notice that they were agreeing to the

3     arbitration and delegation provisions merely by using Defendants' websites and

4     mobile site to purchase concert tickets, for multiple reasons.

5          *First*, until sometime after July 2020, Defendants chose not to use scroll-wrap

6     (requiring consumers to affirmatively scroll through the terms of use and check a

7     box stating that they have read and agree to the terms of use), like Apple and

8     Amazon do (Andre Decl. ¶¶ 38-39), or clickwrap (requiring consumers to click a

9     button to indicate assent to terms), like Taylor & Francis and U-Haul do (Andre

10    Decl. ¶¶ 33, 67) and Defendants themselves did on one of their other websites

11    (www.ticketexchangebyticketmaster.com) prior to April 7, 2016 (requiring

12    consumers to affirmatively check box stating "You must confirm that you have read

13    and agree to the Terms & Conditions to place your order.") (Exs. K & L, *Lee v.*

14    *Ticketmaster* Declaration and Exhibit O thereto; Tobias Dep. Tr. 141:1-152:14.)

15    Defendants also use clickwrap for agreements other than the Terms on their website.

16    (Andre Decl. ¶¶ 41-44; Tobias Dep. Tr. 115:21-133:12 142:8-143:17; 151:21-

17    152:14.) Defendants' deliberate decision not to use scroll-wrap or clickwrap on the

18    sites at issue here for years indicates their belief that customers would be less likely

19    to notice the Terms absent scroll-wrap or clickwrap. *Nicosia v. Amazon.com, Inc*.,

20    834 F.3d 220, 237 (2d Cir. 2016) ("In a seeming effort to streamline customer

21    purchases, Amazon chose not to employ a clickwrap mechanism.").

22         Sometime after July 2020 – after the filing of this lawsuit and their motion –

23    Defendants finally chose to implement clickwrap on the final purchase screen of

24    Ticketmaster and Live Nation sites (but only that screen), as revealed by discovery.

25    (Exs. M (TM00000001-04) & N (TM00000199); Andre App'x E at 12 (showing

26    checkbox); Tobias Dep. Tr. 97:14-17; 176:2-178:16.) Their own documents reveal

27    they believed they should implement clickwrap so "**the fan will be focused on the**

28    **message.**" (Ex. O (TM00000063-64) (emphasis added).) As the Court has

**ER47**

explained, this type of evidence is highly relevant to the issue of constructive notice. ECF No. 59 at 3 ("evidence of the UX/UI designers' internal deliberations" could be "very relevant"). That Defendants could have implemented, but chose not to use, clickwrap or some other conspicuous form of notice presumptively demonstrates a lack of constructive notice to customers. *Wilson*, 944 F.3d at 1219; *Nicosia*, 834 F.3d at 237; *Kauders v. Uber Techs., Inc.*, 159 N.E.3d 1033, 1051-53, 1055 (Mass. 2021) (finding lack of assent where defendant did not use clickwrap or scrollwrap, but used in other contexts; finding the contrast "telling" because, "[c]learly, [defendant] knows how to obtain clear assent to its terms").[20] Their implementation of clickwrap is a concession, or at least compelling evidence, of the need for it. As Ms. Tobias testified, this change was made for a reason in 2020, but she refused to disclose the reason. (Tobias Dep. Tr. 227:14-229:20; *see also id.* 167:22-168:17 (asserting privilege over reasons for and effect of change).)

*Second*, the hyperlinks were blue or gray but not underlined. (Tobias Decl. ¶¶ 5-15, 20-47; Tobias Exs. 4-13, 15, 17, 21-25, 28-33; Andre Decl. ¶¶ 65, 81, 86, 95.); *see, e.g.*, *Colgate*, 402 F. Supp. 3d at 766; *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63 (1st Cir. 2018) (hyperlinks were deficient because they were not underlined, even though their text was larger, written in bold, contrasting in color, and highlighted by a box). This is important, because hyperlinks are "commonly blue and underlined" and recognized by reasonably prudent consumers when visible in that customary manner. *E.g.*, *Cullinane*, 893 F.3d at 63 (collecting cases).

*Third*, other text and items on the webpage were relatively more conspicuous

---

[20] *Kauders* cited and applied *Wilson v. Huuuge* and is therefore consistent with the controlling law on this issue. 159 N.E.3d at 1055. To the extent there were a difference, however, *Kauders*, a decision of the Massachusetts Supreme Judicial Court, is controlling with respect to Massachusetts law, which governs the claims of Plaintiff Burke, who is a resident of Massachusetts and who made her purchases in Massachusetts. (Am. Compl. ¶ 22); *e.g.*, *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 593-94 (9th Cir. 2012).

1   and attention-grabbing (*e.g.*, larger, darker, written in all caps, highlighted by
2   colored boxes, photographs, PayPal button) than, and therefore distracting from, the
3   Terms' hyperlinks and textual notice. (Tobias Decl. ¶¶ 5-15, 20-47; Tobias Exs. 4-
4   13, 15, 17, 21-25, 28-33; Andre Decl. ¶¶ 66, 67, 69-73, 81, 86, 95); *e.g.*, *Wilson*, 944
5   F.3d at 1221; *Cullinane*, 893 F.3d at 64; *Nicosia*, 834 F.3d at 237; *Colgate*, 402 F.
6   Supp. 3d at 765-66.[21] Context is important: Even if the Terms' hyperlinks and
7   textual notice were conspicuous if viewed in isolation, they would not provide
8   constructive notice, because "[i]f everything on the screen is written with
9   conspicuous features, then nothing is conspicuous." *Cullinane*, 893 F.3d at 64.
10  Importantly, the issue is whether both the textual notice and the hyperlink are
11  conspicuous, not just the hyperlink alone. *Nguyen*, 763 F.3d at 1178 ("the proximity
12  or conspicuousness of the hyperlink alone is not enough to give rise to constructive
13  notice"); *Nicosia*, 834 F.3d at 237 ("The message itself . . . is not bold, capitalized,
14  or conspicuous in light of the whole webpage."); *Kauders*, 159 N.E.3d at 1051-52
15  (no assent where textual notice was less prominently displayed than hyperlinks).

16      As discussed below, the textual notice in particular was deliberately designed
17  to have 35% lower opacity and lower contrast than other text on the same page.
18  (Andre Decl. ¶¶ 58-64 & Appendices D-E.) In addition, Defendants' documents
19  reveal they believed this design choice affected how consumers perceive the text.
20  Defendants' design principles recommend use of 100% opacity for "primary" text
21  and 65% opacity (resulting in lower contrast) for "secondary" text. (Ex. P
22  (Typography Website) at 3.) This is evidence that Defendants believed their design
23  decision to use 65% opacity for the textual notice mattered and rendered it
24  "secondary" to consumers and therefore less prominent than other text on the page.
25  

26     [21] In addition, the textual notice and/or webpage contained multiple hyperlinks,
27  (Tobias Decl. ¶¶ 5, 8-10, 13, 22, 25, 31-32, 34-35, 40, 43; Exs. 4-18, 21-25, 28-35;
    Andre Decl. ¶¶ 66, 81, 86), which is confusing and distracting to reasonably prudent
28  consumers. *E.g.*, *Nicosia*, 834 F.3d at 237.

1   (Andre Decl. ¶ 64.) Defendants' own documents also reveal Defendants themselves

2   believed these types of design decisions advanced their business goals, such as "cart

3   conversion" (more purchases) and "less friction" (less distractions from purchases).

4   (Exs. Q (TM00000170-74, at '170) & R (TM00000145-52, at '145); Tobias Dep.

5   Tr. 78:3-11.) The advancement of those goals is, however, contrary to the goal of

6   making sure that consumers assent to the Terms. *Nicosia*, 834 F.3d at 237.

7        The excerpts Defendants paste into their memorandum (at 4-5, 9-12) do not

8   provide an accurate representation because they magnify the hyperlinks and textual

9   notice and do not show the other text and items. Ms. Tobias confirmed all of the

10  screenshots in her declaration itself are *excerpts*. (Tobias Dep. Tr. 198:8-200:21.)

11  The full images, included in Dr. Andre's declaration, show the Terms' hyperlink is a

12  small one among many. (Andre Decl. ¶¶ 47-52, 79, 84, 94; *see also, e.g.*, Tobias Ex.

13  27.) In addition, the screenshots attached to Ms. Tobias's declaration cannot provide

14  an accurate representation of the appearance of the websites over the entire class

15  period. Ms. Tobias testified that she would need to see a screenshot on a particular

16  day to say what appeared on the website on that day (Tobias Dep. Tr. 157:20-

17  159:24, 210:2-12), but her declaration provides only a single screenshot of each

18  relevant webpage (Tobias Decl. ¶¶ 5-47.).

19        *Fourth*, the hyperlinks and textual notice were placed at the bottom of the

20  page (Tobias Exs. 4-13, 15, 17, 21-25, 28-33), were distant from the button the user

21  was to press to (allegedly) give assent to the Terms (Tobias Exs. 4-6, 8, 13, 15, 17),

22  or otherwise lacked a clear title or "dedicated real estate." (Andre Decl. ¶¶ 71-73,

23  81, 86-87, 94); *see also, e.g.*, *Nguyen*, 763 F.3d at 1177. But, even in those instances

24  where the hyperlinks were placed near the button, that does not provide constructive

25  notice, particularly in light of the many other problems with Defendants' design.

26  *E.g.*, *id.* at 1179.

27        *Fifth*, the textual notice asked only whether consumers agree, not whether

28  they have read the Terms. (Tobias Exs. 4-13, 15, 17, 21-25, 28-33; Andre Decl.

¶¶ 12, 68). *E.g.*, *Nguyen*, 763 F.3d at 1179; *Cullinane*, 893 F.3d at 62 ("the court must examine the language that was used to notify users") (citation omitted); *compare Crawford*, 2014 WL 6606563, at *3 ("you have read and understand") *and Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 835 (S.D.N.Y. 2012) (**"**you have read and agree"). Ms. Tobias testified that Defendants added "you have read" to the textual notice for a reason in 2020. (Tobias Dep. Tr. 165:2-167:13, 176:2-178:16.)

*Sixth*, prior to June 25, 2019, the first page of the Terms stated that other policies are incorporated by reference and that the Terms may be changed, but did *not* state that the Terms contain an arbitration provision (which appeared on the fifth page of the Terms). (Ex. F (redline); Andre Decl. ¶¶ 101-06) This layout failed to provide reasonable inquiry notice. *E.g.*, *Scotti v. Tough Mudder Inc.*, 97 N.Y.S.3d 825, 835 (N.Y. Sup. Ct. 2019). Apparently in recognition of that fact, on June 25, 2019, Defendants changed the first page to add notice of the arbitration provision and a table of contents listing the arbitration provision. (Ex. F (redline).) Ms. Tobias testified this change was made for a reason in 2019, which she refused to disclose. (Tobias Dep. Tr. 214:18-225:12; 227:14-229:20.) Plaintiff Matty's and Plaintiff Burke's last purchases were made before June 25, 2019. (Moon Decl. (ECF No. 86) ¶¶ 8-18.)

*Seventh*, the conclusions in Ms. Tobias' declaration are contrary to and unsupported by the facts, as she admitted at deposition.[22] Her declaration concludes:

> As explained below, users of Live Nation and Ticketmaster's websites are required to affirmatively accept Terms of Use that include a mandatory arbitration clause at multiple points, including when they create their accounts, sign into those accounts, and purchase tickets. For instance, as described further below, it is literally impossible for a user to buy a ticket from the Ticketmaster or Live Nation websites, without agreeing to the Terms of Use.

---

[22] Ms. Tobias testified in her personal capacity as Vice President, Legal Affairs, for LNE and also as Defendants' Rule 30(b)(6) designee and one of their three persons most knowledgeable regarding the Terms. (Tobias Dep. Tr. 9:15-10:18, 18:14-22:1.)

1   (Tobias Decl. ¶ 4.)[23] At her deposition, however, she confirmed Defendants did not

2   require users affirmatively to check a box stating that they have read and agree to

3   the Terms, until Defendants added that feature only to the Place Order screen in

4   2020. (Tobias Dep. Tr. 97:14-17; 176:2-178:16.) She also confirmed her conclusion

5   that it is "literally impossible" for a user to buy a ticket without "agreeing" to the

6   Terms is legal in nature and unsupported by any facts other than the use of the word

7   "agree" in the textual notice of the Terms. (Tobias Dep. Tr. 37:8-46:3.) Indeed, she

8   testified Defendants have no way to determine whether a user notices the Terms.

9   (Tobias Dep. Tr. 37:25-40:5.)

10              **3.    Expert Analysis of Facts**

11          The importance of each of these issues, among others, is confirmed by the

12  analysis of Dr. Andre, an expert in human factors, usability testing, user experience

13  research, and ergonomics.[24] (Andre Decl. ¶¶ 1-6.) Dr. Andre's analysis is based on

14  his human factors, cognitive science, and behavioral psychology education and

15  experience; his review of the literature in those fields; his analysis of the

16  Ticketmaster and Live Nation site; his comparison with the sites of other companies;

17  and his review of documents, testimony, and other information obtained through

18  investigation and discovery. (Andre Decl. ¶¶ 11-16.) Dr. Andre's testimony is

19  helpful to the fact finder in analyzing the facts, including how Defendants'

20  webpages are perceived by consumers during actual use. *E.g.*, *Ticketmaster L.L.C. v.*

21  *RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1106 (C.D. Cal. 2007) (relying on expert

22  testimony regarding use of ticketmaster.com).

23  _____

24      [23] Ms. Tobias clarified her declaration covers only the ticketmaster.com and
    livenation.com websites (accessed via a desktop computer or a mobile device), not

25  any Ticketmaster or Live Nation mobile applications. (Tobias Dep. Tr. 16:13-17:2.)

26  Therefore, Defendants' arguments do not apply to purchases via those applications.

27      [24] In *Dohrmann*, the Court did not consider the expert analysis submitted by the
    appellee because there was no evidence giving rise to a factual dispute, so the issue

28  was an issue of law. *Dohrmann*, 823 F. App'x at 484 n.3; *see also* ECF No. 46 at 4.

*First*, Dr. Andre explains the perspective of consumers using sites in practice. They are goal-oriented; they scan sites to find information or functions that satisfy their goals. (Andre Decl. ¶¶ 20-22.) They are heavily influenced by user interface design choices. (Andre Decl. ¶¶ 23-30.) This is the relevant perspective for evaluation of the conspicuousness of the Terms. *Nguyen*, 763 F.3d at 1177, 1179.

*Second*, Dr. Andre analyzes each of the relevant screens on the Ticketmaster and Live Nation sites and finds the Terms, including the textual notice, the hyperlink, and the arbitration provision within them, are not conspicuous; do not conform with user interface design principles and best practices (as used elsewhere on Defendants' own sites and other companies' sites) to render them more noticeable; and instead use "dark patterns" to render them effectively invisible to consumers on each of the relevant screens. (Andre Decl. §§ IV-V.) In particular, he finds the Terms are displayed in smaller font, lighter color, and lower contrast than other text on the same screen; do not conform with usability best practices such as underlining; are not presented using simple and straightforward language explaining their purpose and significance; are not given dedicated real estate and are instead lumped together with other text, often lower on the screen than that text; lack title or subtitle; and lack a checkbox or similar forcing function (such as clickwrap or scrollwrap).[25] (Andre Decl. § IV.) In addition, before June 25, 2019, the arbitration provision was placed near the end of the Terms, with no notice of them near the top. (Andre Decl. § V.)

Dr. Andre explains this is a relative analysis. (Andre Decl. ¶¶ 47-48, 51.) The issue is not whether the Terms are conspicuous in isolation and out of context, but rather whether the Terms are conspicuous in context relative to other text or items

---

[25] *See, e.g.*, *Cullinane*, 893 F.3d at 62 ("Several nonexhaustive examples of general characteristics that make a term conspicuous include using larger and contrasting font, the use of headings in capitals, or somehow setting off the term from the surrounding text by the use of symbols or other marks.").

1   on the same screen. (Andre Decl. ¶¶ 47-48, 51.) Dr. Andre further explains this is

2   also a cumulative analysis. (Andre Decl. ¶¶ 75, 91.) Each design flaw renders the

3   Terms even more inconspicuous; they build on one another. (Andre Decl. ¶¶ 75, 91.)

4        *Third*, Dr. Andre performs a quantitative analysis of the opacity and contrast

5   ratio of the Terms and other text. (Andre Decl. ¶¶ 48-64.) Dr. Andre reviews the

6   design codes for the text and items on the Ticketmaster and Live Nation sites, and

7   he finds the default setting – 100% opacity – was reduced to 65% opacity for the

8   textual notice for the Terms, but not the other text, thereby reducing its contrast

9   compared to the other text. (Andre Decl. ¶¶ 48-64.) This is a quantitative, factual

10  analysis to avoid any debate over whether the difference is significant or not.

11  Defendants' own documents confirm their belief in the significance of this design

12  choice, in terms of the perception of the textual notice as "secondary" by consumers.

13  (Ex. P (Typography Webpage).) Defendants' Rule 30(b)(6) designee did not know

14  these concepts of opacity and contrast ratio. (Tobias Dep. Tr. 97:18-98:23,100:8-

15  15.)

16       *Fourth*, Defendants' Rule 30(b)(6) designee confirmed that Defendants have

17  performed no studies or analyses of any kind regarding whether users notice the

18  Terms, the textual notice, and/or the hyperlink. (Tobias Dep. Tr. 23:21-27:14,

19  37:25-39:10, 39:12-40:5.)

20          **4.   Prior Cases**

21       Courts have found webpages and application pages similar to Defendants' did

22  not provide constructive notice of the terms of use. *E.g.*, *Colgate*, 402 F. Supp. 3d at

23  765-66 (sign-in and sign-up wrap); *see also Cullinane*, 893 F.3d at 62-64 ("Link

24  Card" and "Link Payment" wrap); *Kauders*, 159 N.E.3d at 1051-55.

25       None of the cases Defendants cite (at 15-18) have addressed or decided all of

26  these factual issues, especially with the benefit of the new facts revealed by the

27  investigation conducted by Plaintiffs' counsel and the discovery permitted by the

28  Court, as well as an analysis by an expert like Dr. Andre to assist the Court in

understanding this evidence and determining the facts, as discussed above. The

cases Defendants cite address only a limited subset of the relevant issues, *i.e.*, the

mere fact of a textual notice, the close proximity of the notice to the relevant button,

the mere fact of a hyperlink, the contrasting color and/or the font size of the

hyperlink and/or the textual notice.[26] In *Dickey*, this Court addressed only the "Sign-

Up" screen, and this Court addressed only the above subset of issues with respect to

that screen. *Dickey v. Ticketmaster LLC*, 2019 WL 9096443, at *7 (C.D. Cal. Mar.

12, 2019). Defendants' motion here (at 4-5), however, relies on only the "Sign-In"

and "Place Order" screens.

To the extent those cases discuss other issues, *e.g.*, the lack of other

distracting content, most actually support Plaintiffs' arguments.[27] Many of those

---

[26] *Ajzenman v. Office of Comm'r of Baseball*, 2020 WL 6031899, at *3-*4 (C.D. Cal. Sept. 14, 2020) (adjacent; blue hyperlink; plaintiff made only brief argument regarding *Lee*); *Lee v. Ticketmaster L.L.C.*, 2019 WL 9096442, at *1 (N.D. Cal. Apr. 1, 2019) (adjacent; blue hyperlink; *see also Lee v. Ticketmaster L.L.C.*, 817 F. App'x 393, 395 (9th Cir. 2020) (directly above or below; blue hyperlink); *Nevarez v. Forty Niners Football Co., LLC*, 2017 WL 3492110, at *7-*8 (N.D. Cal. Aug. 15, 2017) (black bold text against white background; blue hyperlink); *Rodriguez v. Experian Servs. Corp.*, 2015 WL 12656919, at *2 (C.D. Cal. Oct. 5, 2015) (notice at bottom of page; no other analysis).

[27] *Crawford*, 2014 WL 6606563, at *3 (immediately above and below; blue hyperlink; grey notice; **notice states "you have read and understand"**); *DeVries v. Experian Info. Sols., Inc.*, 2017 WL 733096, at *5-*7 (N.D. Cal. Feb. 24, 2017) (directly above; blue hyperlink; legible font size; **no other distracting content**); *see also Dohrmann*, 823 F. App'x at 483-84 (directly below; blue hyperlink; **relatively uncluttered**; **notice and hyperlink are only text italicized**); *Druyan v. Jagger*, 508 F. Supp. 2d 228, 237 (S.D.N.Y. 2007) (immediately above; **hyperlink emphasized**); *Fteja*, 841 F. Supp. 2d at 835 (directly below; **notice states "you have read and agree"**; **blue and underlined hyperlink**); *In re Holl*, 925 F.3d 1076, 1080, 1083-84 (9th Cir. 2019) (**pure clickwrap**; no question that plaintiff had affirmatively assented; clear error standard of review); *Saizhang Guan v. Uber Techs., Inc.*, 236 F. Supp. 3d 711, 723 (E.D.N.Y. 2017) (**clickwrap with notice in all caps**; **also pop up box with clickwrap with bolded notice in all caps**).

In *Hansen*, another court addressed only the Sign-In screen and a limited set of

---

cases are also distinguishable because assent and/or notice were not disputed.[28]

Moreover, none of those cases are binding, except *Holl*, which involved pure clickwrap, *see Holl*, 925 F.3d at 1083-84; many predate *Nguyen*, which articulated the governing analysis, *see Nguyen*, 763 F.3d at 1175-79 (Aug. 18, 2014); and nearly all predate *Wilson*, which further clarified the analysis, *see Wilson*, 944 F.3d at 1220-21 (Dec. 20, 2019), except *Dohrmann* and *Lee*, which are unpublished and do not address *Wilson*. Notably, Defendants' motion does not address *Wilson* or *Nguyen*.

---

the relevant issues. *Hansen v. Ticketmaster Entm't, Inc.*, 2020 WL 7319358, at *3-*5 (N.D. Cal. Dec. 11, 2020) (right above; text not markedly smaller; grey or blue text against white background). The court found the screen was "relatively uncluttered" simply because the graphic on the screen was set to the side. *Id.* at *4. The court also distinguished *Colgate* (requiring underlining of hyperlinks) on the ground that in that case other hyperlinks on the screen were formatted differently. *Id.* Here, however, the other hyperlinks on the screen (such as Sign Up and Forgot Password) are larger. (*E.g.*, Andre Decl. ¶ 57). The court did not address the other factual issues discussed above, including that Defendants have altered the "opacity" of the textual notices to the Terms of Use to make them less conspicuous to users.

[28] *Druyan*, 508 F. Supp. 2d at 234 (plaintiff alleged she had relied on material advertising and ticketing statements, which included Terms of Use); *Fteja*, 841 F. Supp. 2d at 836-37 (plaintiff alleged he had complied with Terms of Use); *Goza v. Multi-Purpose Civic Ctr. Facilities Bd. for Pulaski Cty.*, 2014 WL 3672128, at *3 (W.D. Ark. July 23, 2014) (plaintiff did not dispute validity and enforceability); *Graf v. Match.com, LLC*, 2015 WL 4263957, at *4 (C.D. Cal. July 10, 2015) (plaintiff offered no evidence, so court found actual notice); *Himber v. Live Nation Worldwide, Inc.*, 2018 WL 2304770, at *4 (E.D.N.Y. May 21, 2018) (plaintiff did not dispute he had actually seen or read Terms of Use for earlier purchases; no analysis otherwise); *Moule v. UPS*, 2016 WL 3648961, at *5 (E.D. Cal. July 7, 2016) (plaintiff had clicked through Service Terms and Conditions Update screen including bold text regarding new section providing for binding arbitration of claims; immediately below; hyperlink); *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911 (N.D. Cal. 2011) (no evidence that plaintiff did not see or agree to terms); *Ticketmaster Corp. v. Tickets.com, Inc.*, 2003 WL 21406289, at *2 (C.D. Cal. Mar. 7, 2003) (evidence that plaintiff was fully familiar with terms and conditions); *RMG Techs.*, 507 F. Supp. at 1107 (no dispute over notice of terms of use).

---

24                                          Case No. 2:20-cv-03888-GW-GJS
PLAINTIFFS' OPPOSITION TO DEFENDANTS' AMENDED MOTION TO COMPEL ARBITRATION

**IV.**    **THE CONDITIONAL LICENSE EXCEPTION TO THE ARBITRATION CLAUSE APPLIES HERE**

Even if the arbitration agreement were otherwise valid and enforceable, Plaintiffs' claims fall within a carveout for claims involving the conditional license.

**A.**    **Plaintiffs' Claims Involve The Conditional License**

The conditional license is a provision in the Terms that grants customers a license to use Defendants' copyrighted websites, subject to customers agreeing to conditions including not purchasing more than a certain number of tickets to an event. (Tobias Ex. 41 at 141.) All post-July 2013 Terms state:

> If a claim *involves* the conditional license granted to you as described in the Ownership of Content and Grant of Conditional License section (Section 3) above, *either of us* may file a lawsuit in a federal or state court located within Los Angeles County, California, and we both consent to the jurisdiction of those courts for such purposes.

*E.g.*, *id.* at 144 (emphasis added).

Plaintiffs' claims are subject to this carveout because they "involve[]" the conditional license. Specifically, their complaint alleges that Defendants have used the restrictive license (which customers are forced to use as a result of Defendants' exclusive dealing with concert venues) to coerce customers to resell their tickets using only Defendants' copyrighted websites, thereby forcing other customers to purchase tickets from those websites, resulting in anticompetitive effects and higher prices in the markets for both primary and secondary ticketing services. (*E.g.*, Am. Compl. ¶¶ 8-9, 12, 96-99, 106-107, 115, 123(c), 154-155, 180-181.) This license misuse and Defendants' other anticompetitive acts, which Plaintiffs allege harm competition for both primary and secondary ticketing services, and directly harm Plaintiffs by inflating the fees they pay (*e.g.*, Am. Compl. ¶¶ 12, 107, 115), must be viewed as a whole rather than as their constituent parts. *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992).

Defendants, in *Dickey*, confirmed that the exception applies here: "If a user

1  has a claim against Ticketmaster *related to the conditional license*, he or she may

2  also file a claim in court." Ex. S at 11 (emphasis added). As this Court also

3  concluded, "if a claim involves a conditional license, it may be filed in state or

4  federal court as opposed to arbitration." *Dickey*, 2019 WL 9096443, at *9.

5  Contradicting their *Dickey* representation, Defendants now claim (at 22 & n.6) the

6  exception applies only if a claim involves the *consumer's misuse* of the license.

7  According to Defendants, the carveout is limited to claims against consumers that

8  deploy "viruses," or engage in other "defined conduct" that harms Defendants. *Id.*

9   Defendants' new one-sided interpretation is detached from the plain language.

10  The exception says parties can file claims in court if the claims "involve[] the

11  conditional license granted to you." It does *not* say that it applies only to claims

12  involving consumers' misuse of the license. And "granted to you" does not mean

13  "misused by you"; instead, read in context, "granted to you" is merely part of a

14  broader clause specifying that the "conditional license" is the same license granted

15  to all ticket purchasers referred to above. (Tobias Ex. 41 at 144 ("If a claim involves

16  the conditional license *granted to you as described in the Ownership of Content and*

17  *Grant of Conditional License section (Section 3) above*").) If Defendants had

18  intended to limit the exception to certain types of claims – as they now suggest –

19  they could have said what claims those were. But they did not, and cannot now

20  retroactively limit the carveout to bar Plaintiffs' claims that Defendants misused the

21  license conditions in anticompetitive ways.[29]

22    **B.** **The Court Determines Whether the Exception Applies**

23   Defendants incorrectly suggest (at 22-23) without any explanation that, even

24  if their interpretation of the license exception is wrong, the exception's *scope* (and

25

26   [29] *Greenley v. Avis Budget Grp. Inc.*, 2020 WL 1493618, at *12 (S.D. Cal. Mar.

27  27, 2020) ("Defendant chose to resolve disputes through arbitration with a carve out
for claims regarding 'personal injury.' Defendant was free to define 'personal

28  injury' and to limit it to bodily injury, but it did not.").

whether it encompasses the claims here) must be determined by the arbitrator.

"Courts should *not* assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (emphasis added; citation omitted). This is a "heightened standard." *Rent-a-Center, West, Inc. v. Jackson*, 561 U.S. 63, 69 n.1 (2010); *see also Ajamian v. CantorCO2e, L.P.*, 203 Cal. App. 4th 771, 784 (1st Dist. 2012) (party seeking delegation bears a "heavy" burden). "Even broad arbitration clauses that expressly delegate the enforceability decision to arbitrators may not meet the clear and unmistakable test, where other language in the agreement creates an uncertainty in that regard." *Ajamian*, 203 Cal. App. 4th at 792. "As a general matter, where one contractual provision indicates that the enforceability of an arbitration provision is to be decided by the arbitrator, but another provision indicates that the *court* might also find provisions in the contract unenforceable, there is no clear and unmistakable delegation of authority to the arbitrator." *Id.* (emphasis in original; citation omitted); *see also Dennison v. Rosland Capital LLC*, 47 Cal. App. 5th 204, 209-10 (2d Dist. 2020).

Here, there is no such "clear and unmistakable" evidence; at best, the Terms are ambiguous. *Vargas v. Delivery Outsourcing, LLC*, 2016 WL 946112, at *7-*8 (N.D. Cal. Mar. 14, 2016). For example, the exception states that "either of us may file a lawsuit in a federal or state court located within Los Angeles County, California, *and we both consent to the jurisdiction of those courts for such purposes*." (Tobias Ex. 41 at 144 (emphasis added).) Defendants cannot "consent to the jurisdiction" of the courts for purposes of claims involving the conditional license while also reserving the right to compel others to arbitration in such cases. And there is no reference to appearing before an arbitrator prior to filing a lawsuit in court. The most natural reading of the delegation clause is thus that it does not apply to claims involving the conditional license *at all*, and that disputes about the exception's scope are for the Court, not an arbitrator. *See NASDAQ OMX Grp., Inc.*

1   *v. UBS Secs. Inc.*, 770 F.3d 1010, 1031-32 (2d Cir. 2014) (where arbitration clause

2   is subject to an express carveout, "far from 'clear and unmistakable' that" scope of

3   carveout was delegated to arbitrator); *Armor All/STP Prods. Co. v. TSI Prods., Inc.*,

4   337 F. Supp. 3d 156, 166 (D. Conn. 2018) (similar); *see also Archer & White Sales,*

5   *Inc. v. Henry Schein*, *Inc.*, 935 F.3d 274, 282 (5th Cir. 2019) ("The parties could

6   have unambiguously delegated this question [to an arbitrator], but they did not, and

7   we are not empowered to re-write their agreement."), *cert dismissed*, 141 S. Ct. 656

8   (2021).[30]

9        Later in the Terms, the delegation clause refers "disputes arising out of or

10  relating to … this Agreement" to an arbitrator, but this language is immediately

11  preceded by a sentence referencing "[t]his arbitration agreement" (with "agreement"

12  in lower case). The use of defined and generic terms so close together denotes a

13  difference between the two, and, at a minimum, creates confusion on what exactly is

14  being delegated. The best interpretation is that "Agreement" refers to the Terms

15  other than the arbitration provision, and thus that the arbitrator has been delegated

16  disputes regarding the "Agreement," but not the arbitration provision. Under this

17  interpretation, arbitrability is for the Court to decide, which is the default rule.

18       Moreover, the limitation of liability provision in the Terms purports to limit

19  liability to consumers to the greater of $100 or the amount that the consumer has

20  paid in the past twelve months, thereby purporting to limit claims for most

21  consumers to small claims (*i.e.*, claims for $10K or less) under California law. (*E.g.*,

22  Tobias Ex. 41 at 144.) Later in the Terms, the small claims exception provides,

23

24       [30] *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1075-76 (9th Cir. 2013),
     is not to the contrary. The arbitration clause there covered "any claim arising out of"

25  a licensing agreement, but also exempted a subset of claims involving "the TCK
     license." *Id.* The "TCK license," however, was part of the licensing agreement, so

26  the delegation clause effectively covered any licensing-related disputes. *Id.* Here, by

27  contrast, there is no such issue: the conditional license exception plainly exempts

28  from arbitration claims like Plaintiffs' that "involve" the conditional license.

1   "You may assert claims in small claims court if your claims apply." *Id.* Consumers

2   would have understood these provisions to mean that they may assert their claims in

3   court – again, with no reference to appearing before an arbitrator (which would be

4   unduly burdensome, especially for small claims). This is an additional reason that

5   the delegation provision cannot be read to apply to claims within the exception. If it

6   were read to apply, it would conflict with the plain terms of the exception and be

7   anything but "clear and unmistakable." *E.g.*, *Ajamian*, 203 Cal. App. 4th at 792; *see*

8   *also Monster Energy Co. v. Olympic Eagle Distrib. & King Bev., Inc.*, 2015 WL

9   12781213, at *3 (C.D. Cal. Sept. 29, 2015) (similarly ambiguous delegation clause

10  did not clearly and unmistakably delegate to arbitrator questions of exception's

11  scope).[31]

12  **V.     THE DELEGATION AND ARBITRATION CLAUSES ARE
        UNCONSCIONABLE**

13

14      Finally, even if this Court disagrees with Plaintiffs on all of Points I-IV *supra*,

15  the Terms' delegation clause and arbitration agreement are unenforceable because

16  they are unconscionable. After this Court's decision in *Dickey*, the California

17  Supreme Court clarified the law regarding procedural and substantive

18  unconscionability of arbitration and other agreements. *OTO, L.L.C. v. Kho*, 8 Cal.

19  5th 111, 125-38 (2019), *cert. denied*, 141 S. Ct. 85 (2020). The Court held that the

20  more substantive unconscionability is present, the less procedural unconscionability

21  is required; and, for the first time, the Court held that the converse is also true. *Id.* at

22

23      [31] Defendants also argue (at 20 n.5) that certain disputes are delegated to the
    arbitrator because the Terms references JAMS' rules. This argument fails for the
24  same reason as Defendants' other "delegation" arguments – because the delegation
    is not clear and unmistakable, it is ineffective. In addition, a mere reference to the
25  JAMS rules is insufficient for delegation, because courts find such implied
    delegation only where the parties are "sophisticated." *Eiess v. USAA Fed. Savings*
26  *Bank*, 404 F. Supp. 3d 1240, 1252-54 (N.D. Cal. 2019). Here, Defendants have
    submitted no evidence that any Plaintiff "possesses a heightened level of
27  sophistication," and there is thus no implied delegation. *Id.*

28

1  146 (Chin, J., dissenting) (characterizing majority decision's rule as "new"). Here,

2  applying "the majority's new rule" in *OTO*, both types of unconscionability apply to

3  the delegation clause, the arbitration clause, and the agreement as a whole (including

4  a purported one-sided limitation on liability for federal antitrust claims). Some of

5  the reasons overlap, but each provision is independently unconscionable.

### A.   Procedural Unconscionability

7  Procedural unconscionability addresses "the circumstances of contract

8  negotiation and formation, focusing on oppression or surprise due to unequal

9  bargaining power." *Id.* at 125 (citations omitted). In *Dickey*, the Court did not

10  address these issues regarding procedural unconscionability because it concluded

11  the plaintiffs failed to demonstrate substantive unconscionability with respect to the

12  delegation clause. 2019 WL 9096443, at *9.

### 1.   Adhesion

14  The delegation clause and arbitration agreement are procedurally

15  unconscionable because they are part of a contract of adhesion, *i.e.*, a contract that is

16  "standardized, generally on a preprinted form, and offered by the party with superior

17  bargaining power on a 'take-it-or-leave-it basis.'" *OTO*, 8 Cal. 5th at 126 (citation

18  omitted). The Terms constitute a contract of adhesion because they were

19  standardized, pre-printed, and offered by Defendants (who have superior bargaining

20  power) to consumers on a take-it-or-leave-it basis.

### 2.   Oppression

22  Oppression exists where "a contract involves lack of negotiation and

23  meaningful choice" and is established by circumstances including "(1) the amount

24  of time the party is given to consider the proposed contract; (2) the amount and type

25  of pressure exerted on the party to sign the proposed contract; (3) the length of the

26  proposed contract and the length and complexity of the challenged provision; (4) the

27  education and experience of the party; and (5) whether the party's review of the

28  proposed contract was aided by an attorney." *Id.* at 126-27 (citations omitted).

Oppression is present here for multiple reasons. *First*, consumers were given only minutes to review and consider the Terms, including the delegation clause and arbitration agreement, and then to complete other steps required to purchase their tickets, before their reservation/hold on the tickets was lost. (Pls. Decls. ¶ 7; Andre Decl. ¶¶ 53, 76-77.) *Second*, the loss of the reservation/hold was a real threat because tickets for desirable seats at popular shows were in high demand and sold out in minutes.[32] *Third*, the Terms are 6 pages and more than 50 paragraphs long. (*E.g.*, Tobias Ex. 41.) The arbitration agreement containing the delegation clause is buried near the end of the Terms at page 5 of 6 and in section 17 of 20. (*Id.* at 144.) As discussed above, consumers reading the first page of the Terms would have had notice of other policies and provisions, but not the arbitration or delegation clauses, prior to June 25, 2019, when the Terms were changed to add that notice and a table of contents. In addition, the arbitration agreement containing the delegation clause is 11 paragraphs long. (*Id.* at 144-45.) The delegation clause is buried at the end of the fifth paragraph in the middle of the arbitration agreement. (Tobias Ex. 141 at 144-45.) While other sentences in the arbitration agreement are written in bold and all caps and/or underlines, the delegation clause is not highlighted in any way. (*Id.* at 144-45.) *Fourth*, Plaintiffs do not have any formal legal education. (Pls. Decls. ¶ 2.) *Fifth*, consumers are unlikely to be aided by an attorney in reviewing the Terms.

### 3.  <u>Surprise</u>

Surprise is present where "the allegedly unconscionable provision is hidden within a prolix printed form." *OTO*, 8 Cal. 5th at 126 (citation omitted). Here, as discussed above, until June 25, 2019, the arbitration agreement was buried on the fifth page of the hyperlinked Terms, and the delegation clause was buried within the arbitration agreement. In addition, as discussed above, Defendants argue a new

---

[32] *See* N.Y. Attorney General, *Obstructed View: What's Blocking New Yorkers from Getting Tickets* at 15 (2016), https://ag.ny.gov/pdfs/Ticket_Sales_Report.pdf.

Case No. 2:20-cv-03888-GW-GJS
PLAINTIFFS' OPPOSITION TO DEFENDANTS' AMENDED MOTION TO COMPEL ARBITRATION

1  interpretation of the agreement's exception, which is contrary to its plain language

2  and their prior interpretation to this Court (and thus surprising). *E.g.*, *Geoffroy v.*

3  *Wash. Mut. Bank*, 484 F. Supp. 2d 1115, 1121-22 (S.D. Cal. 2007) (finding

4  procedural unconscionability where terms were "somewhat misleading" and

5  amounted to unfair "surprise").

6      **B.    Substantive Unconscionability**

7      Substantive unconscionability pertains "to the fairness of an agreement's

8  actual terms and to assessments of whether they are overly harsh or one-sided."

9  *OTO*, 8 Cal. 5th at 125 (citation omitted); *see also Perez v. DirecTV Grp. Holdings,*

10 *LLC*, 251 F. Supp. 3d 1328, 1346-48 (C.D. Cal. 2017).

11     **1.    Delegation Clause**

12     "[A delegation] clause may be found substantively unconscionable where it

13 imposes an unfair burden that is different from the inherent features and

14 consequences of delegation clauses." *Pinela v. Neiman Marcus Grp.*, 238 Cal. App.

15 4th 227, 246 (1st Dist. 2015).

16     As discussed above, the Terms' arbitration agreement contains a number of

17 carveouts from arbitration, including the conditional license exception that applies

18 to Plaintiffs' claims here. The delegation clause does not clearly and unmistakably

19 delegate issues regarding those carveouts to an arbitrator. However, Defendants'

20 new, post-*Dickey* interpretation of the carveouts – if accepted – would permit

21 Defendants to file the claims they want in court without delegation to an arbitrator,

22 but effectively prohibit consumers from doing the same. As numerous courts have

23 held, a lopsided situation where the stronger party may file in court, but force its

24 weaker counterparties to arbitrate, is inherently unfair. *E.g.*, *Ferguson v.*

25 *Countrywide Credit Indus., Inc.*, 298 F.3d 778, 784-85 (9th Cir. 2002); *McGuire v.*

26 *JP Morgan Chase Bank, N.A.*, 2010 WL 11587069, at *3 (N.D. Cal. July 8, 2010);

27

28

1  *Fitz v. NCR Corp.*, 118 Cal. App. 4th 702, 725 (4th Dist. 2004).[33]

2  Moreover, unlike consumers, Defendants are not limited to judicial or arbitral

3  remedies, and they can punish consumers through *self-help* even as they force those

4  same consumers to arbitrate gateway issues. Ticketmaster can, for example,

5  supposedly force a consumer to arbitrate whether a carveout applies to their claims

6  *and* simultaneously kick that consumer off ticketmaster.com or the Ticketmaster

7  mobile site. The consumer that would otherwise have a court's preliminary

8  injunctive power available to her thus would have no ability to fight back in the

9  interim, and all because of the delegation clause Defendants impose on consumers,

10  but not themselves. This non-judicial power is one-sided. *Flores v. Transamerica*

11  *HomeFirst, Inc.*, 93 Cal. App. 4th 846, 854 (1st Dist. 2001) (arbitration agreement

12  that permitted franchisor to seek non-judicial remedies, even pending arbitration,

13  was substantively unconscionable); *see also Swain v. LaserAway Med. Grp., Inc.*,

14  270 Cal. Rptr. 3d 786, 799 (2d Dist. 2020) (arbitration agreement that "lack[ed]

15  mutuality" had "high degree of substantive unconscionability" and was

16  unconscionable despite minimal procedural unconscionability).

17  Furthermore, although the Terms promise class members that they can bring

18  "small claims" in small claims court, the delegation clause (under Defendants'

19  interpretation) makes this an empty promise. The Terms include a small claims

20  carveout, just as they include the conditional license carveout. Nevertheless,

21  Defendants now essentially argue that the delegation clause permits them to compel

22  a consumer to arbitration to determine whether their small claim fits within the

23  carveout for such claims. Such a result, which is clearly aimed at dissuading even

24  the smallest of claims against Defendants (while not similarly constraining

25  Defendants), renders the small claims carveout illusory and one-sided.

26  _____

27  [33] *See also Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1173-74 (9th Cir.
2003); *Carmona v. Lincoln Millennium Car Wash, Inc.*, 226 Cal. App. 4th 74, 86

28  (2d Dist. 2014).

1   These facets of the delegation clause render it substantively unconscionable
2   because it is an added deterrent or obstacle for consumers to pursue their claims –
3   according to Defendants, consumers need an arbitrator's blessing before going to
4   court to pursue claims limited to small amounts. *E.g.*, *Pinela*, 238 Cal. App. 4th at
5   249-50; *Cerneka v. Russell No. 8 Santa Monica Props., LLC*, 2018 WL 3154565, at
6   *9-*10 (2d Dist. June 28, 2018).

7   In *Dickey*, the plaintiff did not argue substantive unconscionability of the
8   delegation provision. 2019 WL 9096443, at *9 & n.9. In addition, Defendants did
9   not argue their new one-sided interpretation of the conditional license exception. *Id.*

10   **2.   Arbitration Agreement as a Whole**

11   The arbitration agreement as a whole (including the delegation provision) is
12   also substantively unconscionable because it is itself one-sided.

13   As discussed above in Section III, the conditional license exception is a
14   carveout from the scope of the arbitration provision, and Defendants' interpretation
15   of the exception, and therefore the remaining scope of the arbitration provision, is
16   one-sided and therefore substantively unconscionable.

17   Moreover, the Terms' limitation of liability provision is one-sided. As
18   discussed above, this provision purports to limit liability from consumers to the
19   greater of $100 or the amount that the consumer has paid in the past twelve months,
20   and to waive consequential and multiple damages and attorneys' fees. But the
21   limitations do not apply to claims by a Defendant against a consumer. (*E.g.*, Tobias
22   Ex. 41 at 144.) This is one-sided and substantively unconscionable, especially as
23   applied to claims under federal antitrust statutes providing for compensatory and
24   treble damages and attorneys' fees. *E.g.*, *Ingle*, 328 F.3d at 1178-79; *Rosendahl v.*
25   *Bridgepoint Educ., Inc.*, 2012 WL 667049, at *10 (S.D. Cal. Feb. 28, 2012); *Bridge*
26   *Fund Capital Corp. v. Fastbucks Franchise Corp.*, 2008 WL 3876341, at *8 (E.D.
27   Cal. Aug. 20, 2008); *Bakersfield College v. Cal. Community College Athletic Ass'n*,
28

1   41 Cal. App. 5th 753, 767 (3d Dist. 2019).[34]

2       Finally, the arbitration agreement waives a jury trial even with respect to non-

3   arbitrable claims. *See, e.g.*, *Dougherty v. Roseville Heritage Partners*, 47 Cal. App.

4   5th 93, 107 (3d Dist. 2020).

5       All of these problems together show that substantive unconscionability

6   permeates the arbitration agreement and renders it unenforceable. *Armendariz v.*

7   *Found. Health Psychcare Servs.*, 24 Cal. 4th 83, 124 (Cal. 2000) (finding contract

8   permeated and thus invalid where "no single provision" could be stricken "in order

9   to remove the unconscionable taint from the agreement"); *see also Bakersfield*

10  *College*, 41 Cal. App. 5th at 770 (finding permeation and declining to sever where

11  "the arbitration agreement contains several serious defects – most significantly the

12  lack of mutuality"); *Subcontracting Concepts (CT), LLC v. De Melo*, 34 Cal. App.

13  5th 201, 215 (1st Dist. 2019) (similar); *Mercuro v. Superior Ct.*, 96 Cal. App. 4th

14  167, 185 (2d Dist. 2002) (similar). In *Dickey*, the Court did not reach these issues.[35]

15                          **CONCLUSION**

16      Plaintiffs respectfully request that the Court deny Defendants' Amended

17  Motion to Compel Arbitration.

18

19

20

21

22

---

23  [34] The limitation of liability provision states that it does not apply where

24  "applicable law" provides otherwise, but it lists only state law, including New Jersey

25  law, not federal law. (Tobias Ex. 41 at 144.) At a minimum, this imposes another
    deterrent or obstacle that consumers must overcome to pursue their claims.

26  [35] If the Court grants Defendants' motion, this case should be stayed, rather than

27  dismissed. *E.g.*, *MediVas, LLC v. Marubeni Corp.*, 741 F.3d 4, 9 (9th Cir. 2014).
    This will allow the Court to retain jurisdiction to resolve any remaining issues and is

28  consistent with this Court's practice. *Dickey*, 2019 WL 9096443, at *10.

1 | DATED: March 19, 2021

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By  /s/ *Frederick A. Lorig*

Frederick A. Lorig (Bar No. 057645)
fredlorig@quinnemanuel.com
Kevin Y. Teruya (Bar No. 235916)
kevinteruya@quinnemanuel.com
Adam B. Wolfson (Bar No. 262125)
adamwolfson@quinnemanuel.com
William R. Sears (Bar No. 330888)
willsears@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

*Attorneys for Plaintiffs* Mitch Oberstein,
Gary Matty, and Sophie Burke, on behalf
of themselves and all those similarly
situated

1
2
3
4
5
6

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Warren Postman (Bar No. 33069)
wdp@kellerlenkner.com
Albert Pak (admitted *pro hac vice*)
albert.pak@kellerlenkner.com
KELLER LENKNER LLC
1300 I Street, N.W., Suite 400E
Washington, D.C. 20005
(202) 749-8334

Benjamin Whiting (admitted *pro hac vice*)
ben.whiting@kellerlenkner.com
KELLER LENKNER LLC
150 N. Riverside Plaza, Suite 4270
Chicago, Illinois 60606
(312) 741-5220

*Attorneys for Plaintiffs* Mitch Oberstein,
Gary Matty, and Sophie Burke, on behalf
of themselves and all those similarly
situated

# Declaration of Adam Wolfson
# Attachment 2

# FILED UNDER SEAL

1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
2    Frederick A. Lorig (Bar No. 057645)
     fredlorig@quinnemanuel.com
3    Kevin Y. Teruya (Bar No. 235916)
     kevinteruya@quinnemanuel.com
4    Adam B. Wolfson (Bar No. 262125)
     adamwolfson@quinnemanuel.com
5    William R. Sears (Bar No. 330888)
     willsears@quinnemanuel.com
6
7  865 South Figueroa Street, 10th Floor
   Los Angeles, California 90017-2543
8  Telephone:  (213) 443-3000
   Facsimile:   (213) 443-3100
9
   (additional counsel listed on signature page
10 of Plaintiffs' Opposition to Defendants'
   Amended Motion to Compel Arbitration)
11
12 Attorneys for Plaintiffs
13
14
15              UNITED STATES DISTRICT COURT
16        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
17 Mitch Oberstein, Gary Matty, and      CASE NO. 2:20-cv-03888-GW-GJS
   Sophie Burke on behalf of themselves
18 and all those similarly situated,     **DECLARATION OF DR.
                                         ANTHONY D. ANDRE**
19              Plaintiffs,
                                         The Honorable George H. Wu
20       v.
21 Live Nation Entertainment, Inc., and
   Ticketmaster LLC,
22
                Defendants.
23
24        **DECLARATION OF DR. ANTHONY D. ANDRE**
25
26
27
28

# TABLE OF CONTENTS

**Page**

I.      Experience and Qualifications ........................................................ 1

II.     Summary of Opinions ................................................................... 3

III.    Human Factors Principles Related to the Design of the Terms of Use ......... 7

        A.      Web Designers Can and Do Take Advantage of the Fallible
                Nature of Human Perception to Manipulate User Conduct ............... 7

        B.      Web Designers Frequently Deploy Prominent Design Features
                When They Want Users to Notice Hyperlinked Terms of Use ......... 11

        C.      Discovery Produced By Defendants Confirms They Were
                Familiar With These Common and Prominent Design Features ........ 21

IV.     The Ticketmaster and Live Nation Terms of Use Are Not Designed to
        Be Conspicuous to Users ............................................................ 25

        A.      The Sign-Up Screens Are Not Conspicuous to Users ................... 29

        B.      The Sign-In Screens Are Not Conspicuous to Users .................... 39

        C.      The Place Order Screens Are Not Conspicuous to Users .............. 41

        D.      The Other References to the Terms of Use on the Ticketmaster
                and Live Nation Websites Are Not Conspicuous to Users ............. 43

V.      The Terms of Use Failed to Provide Conspicuous Notice of Their
        Arbitration Provision Prior to June 2019 ...................................... 47

VI.     Conclusion ........................................................................... 49

**ER72**

## I.   Experience and Qualifications

1.   I received my B.S., M.A., and Ph.D. in Human Factors and Ergonomics (then called Engineering Psychology) from the University of Illinois at Urbana-Champaign in 1991.  I am the Founder and Principal of Interface Analysis Associates, a human factors, usability, and ergonomics consulting firm in business since 1993. My firm performs user interface design, user interface evaluation, and usability testing services, with over 1,500 clients in our 27 years of business.  We operate a custom usability testing lab (for many years, two labs) that has afforded us the ability to observe tens of thousands of actual users interact with various product interfaces, including web sites, desktop software, and smartphone applications.  We have designed, evaluated, and tested hundreds of web and software interfaces.

2.   Since 1993, I have been an Adjunct Professor in both the Department of Industrial & Systems Engineering and the Department of Psychology.  I'm also a founding faculty member of the graduate Human Factors/Ergonomics Program at San Jose State University.  This is now the largest graduate program of its kind in the United States and is ranked #3 among similar programs.

3.   In my 28-year role as a Human Factors and Ergonomics professor, I have taught courses on, among other subjects, Human Cognition, Engineering Psychology and Human Factors, User Research Methods & Usability Testing, Cognitive Engineering, Human Factors Research Methods, and Ergonomics.  These courses are relevant to my opinions because they bear on my mastery of the science and literature related to how users perceive and interact with information user interfaces such as the presentation of online terms of use.  I have also advised numerous graduate students on theses regarding similarly relevant topics in human factors, such as perception, attention, salience coding, comprehension, and conspicuity.

4.   I hold a Board Certification in Professional Ergonomics (CPE).  I was previously elected President (2010), and then Fellow (2012), of the Human Factors and Ergonomics Society, the largest organization of Human Factors Professionals.  I

was more recently (2020) elected a Fellow of the International Ergonomics Association (IEA), one of only 134 people to ever achieve that designation.

5.   I have published and presented extensively on human factors issues, including an article on design functions from a user's perspective.[1]  I have also published on the application of human factors analysis to fields such as healthcare, aviation, and consumer products.

6.   Among other honors and awards, in 2019 I received the *Arnold M. Small President's Distinguished Service Award*, from the Human Factors and Ergonomics Society.  This award recognizes individuals whose career-long contributions have brought honor to the profession and the Society.  In 2016, I was the inaugural winner of the *Ergonomist Practitioner of the Year* Award, from the Foundation for Professional Ergonomics.  In 2009, I was selected as the Winner of the *User-Centered Design Award*, from the Product Design Technical Group of the Human Factors and Ergonomics Society (HFES).  Also in 2009, I was designated the *Outstanding Lecturer of the Year*, from the Davidson College of Engineering, San Jose State University.

7.   My qualifications and publications are set forth in more detail in my curriculum vitae, which is attached as Appendix A to this declaration.

8.   I am being compensated at a rate of $450/hour.  My compensation is not dependent on my conclusions, and the opinions expressed here are my own.

9.   A list of the materials I considered in the process of preparing this declaration is listed in Appendix B.  A list of cases in which I have provided expert testimony over the past four years is attached as Appendix C.

---

[1]   *See, e.g.*, Andre, A.D. and Segal, L.D. (1998, July).  *Design Functions: The User's Perspective*. Ergonomics in Design. Santa Monica: HFES.

**ER74**

## II.    Summary of Opinions

10.    I have been retained by Plaintiffs' counsel in the above-captioned matter to analyze whether the hyperlinked Terms of Use on Ticketmaster and Live Nation's desktop and mobile websites and their related "textual notices" (*i.e.*, the language used to introduce the Terms of Use hyperlinks) are conspicuous or recognizable to users and whether they conform to user interface design principles or best practices.[2] I analyze this factual issue from the perspective of a user exercising an ordinary level of care under the circumstances, consistent with the manner in which this issue is analyzed in the field of my expertise.

11.    Based on my expertise in this field, the Terms of Use hyperlinks and their textual notices are inconspicuous in the actual context of use and do not conform to accepted user interface design principles or known best practices.  Further, I conclude that the design of the websites at issue here appear to have been purposefully designed to minimize the conspicuousness of the hyperlinked Terms of Use and their textual notices.  Moreover, since this lawsuit was filed, Defendants have added a "check box" adjacent to the textual notice, which users need to click in order to complete ticket purchases—something Defendants could have done before this lawsuit was filed.  Finally, I conclude that even users who clicked on the Terms of Use are unlikely to have noticed or read the arbitration clause contained near the bottom of the Terms of Use "document," at least prior to June 2019, after which a summary of the arbitration notice was placed at the beginning of the Terms of Use.

12.    The Terms of Use suffer from the following design flaws:

- The textual notices stating users supposedly agree to the Terms of Use are not displayed prominently to users.  In fact, the textual notices are less noticeable

---

[2] I understand there is a dispute about which (if any) Live Nation and Ticketmaster entities are parties to the Terms of Use, and my references to "Live Nation" and "Ticketmaster" should not be taken to suggest that any particular entity is a party to the Terms of Use. Relatedly, when I refer to "Defendants" in this declaration, I mean "Ticketmaster LLC" and "Live Nation Entertainment, Inc."

than other text on the screen. They are displayed using smaller font, lighter perceived color through reduced "opacity," and lower contrast than other text on the same page, rendering them effectively invisible to users in context.

- The Terms of Use do not conform to usability best practices such as underlining the hyperlinks to the Terms of Use. As a result, the Ticketmaster and Live Nation websites lack a clear indication that users should click on the Terms of Use, and users are less likely to notice them.

- The textual notices to the Terms of Use are not presented using simple, straightforward language that explains the purpose and significance of the Terms of Use. Instead, the textual notices suggest that agreement with the Terms of Use is a "fait accompli." The textual notices suggest that by merely completing a specific goal (*e.g.*, "signing in"), a user has agreed to the Terms of Use, which does not communicate to a user that they should make an independent decision as to whether to agree to the Terms of Use. The effect of this design choice is that even if a user happens to *see* the textual notice to the Terms of Use, the user is highly unlikely to understand or appreciate their purpose and significance.

- The Terms of Use hyperlinks and textual notices are not given dedicated real estate on the Ticketmaster and Live Nation websites. This makes it even less likely that users will notice the Terms of Use.

- The Terms of Use hyperlinks and textual notices lack a title or subtitle. Instead, the Terms of Use hyperlinks and textual notices are presented either just above the action/goal button of the screen in question, or "below the fold" in the web site footer; that is, one or more screens below the user focus, which requires scrolling to reach. This further reduces the likelihood users will notice the Terms of Use or understand or appreciate their purpose and significance.

- The Terms of Use as presented do not require any form of explicit acknowledgement or agreement. That is, they lack a "checkbox" or a similar forcing function that requires users to acknowledge their assent to the Terms of Use before being able to continue with their transaction. This is important because users are highly unlikely to pause to interact with, notice, understand, appreciate, or read the Terms of Use absent some kind of forcing function. And combined with the above-mentioned defects, the lack of a forcing function all but eliminates the possibility users will notice, understand, or appreciate the Terms of Use.

13. In this report, I examine each of the screens put forward by Defendants as purportedly providing users with notice of the Terms of Use, and I conclude that all of these screens suffer from the above-mentioned design flaws. *See infra* § IV. I ground this analysis in a review and discussion of the relevant literature and design

principles, which I lay out before I discuss each of Defendants' specific screens (as well as the underlying code of the screens themselves), because doing so provides important context for my opinions. *See infra* § III.A-B.

14. Moreover, discovery produced by Defendants also supports my opinion and is consistent with my discussion of these design principles. As I detail later in the report, *infra* § III.C, it shows that Defendants were aware of these prominent design features and deliberately chose not to utilize them for the Terms of Use. For example, Defendants' internal documents show that Defendants were aware that using a checkbox or "Opt-In Box" for the Terms of Use would ensure "***the fan will be focused on the message***."[3] The documents also show that, after this lawsuit was filed, Defendants "Start[ed] development for Accept/opt-in disclosure/TOU in Checkout"—*i.e.*, Defendants began developing an "opt-in disclosure" or checkbox that would require users to acknowledge and assent to the Terms of Use before making ticket purchases on the Ticketmaster and Live Nation websites.[4] I understand Defendants have now implemented this change on their websites. This demonstrates that Defendants previously designed the Terms of Use to *minimize* the likelihood that users would "be focused on the message"—otherwise, they would have utilized more prominent design choices, instead of inconspicuous design choices, for the Terms of Use.

15. I have also analyzed the underlying code on the Ticketmaster and Live Nation websites, which is publicly available. This analysis shows that Defendants have deliberately and manually altered the coding for the Terms of Use hyperlinks and textual notices to make them less visible and salient than other text on their

---

[3] *See* TM00000063 (July 24, 2020 email) (emphasis added throughout unless otherwise noted).

[4] TM00000197 (July 23, 2020 email).

Case No. 2:20-cv-03888-GW-GJS
DECLARATION OF DR. ANTHONY D. ANDRE

websites.  Thus, the evidence indicates that Defendants intentionally designed the Terms of Use to be *in*conspicuous.

16.   Defendants' choices of conspicuous designs in other contexts, but inconspicuous designs for the Terms of Use, further confirm that the Terms of Use were deliberately structured to be inconspicuous and not to implement best practices even known to Defendants.  In other words, Defendants' different choices reveal they understood and appreciated the effect of those choices.

17.   My report proceeds as follows.  In Section III.A, I explain how human factors analysis and cognitive science can be used in a negative manner to purposely dissuade users from noticing or interacting with certain elements of online interfaces (such as terms of use), instead of supporting effective interaction and discovery.  As I explain, such negative design choices are often referred to as "dark patterns" in the relevant literature.  In Section III.B, I contrast such "dark patterns" with common design choices that make it *more* (rather than less) likely that users will notice hyperlinked terms of service.  I also show how other websites and Defendants themselves commonly employ such design choices (albeit not for the Terms of Use hyperlinks and textual notices).

18.   In Section IV, I apply human factors analysis to the ticketmaster.com and livenation.com desktop and mobile websites to show that they deploy "dark patterns" that render the Terms of Use inconspicuous to users.  And because Defendants used more prominent design features coupled with forcing functions to produce explicit choice points on other portions of their websites, I conclude that Defendants intentionally designed their websites to minimize the likelihood that users notice the Terms of Use.

19.   In Section V, I address another flaw in the Terms of Use:  prior to June 2019, the arbitration provision in the Terms of Use did not appear until several pages into the Terms, rendering it less discoverable and highly unlikely to be noticed or

Case No. 2:20-cv-03888-GW-GJS
DECLARATION OF DR. ANTHONY D. ANDRE

read.  Thus, prior to June 2019, even users that clicked on the Terms of Use were unlikely to notice that the Terms of Use contained an arbitration provision.

**III.**   **Human Factors Principles Related to the Design of the Terms of Use**

    **A.**   **Web Designers Can and Do Take Advantage of the Fallible Nature of Human Perception to Manipulate User Conduct**

20.   In evaluating hyperlinked terms of use and related textual notices, human factors analysis is important because it teaches that human perception is inherently fallible.  Research shows that people often fail to notice critical details, even when those details are right in front of them.  In one famous study, participants were asked to watch a video and count the number of times a group of players passed a basketball back and forth.  Midway through the video, a person dressed in a gorilla suit walks across the screen.  Many participants failed to notice the gorilla, because they were focused on counting the number of passes, and thus had developed what is referred to as "inattentional blindness" or "change blindness" to other events on the screen.[5]

21.   This same principle—that humans can develop "inattentional blindness" to important details—applies in the web design context.  Indeed, human factors principles and analyses have been applied to website design for many years.  There are two important findings among the many articles that have been published on this subject.

22.   *First*, users are goal-oriented and scan web sites until they find information or functions that satisfy their goals.[6]  Users are also heavily influenced by the organization, grouping, layout, separation, and salience of information.  This

---

[5]   *See* Drew, T., Vo, M., & Wolfe, J., *The invisible gorilla strikes again: Sustained inattentional blindness in expert observers*, Psychological Science, 24, 1848-1853 (2013); *see also* Rensink, Ronald A.; O'Regan, J. Kevin; Clark, James J., *To See or not to See: The Need for Attention to Perceive Changes in Scenes*, Psychological Science 8 (5), 368-373 (1997).

[6]   *See, e.g.*, Steve Krug, *Don't Make Me Think: A Common Sense Approach to Web Usability* (2005).  New Riders: 2nd Edition.  ISBN-13: 978-0321344755.

Case No. 2:20-cv-03888-GW-GJS
DECLARATION OF DR. ANTHONY D. ANDRE

is in part because users typically have limited time to process the layout and content of websites. Such time constraints result both from limitations imposed by websites (such as time constraints to complete a purchase) and practical constraints that prevent most users from spending extensive amounts of time poring over websites with multiple hyperlinks.[7]

23.     *Second*, website design often utilizes cognitive science and behavioral psychology to affect user behavior, including by rendering certain aspects of the website effectively "invisible," less conspicuous to the user, or difficult to notice, comprehend, or interact with. Such design choices are known as "dark patterns"— design interfaces that "knowingly confuse users, make it difficult for users to express their actual preferences, or manipulate users into taking certain actions."[8]

24.     "Dark patterns" are sometimes deployed by businesses to achieve business goals, but at the expense of users trying to achieve their own objectives that may be in tension with the business's goals. As one article explains, dark patterns can "deceiv[e] users into making unintended and potentially harmful decisions."[9]

25.     Reflecting the increased awareness that dark patterns can manipulate user behavior, a bill to curb such practices was introduced to the United States Senate

---

[7]     *See, e.g.*, Written Testimony of Justin (Gus) Hurwitz, Associate Professor of Law at the University of Nebraska School of Law, Before the United States House of Representatives Committee on Energy and Commerce Subcommittee on Consumer Protection (Jan. 8, 2020), https://docs.house.gov/meetings/IF/IF17/20200108/110351 /HHRG-116-IF17-Wstate-HurwitzJ-20200108.pdf ("[P]eople are unwilling to devote a large amount of cognitive resources to relatively low value activities. As such, people skim when they read, often missing some details – particularly those that may be designed in a way that makes them relatively easier to miss.").

[8]     *See, e.g.*, Luguri, J. & Strahilevitz, L., *Shining a Light on Dark Patterns* 1-3 (Aug. 2019 draft), https://www.oag.ca.gov/sites/all/files/agweb/pdfs/privacy/shining-a-light-on-dark-patterns.pdf

[9]     *See* Arunesh Mathur et al., *Dark Patterns at Scale: Findings from a Crawl of 11K Shopping Websites* (Nov. 2019), https://arxiv.org/pdf/1907.07032.pdf.

Case No. 2:20-cv-03888-GW-GJS
DECLARATION OF DR. ANTHONY D. ANDRE

**ER80**

in 2019.[10]  And in 2020, California actually enacted the California Consumer Privacy

Rights Act ("CPRA") via ballot referendum, which places limitations on the use of

dark patterns by businesses and expressly provides that "agreement obtained through

use of dark patterns does not constitute consent."[11]

26.    As one article summarized the problem posed by dark patterns:  "website

developers aren't stupid.  They closely study behavioral psychology to understand

how internet users can be most easily misled."[12]  Of particular relevance here, it has

been documented that the Ticketmaster and Live Nation websites deploy dark patterns

to benefit themselves at the expense of users.[13]

27.    Consistent  with  the  above-referenced  literature,  statements  by

Defendants' own user experience ("UX") designers show that Defendants understood

that their design choices had a significant effect on the user experience, and that their

own goals were not always consistent with those of their users.  For example, Sara

---

[10]  S.1084 – Deceptive Experiences To Online Users Reduction Act, 116th Congress  (2019-2020),  https://www.congress.gov/bill/116th-congress/senate-bill/1084/text.

[11]  Cal. Civ. Code § 1798.140(h) (operative January 1, 2023).

[12]  David Lazarus, '*Dark patterns' are steering many internet users into making bad  decisions*,  L.A.  Times  (June  25,  2019), https://www.latimes.com/business/lazarus/la-fi-lazarus-dark-patterns-consumer-consent-20190625-story.html.

[13]  *See, e.g.*, Harry Brignull, *Types of Dark Patterns: Roach Motel*, https://darkpatterns.org/types-of-dark-pattern/roach-motel ("Ticket sales sites Livenation and Ticketmaster have engaged in a roach motel practices for a number of years. When purchasing some types of tickets, they try to sneak a subscription to a magazine . . . into your basket via a trick question on the checkout page[.]"); *see also* Luguri, J. & Strahilevitz, L., *Shining a Light on Dark Patterns* 1-3 (Aug. 2019 draft), https://www.oag.ca.gov/sites/all/files/agweb/pdfs/privacy/shining-a-light-on-dark-patterns.pdf (describing dark patterns on Ticketmaster's mobile app); Roger Dooley, *Dark Patterns: How Even Savvy Users Get Tricked*, Neuromarketing, https://www.neurosciencemarketing.com/blog/articles/dark-patterns.htm (describing dark patterns on Live Nation's website).

9

Case No. 2:20-cv-03888-GW-GJS
DECLARATION OF DR. ANTHONY D. ANDRE

Saito, a former Senior UX Designer at Ticketmaster North America, wrote that "*[b]usiness priorities can preclude optimal accessibility*."[14]

28.    Similarly, Josh Hickman, a Director (Product) at Ticketmaster, wrote during a discussion of the "legal text" on the Ticketmaster and Live Nation websites: "In my opinion, *the less friction the better*."[15]   I understand this reference to "less friction" to refer to the notion that a user should remain focused on completing ticket purchases, not other goals such as noticing, reading, or comprehending "legal text" that would distract or deter the user from making the purchase.

29.    Finally, I have reviewed documents produced by Defendants stating that their "Business Goal" was to "*Increase cart conversion*."[16]   I understand "conversion" here to refer to ticket sales—*i.e.*, the percentage of users browsing the site who are "converted" to purchasers by the end of their browsing session.[17]   This shows that Defendants considered "business goals" such as "increas[ing] cart conversion" when designing their websites.[18]

30.    As I show below, Defendants' designing their websites to minimize "friction" and "increase cart conversion" involved minimizing the likelihood users will notice the Terms of Use, their textual notices, and the arbitration provision within the Terms of Use.

---

[14]    *See About − Sara Saito*, https://www.visualgarden.net/about (last accessed Nov. 23, 2020).

[15]    *See* TM00000145 (July 18, 2019 email chain).

[16]    TM00000170 (Nov. 11, 2019 email).

[17]    *See* Tobias Dep. Tr. 78:16-17 ("My understanding of conversion is converting a prospective sale into a sale.").

[18]    *See also* Tobias Dep. Tr. 78:3-11 ("a goal in any business is to increase conversion").

Case No. 2:20-cv-03888-GW-GJS
DECLARATION OF DR. ANTHONY D. ANDRE

**B.    Web Designers Frequently Deploy Prominent Design Features When They Want Users to Notice Hyperlinked Terms of Use**

31.    Professional user experience ("UX") and user interface ("UI") designers are aware of the cognitive limitations described above, and these designers frequently apply known attention-demanding design choices when they want to ensure that users notice and understand they are agreeing to hyperlinked terms of use, regardless of whether the users actually read the terms of use.  While the absence of one of these design choices (discussed below) does not necessarily render hyperlinked terms of use inconspicuous, a failure to abide by some or all of them will often do so.  In addition, the failure to adhere to all or most of these design choices strongly suggests that terms of use were intentionally designed to be inconspicuous, because, as I show below, these design choices are common, easy to implement, well-known, widely used, and there is thus little legitimate reason to depart from them.  Simply stated, there are well established design conventions for the presentation of terms of use.[19]

32.    *Salience/Prominence*:  The terms of use hyperlink and textual notice should be as prominent as possible, attracting users to notice and read them by creating conspicuity.[20]   The terms of use hyperlink also should not be hidden,

---

[19]   Below, I use screenshots to provide examples of these design conventions. I note that not all of these screenshots embody every one of the attention-demanding design choices that I discuss in this report. As I discuss, though, different design choices can be implemented in different and varied ways to demand attention. What is most notable about the presentation of the Terms of Use hyperlinks and textual notices on the Ticketmaster and Live Nation websites is that they generally employ *none* of these attention-demanding design choices.

[20]   For examples of empirical literature discussing the importance of these types of design features, *see* Quanlong Zheng, Jianbo Jiao, Ying Cao, Rynson W.H. Lau; *Proceedings of the European Conference on Computer Vision (ECCV) - Task-driven Webpage Saliency*, pp. 287-302 (2018); *see also* Hsieh, P. J., Colas, J. T., & Kanwisher, N., *Pop-out without awareness: unseen feature singletons capture attention only when top-down attention is available*, Psychological science, 22(9), 1220-1226 (2011); G. Buscher, E. Cutrell., and M.R. Morris, *What do you see when*

1  obscured, or de-emphasized. The below example from Amerigas qualifies as a

2  salient/prominent presentation of terms of use:[21]



12      33.    ***Usability Best Practices***:  The presentation of the terms of use should

13  conform to usability best practices, including underlining the hyperlink to the terms

14  of use. Users have automatic recognition of underlined hyperlinks due to repeat

15  exposure—*i.e.*, users are conditioned to notice and understand that an underlined

16  hyperlink is one they can or should click on.[22]  Conversely, removing the underlining

17  _____

18  *you're surfing? Using eye tracking to predict salient regions of web pages*. Proc. CHI,

19  21-30 (2009). For a recent discussion of how UX and UI designers can adopt design
    choices that enhance the salience of apps for users, *see* Lisa Danilchik, *Visual*

20  *Salience: Evidence-Based Tips to Developing App Store Creatives*, App Store
    Optimization Blog (Apr. 14, 2020), https://splitmetrics.com/blog/how-to-develop-

21  app-store-creatives-to-improve-conversion-based-on-salience/.

22      [21]  It is common to use other websites as benchmarks for assessing usability, and

23  Defendants' own employees employed a similar methodology in the ordinary course
    of business.  For example, Emily Smith, a former Senior Product Designer at

24  Ticketmaster North America, noted that Ticketmaster "studied best in class
    eCommerce checkouts" in an attempt to "build a more streamlined and efficient

25  checkout experience."  *See* Emily Smith, *Ticketmaster One-Page Checkout*,

26  http://www.imemilysmith.com/one-page-checkout (last accessed Nov. 23, 2020).

27      [22]  *See, e.g.*, Baynard Institute, *Formatting Links for Usability* (Aug. 9, 2010),
    https://baymard.com/blog/formatting-links-for-usability ("If you see an underlined

28  word or sentence in a text online, you **immediately** conclude that it's a link. This is

─────────────────────────────────────

                                    12              Case No. 2:20-cv-03888-GW-GJS
                                        DECLARATION OF DR. ANTHONY D. ANDRE

1  *reduces* automatic user recognition.[23]  For example, the Taylor & Francis website

2  presents users with underlined terms of use:

> Taylor & Francis Group uses the details that you shared here to
> create an account for you.
> Taylor & Francis Group would also like to use your e-mail address
> to send you offers and information about related products and
> services that we think will be of interest to you.
> You may opt out of receiving these messages at any time by
> clicking unsubscribe.
>
> You can find more information in our Privacy Policy
>
> ☐ If you do not want to receive marketing communication from us,
>    please tick the box
>
> ☐ I agree to the Terms & Conditions
>
> SIGN UP
>
> Already have an account? Log in

18  34.  **Simplicity**:  The presentation of hyperlinked terms of use should avoid

19  confusion and complexity by presenting a single concept for the user to process.[24]  For

---

20  how links have looked from day one on the Internet and everyone (subconsciously)
21  grasp this fundamental principle.") (emphasis in original).

22  [23] *See, e.g.*, Norman Nielsen Group, *Guidelines for Visualizing Links* (May 9,
23  2004),  https://www.nngroup.com/articles/guidelines-for-visualizing-links/  ("To
    maximize the perceived affordance of clickability, **color** and **underline** the link text.
24  Users shouldn't have to guess or scrub the page to find out where they can click.")
25  (emphasis in original).

26  [24]  For examples of relevant human factors literature discussing this concept, *see*
    W. E. Hick, *On the rate of gain of information*, Quarterly Journal of Experimental
27  Psychology, 4:11-26 (1952); R. Hyman, *Stimulus information as a determinant of*
    *reaction time*, Journal of Experimental Psychology, 45:188-196 (1953); Barnett BJ,
28  Wickens CD, *Display Proximity in Multicue Information Integration: The Benefits of*

example, in the above two images the terms of use (or service) are presented singularly and without comingling of other concepts or topics. Further, as shown below, the online conferencing service Ex Ordo explains the significance of its terms of service using clear, simple language, not to mention use of a check-box and dedicated dialogue box to this one subject, which together result in explicit acknowledgment/agreement:



35. *Dedicated Real Estate*: The presentation of the hyperlinked terms of use should have dedicated real estate, grouped away from other information and actions.[25]

---

*Boxes*, Human Factors, 1988;30(1):15-24; Wickens CD & Carswell CM. *The Proximity Compatibility Principle: Its Psychological Foundation and Relevance to Display Design*, Human Factors, 37(3), 473-494 (1995).

[25] For examples of relevant human factors literature discussing this concept, *see* Bernard, M., Chaparro, B. and Thomasson, R., Finding Information on the Web: Does the Amount of Whitespace Really Matter, *Usability News*, 2, 1 (2000); *see also* Truchard, A. and Katz-Haas, R., *Ten Guidelines for User-Centered Web Design*. *Usability Interface*, 5, 12-13 (1998); *see also generally* Palmer, S.E., *Common region:*

1    CIT Bank's website provides a good example of this; it presents its terms and
2    conditions to users in a prominent window that attracts the user's eye, includes a
3    contextual header to this window ("Agree to Terms and Conditions"), and requires
4    the user to explicitly acknowledge the terms and conditions:



19        36.    **Title:**  The presentation of the hyperlinked terms of use should be framed
20   for the user by adding a title or sub-title to that section.[26]  See the above example for

22   *A new principle of perceptual grouping*, Cognitive Psychology, 24(3), 436-447
23   (1992).

24       [26]  For representative examples of the relevant literature on this topic, *see* Miller,
25   G. A., *The magical number seven, plus or minus two: some limits on our capacity for
     processing information*, Psychological Review, 63(2), 81-97 (1956); Tversky, A., &
26   Kahneman, D., *The framing of decisions and the psychology of choice*, Science,
27   211(4481), 453-458 (1981).  For an example of a website discussing and applying this
     concept, *see* Yale University, *Usability & Web Accessibility: Headings* (last accessed
28   Feb. 2, 2021), https://usability.yale.edu/web-accessibility/articles/headings.

1  CIT.  Also, consider the DocuSign example below, in which the terms of use are

2  introduced by a large and bold title:  "Please Review & Act on These Documents."

3  And again, notice use of the standard design approach which requires explicit

4  agreement prior to continuing the process:



## Please Review & Act on These Documents

Nha-Nghi Nguyen
San Jose State University

Please sign your letter of intent and CSU Questionnaire for Fall 2020 semester, thank you.

Please read the Electronic Record and Signature Disclosure.
[ ] I agree to use electronic records and signatures.

12  37.  The ORCID website presents another example of using headers ("Terms

13  of Use") to frame the content for the user:

**ER88**



38. ***Checkbox or Forcing Functions***:  Finally, the presentation of the hyperlinked terms of use and related textual notices should require explicit acknowledgement, such as use of a check box.[27]  Further, the presentation of the hyperlinked terms of use and textual notices should use forcing functions or

---

[27] *See, e.g.*, Interaction Design Foundation, *Forcing Functions* (last accessed Feb. 2, 2021), https://www.interaction-design.org/literature/book/the-glossary-of-human-computer-interaction/forcing-functions.  For examples of literature discussing the importance of forcing functions generally, *see* Norman, Donald A., *The Design of Everyday Things*, New York: Doubleday (1990); Beerens, Gijs & Damveld, Herman & Mulder, Max & Van Paassen, Marinus M., *Design of Forcing Functions for Identification of Human Control Behaviour*, Journal of Guidance, Control, and Dynamics, 33 (2009).

1  constraints to prevent continuation of the process until the terms of use are explicitly

2  acknowledged by the user; that is, until the checkbox is checked.  The simplest

3  example is use of a checkbox that does not allow continuation of a process until the

4  checkbox is checked, exemplified by the ORCID example above.  Another such

5  example is use of a dedicated dialogue box (shown above in the Ex Ordo and CIT

6  examples).  Yet another example is use of "scroll-wrap," a design feature by which a

7  user must scroll through the terms of use before agreeing to them.  Such features are

8  common, as shown in the examples below from Apple, VeraCrypt, Auto Express Inc.,

9  and Amazon:



Case No. 2:20-cv-03888-GW-GJS
DECLARATION OF DR. ANTHONY D. ANDRE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



19                          Case No. 2:20-cv-03888-GW-GJS

DECLARATION OF DR. ANTHONY D. ANDRE



39.    Simply stated, if one can't continue a process unless they agree to the terms of use, then one shouldn't be physically able to continue the process unless they agree to the terms of use.  In the examples above, the user cannot continue without committing an action (checking a checkbox, clicking an agree button, etc.) that results

in explicit agreement.  In contrast, one can continue any process on the Ticketmaster and Live Nation websites without any such explicit action or acknowledgement.

**C.      Discovery Produced By Defendants Confirms They Were Familiar With These Common and Prominent Design Features**

40.      From reviewing discovery materials produced by Defendants, I understand that their UX and UI designers were familiar with the above design features and took them into account when designing the Terms of Use hyperlinks and textual notices.  For example:

•      In July 2020, Defendants discussed modifying the Terms of Use to require users to check a customary "opt-in box" to demonstrate their assent to the Terms of Use.[28]  Under this design, a user would not be able to purchase tickets "until the user checks the box and agrees to terms."[29]  Many examples of this common industry standard have been shown above.  Defendants recognized that adopting such a design choice would ensure "*the fan will be focused on the message*."[30]  I understand that Defendants have now implemented this change, confirming that they considered it an improvement upon their prior "place order" screen.[31]

•      In another July 2020 email, Jessica Voelkner (Director of Product Management at Ticketmaster) noted that any updates to the Terms of Use "should use the best practices defined by WCAG 2.0 standards."[32]  "WCAG" here refers to the "Web Content Accessibility Guidelines," which are often used as a benchmark for what is necessary (though not always sufficient) for a website to satisfy basic accessibility (often measured by contrast) criteria.  That Defendants referenced the WCAG standards demonstrates that they understood the importance of following basic usability and accessibility guidelines (although, as noted below, they often failed to do so).

•      In a March 2020 email chain, Defendants' employees discussed how "moving the 'Place Order' button to the top of the order summary [] will increase

---

[28]    *See* TM00000063 (July 24, 2020 email).

[29]    *See* TM00000063 (July 24, 2020 email).

[30]    *See* TM00000063 (July 24, 2020 email).

[31]    *See* Tobias Dep. Tr. 97:14-17 ("I believe a check box was added last year.").

[32]    *See* TM00000001 (July 28, 2020 email).

1  CR%."[33]  I understand "CR%" here to refer to "conversion percent," or the percentage
2  of customers who complete a ticket purchase (*i.e.*, the percentage of users browsing
3  the site who are "converted" to customers by the end of their browsing session).  This
4  email reflects an acknowledgement that moving text "to the top" of the website makes
   it more conspicuous for users.

5       41.    In addition to discussing these common design features in their internal
6  documents, Defendants have also long employed such design features on other
7  aspects of their website, further demonstrating that they are well are of this more
8  effective design pattern for presenting terms of use.[34]  The image below was captured
9  in or around May 2020 in connection with a user claiming a refund for a COVID-
10 delayed concert.  As shown, in this case Defendants added "friction" by forcing users
11 to click an "opt-in box" in order to receive their refund and by using a modal dialogue
12 to force attention to the content.[35]  This clearly demonstrates that Defendants are
13 aware of this technique but purposely chose not to use it on other screens of their
14 websites and mobile applications (*e.g.*, sign in, sign up, purchase).

15

16

17

18

19

20

21

22

23

24

25  [33]   *See* TM00000189 (Mar. 6, 2020 email).

26  [34]   *See, e.g.*, Tobias Dep. Tr. 117:10-15 ("Are you familiar with screens on the
27  Ticketmaster and/or Live Nation websites where buttons are faded or grayed out to
    show they're disabled?  A.  Generally, yes.").

28  [35]   *See also* Tobias Dep. Tr. 130:12:21 (discussing screenshot).

1
2
3
4
5
6
7
8
9
10
11



12   42.   Consider also the screen below, in which the user is about to purchase

13   tickets to a concert:

14
15
16
17



18
19
20
21
22
23

24   In order for the "Place Order" button depicted above to become active and clickable,

25   the user **must** accept or decline the ticket purchase protection.[36]  In this example the

26   user selected "No," thus allowing continuation with the order.  This is a common type

27

28   [36]   *See* Tobias Dep. Tr. 126:4-12 (discussing screenshot).

23                           Case No. 2:20-cv-03888-GW-GJS
                      DECLARATION OF DR. ANTHONY D. ANDRE

1  of forcing function (similar to a checkbox) that both renders content conspicuous to

2  users by drawing their attention to it and preventing continuation of a process prior to

3  active engagement with and explicit acknowledgment of the material.  On this screen,

4  the technique is used with the (presumable) hope of generating more income from

5  users selecting the first option (Yes).  This forced-selection forcing function is a

6  common approach to terms of use that was described and demonstrated among many

7  different products shown earlier.  Interestingly, in order to gain the attention of the

8  user to an additional purchase/revenue option, Defendants have no hesitation in

9  employing the technique for the ticket protection option while they fail to do so for

10  the Terms of Use presented on the very same screen (presented in the upper right

11  corner).

12       43.  Internal documents produced by Defendants show that Defendants

13  discussed adopting this type of forcing function for the ticket insurance aspect of their

14  website, confirming that they considered these types of design choices carefully.[37]

15       44.  As a final example, a Defendant-affiliated website called

16  "TicketExchange" required users to check a box indicating their agreement to its

17  terms of use before purchasing tickets, confirming Defendants were aware of such

18  design choices.  Specifically, the TicketExchange website stated: "You must confirm

19  that you have read and agree to the Terms & Conditions to place your order."  The

20  text was white, and contained in a red box, which is highly visible to the user.  A

21  screenshot of that website is pasted below, which is taken from a brief Defendants

22  submitted in a prior lawsuit:[38]



25  _____

26  [37]  TM00000175 (Nov. 11, 2019 email chain).

27  [38]  *Lee v. Ticketmaster LLC*, Case 3:18-cv-05987-VC, ECF No. 25 at 6 (N.D. Cal.
Nov. 30, 2018); *see also* Tobias Dep. Tr. 142:8-143:17; 151:21-152:14 (discussing

28  screenshot).

<span style="text-align:center">24</span>   Case No. 2:20-cv-03888-GW-GJS
DECLARATION OF DR. ANTHONY D. ANDRE

## IV.    The Ticketmaster and Live Nation Terms of Use Are Not Designed to Be Conspicuous to Users

45.    In this section, I show that the Terms of Use are not conspicuous to users or likely to be understood by users, particularly when considered against the more prominent design features detailed above.

46.    Defendants identify four sets of "screens" at which users may encounter a hyperlink to the Terms of Use on the Ticketmaster and Live Nation websites:  (i)  the account creation or "Sign-Up" screen; (ii) the "Sign-In" screen; (iii) the "Place Order" screen; and (iv) other screens on the Ticketmaster and Live Nation websites, which sometimes reference the Terms of Use at the bottom of their pages.  Although all of these screens suffer from similar defects, I analyze each of Defendants' screens (*i.e.*, the "Sign-Up," "Sign-In," "Place Order," and general website screens) in the interest of completeness.

47.    In analyzing Defendants' presentation of the Terms of Use hyperlinks and textual notices, it is important to analyze the Terms of Use as they appear to users. In contrast to this approach, Defendants rely heavily on excerpted and cropped screenshots.[39]  But these excerpted screenshots do not reflect how the sites and pages, and the Terms of Use hyperlink contained within, appear to actual users in context.

48.    Psychologists that study human perception have long known that our perception of any one element is influenced by the others around it.  For example, the "pop-out" effect describes our tendency to notice, rather automatically, a stimulus that is unique (*e.g.*, in color) from other stimuli on the same screen.[40]  In other words, the more distinct or maximally visually different a product is from surrounding products,

---

[39]    *See generally* Declaration of Kimberly Tobias, ECF No. 85; *see also* Tobias Dep. Tr. 200:15-21 ("they do appear to all be excerpts").

[40]    Anne M. Treisman & Garry Gelade, Cognitive Psychology, *A feature-integration theory of attention* (1980), vol. 12, issue 1, pp. 97-136.

Case No. 2:20-cv-03888-GW-GJS
DECLARATION OF DR. ANTHONY D. ANDRE

1   the more likely the user is to notice it.[41]  Finally, the commonly referenced Gestalt

2   Principles are principles/laws of human perception that describe how humans group

3   similar elements, recognize patterns and simplify complex images.[42]   These

4   recognized principles and theories all converge on the fact that our perception is

5   formed in context of all elements viewed in a given instance (on a given screen) and

6   can't be understood by parsing out individual elements.[43]

7        49.   To understand this important distinction, consider the difference between

8   the excerpt of the Live Nation mobile website below (which is displayed in the Tobias

9   Declaration), and the full screen from which it is taken (which is attached to the Tobias

10  Declaration).  First is the excerpt Ms. Tobias provided:[44]



16       50.   Now, compare that to the full screenshot (which, due to its size, takes up

17  multiple pages below):[45]

---

19   [41]   Pieters, R & Warlop, L., *Visual attention during brand choice: The impact of*
20   *time pressure and task motivation*, Intern. J. of Research in Marketing 16 (1999) 1-16.

21   [42]   *See* Palmer, S.E., *Common region: A new principle of perceptual grouping*,
22   Cognitive Psychology, 24(3), 436-447 (1992).

23   [43]   Notably, Defendants' 30(b)(6) witness, Ms. Tobias, appeared to agree with this
24   basic principle.  *See* Tobias Dep. Tr. 169:7-20 (whether a user agreed to the Terms of
     Use "would depend on what the page looks like at a particular time"); *see also id.* at
25   210:2-12 (regarding user perception: "There are a number of factors that would come
26   into play.  Any user's computer would display differently, depending on how big their
     text is, how big their monitor is.").

27   [44]   Tobias Declaration, ECF No. 85, ¶ 36.

28   [45]   Tobias Ex. 38.

27                              Case No. 2:20-cv-03888-GW-GJS
                                DECLARATION OF DR. ANTHONY D. ANDRE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23



24      51.     As this example illustrates, it is critical to capture the full context in order

25  to determine how actual users experience the Terms of Use in the real world.  Short

26  excerpts, such as the ones utilized by Defendants, can create a misleading impression

27  and suggest a perceptual/attentional view and context that is simply not real.  For this

28  reason, Defendants' partial screenshots do not provide a complete picture regarding

1  how users actually arrive at and perceive the Terms of Use in the context of other
2  information, graphics, hyperlinks, and interface elements on the same page or screen
3  as well as the material or screens processed beforehand.

4      **A.  The Sign-Up Screens Are Not Conspicuous to Users**

5      52.  A screenshot of the Ticketmaster desktop "Sign-Up" screen obtained in
6  or around July 2020 is pasted below for reference.[46]



15      53.  Note that in this screenshot, a countdown timer is running in the blue
16  header bar in the upper right-hand corner of the screen.  I understand that the
17  countdown timer often appears on the Ticketmaster and Live Nation websites, but in
18  an abundance of caution I analyze the "Sign-Up" screen assuming that, for some
19  users, the screen may not contain a countdown timer.

20      54.  Also note that much of the Sign-Up screen is omitted from the screenshot
21  contained in the Declaration of Ms. Tobias (repasted below for reference):[47]

---

24    [46]  For purposes of my analysis, I focus on the ticketmaster.com desktop website,
25  because the problems it exhibits are representative of the other websites Defendants
26  highlight in their motion.  I note throughout this section how these other screens suffer
    from the same deficiencies, and I use the ticketmaster.com desktop website only to
27  provide representative examples.

28    [47]  Tobias Decl. ¶ 5.

55.    In particular, the full screen (unlike Defendants' excerpt) includes:  (i) a "Your All-Access Pass" box with large text and eye-catching colors; (ii) text across the top of the screen; and (iii) faded background text.  All of these details would be distracting to users focused on the short-term goal of purchasing concert tickets.

56.    There are at least six aspects of the "Sign-Up" screen that render the Terms of Use inconspicuous from a human factors standpoint, as exemplified by the failure to abide by the common and positive design features noted above.

57.    *Salience/Prominence*:  The font used to present the Terms of Use is smaller than most other fonts on the same page.  All things equal, users are less likely to notice relatively smaller fonts than larger fonts.  It effectively communicates to the user that this (smaller-sized) content is not as important as the rest of the page.

58.    The font used to present the Terms of Use is also altered in its "opacity," which has the effect of making the Terms of Use appear as a light color with less contrast.  Opacity is a website design attribute related to the coloring and contrast of

Case No. 2:20-cv-03888-GW-GJS
DECLARATION OF DR. ANTHONY D. ANDRE

1  on-screen text.  All things equal, a lower opacity value—which is what is used here—

2  lowers the contrast of text and makes it less conspicuous.[48]

3      59.    Below is an image of the "CSS" analysis of this page of the site.  "CSS"

4  stands for "Cascading Style Sheets," and refers to a mechanism for adding styles (such

5  as fonts) to websites.  A CSS analysis is an industry-standard way of evaluating a

6  website's usability.  I produced these values by highlighting the text of interest on the

7  screen and using the inspection tool (available upon a right-click menu command)

8  built into the browser (using both Chrome or Firefox browsers).  In the image below

9  I show an example of what one sees when using the inspection tool.



22      60.    In the analysis below, notice the fourth number added to the CSS code

23  for the textual notice regarding the Terms of Use.  This number is an opacity setting,

24  which by default is 1, unless specified otherwise.  The opacity level describes the

25  transparency level of the text:  a value of 1 is not transparent at all (*i.e.*, most easily

---

48  *See, e.g.*, *CSS-Tricks:  Opacity*, https://css-tricks.com/almanac/properties/o/
opacity/.

visible by the user), 0.5 is 50% see-through, and 0 is completely transparent (invisible).



61.   Note that the *only* text on this screen with a specified opacity is the sentence containing the hyperlink to the Terms of Use.  The level for this text has been manually set to 65% (0.65), which causes otherwise black text to appear light grey with less contrast and therefore less conspicuousness.  This appearance of black text as grey was confirmed by the Defendants' 30(b)(6) witness (Ms. Tobias) who stated in her deposition, when asked to describe the Terms of Use hyperlinks and textual notices, "[t]he text surrounding the hyperlink is gray, the hyperlinks are a bold blue . . . ."[49]  Importantly, this opacity level must be *manually coded—i.e.*, deliberately

---

[49]   Tobias Dep. Tr. 105:2-7.

1  added—as the default opacity value is 1.  A version of this image is also attached as
2  Appendix D.
3         62.    The result of this design choice is that the actual perceived color of the
4  sentence in question is grey, whereas the other text on the page appears (and is) black,
5  as shown below:



63.    In Appendix E, I provide additional examples of Defendants' sign-up, sign-in, place order, and other screens where the opacity has also been set to 65% (0.65).  I thus conclude Defendants have pervasively altered the opacity of the textual notice to the Terms of Use hyperlink to make it less visible to users.

64.    That Defendants deliberately set a 65% (0.65) opacity level for the textual notices to the Terms of Use is confirmed by the Ticketmaster website, which contains "typography" guidelines—*i.e.*, Ticketmaster's own design principles.  These typography guidelines state that "100% opacity" should be used for "primary text," whereas "65% opacity" should be reserved for "secondary text."[50]  This shows that Defendants treated the textual notices to the Terms of Use as "secondary text," not "primary text."

65.    ***Usability Best Practices***:  The hyperlink to the Terms of Use is not underlined, which, as discussed above, is often regarded as a "best practice" for hyperlink design, because underlining clearly and automatically identifies a link users can click as established by Web design convention since the inception of the Web.  The choice not to underline the text here reduces conspicuousness in that it renders it less likely that users will recognize the Terms of Use as a clickable link.

66.    ***Simplicity***:  The sentence referencing the Terms of Use combines two different and unrelated topics and hyperlinks:  the Terms of Use and Privacy Policy.  It states:  "By continuing past this page, you agree to the Terms of Use and understand that information will be used as described in our privacy policy."  This phrasing makes the sentence more complex (referred to as a complex direct object) and lacks focus on a singular concept.  It also does not direct users to "read" the Terms of Use.  This could easily confuse users as to which document they are "agree[ing]" to, particularly where users are under significant time pressure.

---

[50]    Ticketmaster, *Typography* (last accessed Mar. 4, 2021), https://design.ticketmaster.com/components/typography-usage/.

67.   The example below from the UHaul website shows how best to separate unrelated items (though the links should be underlined) and create a forcing function whereby users can't continue with their goal until they explicitly acknowledge each item. In contrast, Defendants' opposite approach conjoins unrelated items, minimizes the conspicuity of presentation, creates linguistic complexity, and allows one to continue the process without acknowledgement of either item.



68.   The sentence describing the Terms of Use is linguistically confusing for another reason:   it suggests that continuing with the process of signing up for ticketmaster.com's website is tantamount to "agree[ing] to the Terms of Use." By proclaiming that an unrelated action (signing up for the website) amounts to agreement to the Terms of Use, this language suggests to users that there is not a separate document (the Terms of Use) and they do *not* need to read the Terms of Use, but should simply proceed with creating a ticketmaster.com account.

69.   The design language on the "Sign Up" screen also does nothing to suggest a relationship between the small-font paragraph containing the Terms of Use hyperlink, and the "Next" button that allegedly triggers acceptance of the Terms of Use. Human factors psychologists have long discussed gestalt principles of grouping

and object theory,[51] which together describe how humans perceive objects and how we group or associate information together.  Drawing on this research, there are several known grouping principles or "laws," none of which are applied to the ticketmaster.com interface.[52]

70.     Specifically, the sentence containing the Terms of Use hyperlink is not in alignment with the "Next" button; they are not on the same perceptual layer; they are not part of the same object; they don't sit on a common background, there is no grouping line around them; there is no arrow or connecting line from one to the other, one is text and the other graphical, etc.  In short, there is nothing about the design of the webpage that creates a perceptual or cognitive relationship between the Terms of Use and the "Next" button.  Accordingly, one would not necessarily assume that clicking the "Next" button would manifest assent to the Terms of Use.

71.     **Dedicated Real Estate**:  The Terms of Use hyperlink lacks dedicated real estate.  The Terms of Use hyperlink is the same color as the "Sign-Up" button and other hyperlinks on the page and thus does not stand out.  Indeed, there are two other similarly-designed links on the page ("Sign In" and "Privacy Policy").

72.     From a human factors standpoint, the presence of multiple, similar-looking hyperlinks diminishes the significance of each one, reduces the likelihood that any one of them will perceptually "pop out," and makes it less likely a user will notice and click on the Terms of Use.  That is all the more true given that other text on the screen—such as the "Next" button"—is larger and more prominent, making it less likely users notice or attend to the "Terms of Use" hyperlink.  This is important because the Terms of Use must be analyzed in context; even if they are arguably

---

[51] *See* Christopher Wickens et al., *Engineering Psychology and Human Performance* (4th ed. 2012); Wickens, Christopher D. and Andre, Anthony D., *Proximity compatibility and information display: Effects of color, space, and objectness on information integration*, Human Factors, 32 (1), at 61-77 (1990).

[52] *See id.*

Case No. 2:20-cv-03888-GW-GJS
DECLARATION OF DR. ANTHONY D. ANDRE

**ER108**

conspicuous standing alone, they can become *inconspicuous* when contrasted with more attention-demanding features. For these reasons, the screen excerpts Ms. Tobias attaches to her declaration fail to provide meaningful insight into conspicuity, exactly because they ignore the other features drawing users' attention on the webpage and create a misleading picture of what users actually experience when using this website.

73. **Title**: The Terms of Use hyperlink lacks a title explaining its context or significance, which further minimizes the likelihood users will notice it.[53] We refer to the concept of headers and sub-headers in articles, research papers, and instructions used to frame and orient the reader to subsequent material.[54]

74. **Checkbox or Forcing Function**: The Terms of Use do not require users to click a checkbox acknowledging their agreement to the Terms of Use, and do not employ any other forcing functions. As noted, Defendants' own internal documents show that they understood such functions keep users "focused on the message," and indeed ultimately adopted this feature on parts of their websites.[55]

75. Importantly, these defects should not be viewed in isolation. Rather, they operate cumulatively and build upon each other to further diminish the likelihood that users notice, read, or ultimately agree to the Terms of Use.

76. All of the above problems are even more pronounced for users who are confronted with the countdown timer, as time stress only serves to heighten goal-oriented interaction and reduce the ability to direct attention to ancillary information. As one user described the experience: "[T]hat ticking clock suddenly puts me in a

---

[53] *See supra* ¶ 33(noting importance of underlining).

[54] *E.g.*, Strategic Content, *How to Write Subheadings and Why They're Important*, https://strategiccontent.co/how-to-write-subheadings/ (last accessed Mar. 6, 2021).

[55] *See* TM00000063 (July 24, 2020 email).

1 | different mindset. Loss aversion kicks in . . . . Stress and anxiety make it harder to
2 | focus on the bigger picture, and you just focus on getting it done."[56]

3 |      77.    Notably, as the timer runs, a user may also be shown a screen like the
4 | one below, captured in or around July 2020, which informs the user that "Tickets are
5 | selling fast" and prompts the user to "Complete your purchase." Such prompts signal
6 | to users that time is of the essence, and encourage them to move forward quickly,
7 | without stopping to peruse all the details of the website.[57] It should be noted that in
8 | the image below the user must click "Got It" in order to return to the background
9 | screen and continue the purchase process, yet they never have to explicitly
10 | acknowledge the Terms of Use.



18 |      78.    The same problems are present in the Ticketmaster.com mobile sign-up
19 | screen, the Live Nation desktop sign-up screen, and the Live Nation mobile sign-up
20 | screen.[58] The presence of a countdown timer only exacerbates these deficiencies.

---

23 |   [56]  Medium, *Making Light Out of Dark Patterns* (Apr. 3, 2016), https://medium
24 | .com/@doublethought/making-light-out-of-dark-patterns-a2bf5080b7a8.

25 |   [57]  *See, e.g.,* Tania Vieira, *How deceptive UX patterns trick you into doing what
companies want*, TNW (Feb. 9, 2020), https://thenextweb.com/syndication/2020/02/
26 | 09/how-deceptive-ux-patterns-trick-you-into-doing-what-companies-want/.

27 |   [58]  *E.g.,* Tobias Decl. Ex. 21 (Ticketmaster mobile sign-up screen); Tobias Decl.
Exs. 28-29 (Live Nation desktop sign-up screens); Tobias Ex. 36 (Live Nation mobile
28 | sign-up screen).

**B.   The Sign-In Screens Are Not Conspicuous to Users**

79.   The "Sign-In" screen is similar to the "Sign-Up" screens and suffers from the same essential flaws.  A screenshot, captured in or around July 2020, is pasted below for reference:



80.   As with the Sign-Up Screen, the screenshot of the Sign-In screen in the Tobias Declaration lacks context.  That version of the screen is pasted below for reference as well.[59]

---

[59] Tobias Decl. ¶ 8.

## Sign In

New to Ticketmaster? Sign Up

Email Address

Password

SHOW

☐ Remember Me                                    Forgot Password?

By continuing past this page, you agree to the Terms of Use and understand that
information will be used as described in our Privacy Policy

81.     The Terms of Use hyperlinks and textual notices on the Sign-In screen are inconspicuous for essentially the same reasons as the Sign-Up Screen. The hyperlinks lack prominence because they are not underlined and are displayed in a small font size. The statement presenting the Terms of Use link has also been altered to appear lighter in color and less conspicuous. They lack simplicity because the language used to introduce them is confusing. They lack dedicated real estate because they are contained near the bottom of a screen with multiple hyperlinks and additional text. They lack a title or a subtitle. And they do not follow established norms of using explicit acknowledgement (*e.g.*, checkboxes that govern the action button) and forcing functions (preventing continuation of the process or action until explicit acknowledgement) for terms of use.

82.     Note also that the screenshot in the Tobias Declaration omits the countdown timer. As with the Sign-Up screen, it is unlikely that a time-pressured user confronted with multiple hyperlinks and a busy-looking screen will notice or click on the hyperlinked Terms of Use. I understand it is possible that a user could

Case No. 2:20-cv-03888-GW-GJS
DECLARATION OF DR. ANTHONY D. ANDRE

1   avoid the countdown timer (*i.e.*, by signing in before selecting tickets), but note that
2   for users confronted with the timer, the Terms of Use appear even less conspicuous.

3       83.    The same problems are present in the Ticketmaster.com mobile sign-in
4   screen, the Live Nation desktop sign-in screen, and the Live Nation mobile sign-in
5   screen.[60]

6   **C.    The Place Order Screens Are Not Conspicuous to Users**

7       84.    The hyperlink to the Terms of Use on the "Place Order" screen is
8   inconspicuous for similar reasons as well.  That screen, captured in or around July
9   2020, is pasted below for reference:



17      85.    Nearly all of this screen is omitted from the excerpt contained in the
18  Tobias Declaration:[61]



23      86.    The problems identified above, *supra* § IV.A-B, are particularly
24  pronounced for the "Place Order" screen because the screen is extremely busy.  It

---

26      [60]  Tobias Decl. Exs. 22-23 (Ticketmaster mobile sign-in screens); Exs. 30-31
27  (Live Nation desktop sign-in screens); Ex. 37 (Live Nation mobile sign-in screen).

28      [61]  Tobias Decl. ¶ 14.

1   contains multiple pieces of information (including regarding ticket pricing) and
2   hyperlinks, making it so the Terms of Use are not conspicuous to users.

3       87.    Also recall that ticket purchasers are activity- or goal-oriented. They
4   seek that which allows them to satisfy their goal and often ignore fine details
5   presented as tangential to their goal.[62] The "Terms of Use" appear at the bottom of
6   the screen between the form and the "Place Order" button. Immediately after filling
7   in their personal information—a requirement to purchase tickets—users will move
8   their attention to the action button that next allows their goal to be achieved (*e.g.*,
9   "Place Order").[63] This makes it even less likely that a user will notice the Terms of
10  Use, since the design of the "Place Order" screen does nothing to suggest that the
11  Terms of Use are related to the user's goal of purchasing tickets.

All Sales Final - No Refunds
By continuing past this page and clicking "Place Order",
you agree to our Terms of Use.

Order Details
^  $135.40                           Place Order

19      88.    Moreover, by this point, the user has already navigated through several
20  screens and is about to complete his or her purchase. From a cognitive science

---

22  [62]  *See, e.g.*, Steve Krug, *Don't Make Me Think: A Common Sense Approach to*
23  *Web Usability* (2005). New Riders: 2nd Edition. ISBN-13: 978-0321344755

24  [63]  *See* Quanlong Zheng, Jianbo Jiao, Ying Cao, Rynson W.H. Lau, *Proceedings*
25  *of the European Conference on Computer Vision (ECCV) - Task-driven Webpage*
25  *Saliency*, pp. 287-302 (2018) (noting that "human attention behaviors on webpages
26  under a particular task are mainly driven by the configurations and arrangement of
27  semantic components" such that "in order to register an email account, people tend to
27  first recognize the key components on a webpage and then move their attention
28  towards the sign-up form region").

42                          Case No. 2:20-cv-03888-GW-GJS
                            DECLARATION OF DR. ANTHONY D. ANDRE

standpoint, a user who has progressed this far is unlikely to notice a relatively small hyperlink, particularly where it is not underlined or perceived as necessary to achieve their goal.  This is because a user who has proceeded to the end of their purchase will, by this point, likely have decided to complete the purchase, and thus will focus only on information or actions necessary to fulfill that goal.  Finally, also discussed above, these issues are even more pronounced for users who are also presented with a countdown timer.

89.    The same problems are present in the ticketmaster.com mobile place order screen, the livenation.com desktop place order screen, and the livenation.com mobile place order screen.[64]

**D.    The Other References to the Terms of Use on the Ticketmaster and Live Nation Websites Are Not Conspicuous to Users**

90.    I understand that Defendants argue that "[v]irtually all of [the pages on Ticketmaster and Live Nation's sites] clearly inform the user that his or her use of the site is subject to the Terms of Use."[65]  I disagree.

91.    To begin with, I disagree with Defendants' suggestion that, by repeatedly including inconspicuous hyperlinks, it becomes more likely that users will notice such hyperlinks.  In fact, repeatedly showing similar screens to users does not increase the likelihood that users will notice the Terms of Use.  To the contrary, repetitively bombarding users with similar information has the *opposite* effect, by subtly conveying that such information is pro forma or unimportant.

92.    I also disagree with Defendants' suggestion that their websites "clearly" inform users that use of the Ticketmaster and Live Nation websites is subject to the Terms of Use.  To conclude that a user has been "clearly informed" of terms of use, a

---

[64]   Tobias Decl. Exs. 24-25 (Ticketmaster mobile place order screens); Tobias Decl. Exs. 32-33 (Live Nation desktop place order screen); Tobias Decl. Ex. 38 (Live Nation mobile place order screen).

[65]   Tobias Decl. ¶ 20.

Case No. 2:20-cv-03888-GW-GJS
DECLARATION OF DR. ANTHONY D. ANDRE

**ER115**

company needs to conduct usability testing (or otherwise collect data) on their user interfaces to truly understand how their design influences user behavior.[66]  Such testing is common in the software and Web industry.  But Defendants provide no evidence that they tested their designs to prove that their presentation of the Terms of Use hyperlinks and textual notice were usable, conspicuous, understandable, or effective.[67]  Indeed, Defendants' 30(b)(6) witness (Ms. Tobias) testified that she was "not aware of" Defendants having undertaken "any investigation as to whether users notice the terms of use as a factual matter."[68]

93.    Further, as shown above, Defendants have *not* "clearly" informed users that their use of the Ticketmaster and Live Nation websites is supposedly subject to the Terms of Use.  Specifically, Defendants set an opacity value at 65% (35% transparent) and effectively reduced the contrast of the textual notices for the Terms of Use relative to all other text on the screen.  This purposeful technique stands in stark contrast to Defendants' assertion that they have "clearly" informed users about the Terms of Use.

94.    Moreover, in context, the link to the Terms of Use on ticketmaster.com's general website is not conspicuous, as shown in the screenshot below, which was captured in or around July 2020:

---

[66]   Jeffrey Rubin & Dana Chisnell, *Handbook of Usability Testing*, 2nd Ed.; Joseph S. Dumas & Janice (Ginny) Redish, *A Practical Guide to Usability Testing* (1999).

[67]   *See* Tobias Dep. Tr. 23:21-27:14, 37:25-39:10 (acknowledging Defendants have not conducted any studies regarding this issue).

[68]   Tobias Dep. Tr. 39:4-10; *see also id.* 39:12-40:5.



95.     In the screenshot above, the reference to the Terms of Use is small, buried at the bottom "footer" of the website (requiring the user to scroll down several times to even reach that section of the page), and appears in a gray-white color that is similar to many other hyperlinks on the screen—all of which appear above the link to the Terms of Use.  The hyperlinks are on a portion of the webpage that almost no users would see under ordinary circumstances.  The industry term for this is "below the fold" (which it takes from the newspaper industry, where that term referred to news stories below the fold of the paper and were thus considered less important or attention-grabbing), and it is well established that users process more information and to a deeper level above the fold versus below the fold (requiring scrolling).

96.     The same problems are present for the ticketmaster.com mobile website, the livenation.com desktop website, and the livenation.com mobile website.[69]

---

[69] Tobias Decl. Exs. 26-27 (Ticketmaster mobile website); Tobias Decl. Exs. 34-35 (Live Nation desktop website); Tobias Decl. Exs. 39-40 (Live Nation mobile website).

Case No. 2:20-cv-03888-GW-GJS
DECLARATION OF DR. ANTHONY D. ANDRE

97.   As with the other screenshots, the contrast between the screen I reviewed and the screenshot in the Tobias Declaration (repasted below) is pronounced:[70]

**ticketmaster**   By continuing past this page, you agree to our **Terms of Use**

98.   I also note that there are times when the "Terms of Use" hyperlink at the bottom of the screen was entirely obscured by advertisements.  For example, in the following screenshot of the Ticketmaster.com mobile website, captured in or around July 2020, the "Terms of Use" hyperlink is not visible because it is covered up by a Verizon advertisement:



99.   Similarly, in the following screenshot of the Live Nation desktop website, captured in or around July 2020, an advertisement has been placed over the hyperlink to the Terms of Use:



---

[70]   Tobias Decl. ¶ 20.

100.   These examples confirm that actual user experience varies significantly from the screens depicted in Defendants' declaration and exhibits, and that they seek to make prominent in their motion what the websites almost completely obscure.

**V.     The Terms of Use Failed to Provide Conspicuous Notice of Their Arbitration Provision Prior to June 2019**

101.   I have already explained why users are unlikely to notice the hyperlinks to the Terms of Use, or understand the significance of the Terms of Use, and that they are not required to explicitly acknowledge the Terms of Use as is common convention.  Accordingly, I assume that only a very small fraction of users (if any) actually click on the hyperlinks to open the Terms of Use, though I understand that Defendants have not produced data that would allow me to quantify the percentage of users that do so.

102.   But even assuming a non-trivial number of users actually click on the Term of Use hyperlink, there is still the question of whether such users would notice the *arbitration provision* within the Terms of Use.  This question has particular salience for pre-June 2019 users, because prior to June 2019, the Terms of Use made no reference to arbitration until several pages into the Terms of Use.[71]

103.   For example, a pre-June 2019 user clicking on the Terms of Use would be confronted with the following page, which makes no reference to arbitration:[72]

---

[71]  *Compare* Tobias Decl. Ex. 46 (Dec. 2018 Terms of Use) *with* Tobias Decl. Ex. 45 (June 2019 Terms of Use) *and* Tobias Ex. 42 (Jan. 1, 2021 Terms of Use).

[72]  *See* Tobias Ex. 46 at 143 (pre-June 2019 Ticketmaster Terms of Use); *see also* Tobias Dep. Tr. 214:18-22 (acknowledging that prior to June 2019, the first page of the Terms of Use contain "no table of contents and no notice of arbitration and class action waiver").

## Terms of Use

Last Updated: December 7, 2018

Welcome! The following are the terms of use ("Terms") that govern your use of the Ticketmaster sites and applications where this appears (collectively, the "Site"). Our Privacy Policy, Purchase Policy, and any other policies, rules or guidelines that may be applicable to particular offers or features on the Site are also incorporated into these Terms. By visiting or using the Site, you expressly agree to these Terms, as updated from time to time.

We may make changes to these Terms at any time. Any changes we make will be effective immediately when we post a revised version of these Terms on the Site. The "Last Updated" date above will tell you when these Terms were last revised. By continuing to use this Site after that date, you agree to the changes.

While some of the events listed on the Site may appeal to children, the Site is not targeted at children under the age of 13, and they are not permitted to use the Site We strongly encourage all parents and guardians to monitor the Internet use by their children. If you use the Site, you affirm you are at least 13 years old.

### Account Registration

You may browse the Site without registering for an account. You will be required to register for an account to use certain features of the Site, such as reserving or purchasing a ticket. Your account username may not include the name of another person with the intent to impersonate that person, or be offensive, vulgar or obscene. Your account username and password are personal to you. You will be responsible for the confidentiality and use of your username and password, and for all activities (including purchases) that are conducted through your account. You may not transfer or sell access to your account. We will not be liable for any harm related to disclosure of your username or password or the use by anyone else of your username or password. You may not use another user's account without that user's permission. You will immediately notify us in writing if you discover any unauthorized use of your account or other account-related security breach. We may require you to change your username and/or password if we believe your account is no longer secure or if we receive a complaint that your username violates someone else's rights. You will have no ownership in your account or your username. We may refuse registration, cancel an account or deny access to the Site for any reason.

### Code of Conduct

You agree that you will comply with all applicable laws, rules and regulations, and that you will not:

- Restrict or inhibit any other person from using the Site;
- Use the Site for any unlawful purpose;
- Express or imply that any statements you make are endorsed by us, without our prior written consent;
- Impersonate any person or entity, whether actual or fictitious, including any employee or representative of our company;
- Submit (a) any content or information that is unlawful, fraudulent, libelous, defamatory, or otherwise objectionable, or infringes our or any third party's intellectual property or other rights; (b) any non-public information about companies without authorization; or (c) any advertisements, solicitations, chain letters, pyramid schemes, surveys, contests, investment opportunities or other unsolicited commercial communication;
- Submit, or provide links to, any postings containing material that could be considered harmful, obscene, pornographic, sexually explicit, indecent, lewd, violent, abusive, profane, insulting, threatening, harassing, hateful or otherwise objectionable, includes the image or likeness of individuals under 18 years of age, encourages or otherwise depicts or glamorizes drug use (including alcohol and cigarettes), characterizes violence as acceptable, glamorous or desirable, or contains any personal contact information or other personal information identifying any third party;
- Submit, or provide links to, any postings containing material that harasses, victimizes, degrades, or intimidates an individual or group of individuals on the basis of religion, race, ethnicity, sexual orientation, gender, age, or disability;
- Engage in spamming or flooding;
- Harvest or collect information about Site users;
- Order, or attempt to order, a number of tickets for an event that exceeds the stated limit for that event;
- Use any password or code to participate in a presale or other offer on the Site if you did not receive the password or code from us or if you violate the terms of the presale or offer; or
- Use any area of the Site for commercial purposes, such as to conduct sales of tickets, products or services.

### Ownership of Content and Grant of Conditional License

The Site and all data, text, designs, pages, print screens, images, artwork, photographs, audio and video clips, and HTML code, source code, or software that reside or are viewable or otherwise discoverable on the Site, and all tickets obtained from the Site, (collectively, the "Content") are owned by us or our licensors. We own a copyright and, in many instances, patents and other intellectual property in the Site and Content. We may change the Content and features of the Site at any time.

We grant you a limited, conditional, no-cost, non-exclusive, non-transferable, non-sub-licensable license to view this Site and its Content as permitted by these Terms for your non-commercial purposes only if, as a condition precedent, you agree that you will not:

- Submit any software or other materials that contain any viruses, worms, Trojan horses, defects, date bombs, time bombs or other items of a destructive nature;

104. From a cognitive science perspective, this presentation makes it extremely unlikely that a reasonable user would find, much less read, the arbitration provision. As one article explains:

> It's nice when there's empirical data to support a theory. And that evidence is abundantly available in the case of the page fold. We have

48                          Case No. 2:20-cv-03888-GW-GJS
DECLARATION OF DR. ANTHONY D. ANDRE

observed countless users in qualitative usability studies having their behaviors impacted by the fold — often for the worse, because websites didn't prioritize above-the-fold content appropriately. Users stopped scrolling before finding the information they needed, or worse, didn't realize that there was more information waiting for them below the fold.

There's also quantitative evidence: in an analysis of 57,453 eye tracking fixations, we found that there was a dramatic drop-off in user attention at the position of the page fold. Elements above the fold were seen more than elements below the fold: the 100 pixels just above the fold were viewed 102% more than the 100 pixels just below the fold.[73]

105.   Thus, by placing the arbitration provision near the *end* of the Terms of Use (which would be reached only if the user substantially scrolled down from the text initially displayed) prior to June 2019, Defendants all but guaranteed users would not notice the arbitration provision within the Terms of Use.

106.   Further adding to the problem, the Terms of Use did not start with a table of contents (TOC). Such inclusion would make it more likely for the user to recognize that an arbitration section was part of the larger document. The absence of a TOC, coupled with the placement of the arbitration clause below the fold, has the effect of all but guaranteeing that users prior to June 2019 would not read the arbitration provisions in the Terms of Use.

**VI.   <u>Conclusion</u>**

107.   The presentation of the Terms of Use hyperlinks and textual notices on the Ticketmaster and Live Nation websites renders the Terms of Use objectively inconspicuous and violates established usability design principles. Defendants' purposeful design choices render it unlikely that users will notice the Terms of Use. Thus, users of the Ticketmaster and Live Nation websites are not given effective notice of the Terms of Use.

---

[73]   Amy Schade, World Leaders in Research-Based User Experience, *The Fold Manifesto: Why the Page Fold Still Matters* (Feb. 1, 2015), www.nngroup.com/articles/page-fold-manifesto/

Case No. 2:20-cv-03888-GW-GJS
DECLARATION OF DR. ANTHONY D. ANDRE

108.   Another way to understand my conclusion is to consider a design where the goal was to facilitate users noticing the Terms of Use.  Such a design would be polar opposite, along numerous dimensions, to the screen designs implemented by Defendants.

109.   The improper design choices discussed above appear to be deliberate. Discovery produced by Defendants shows that their UX and UI designers were aware of the various design options available to them and even discussed alternative ways and techniques to present the Terms of Use.  In addition, the CSS code on the Ticketmaster and Live Nation websites shows a purposeful manipulation of the opacity of the Terms of Use hyperlink, rendering it lighter and with less contrast than other text on the same page.  Indeed, this manipulation even caused Defendants' 30(b)(6) witness (Ms. Tobias) to perceive the black text as grey.  I therefore conclude that Defendants have purposefully implemented a dark pattern and designed their Terms of Use to be both inconspicuous and devoid of the need for explicit acknowledgement, let alone agreement.  And even if such design choices were not purposeful (which is highly doubtful, based on the evidence), my opinion remains that the Terms of Use are not conspicuous to users.

110.   Finally, even for the extremely small subset of users that may have clicked on the Terms of Use, such users were highly unlikely to have noticed the arbitration provision buried within the Terms of Use prior to June 2019, after which it was moved "above the fold."  The provision was not discoverable due to the lack of a TOC and its position within a long and complex document.

111.   My research into the matters discussed in this report is ongoing, and I reserve the right to modify or supplement my opinions as additional information becomes available, including in response to the opinions of any experts retained by Defendants.  I declare under penalty of perjury that the foregoing is true and correct.



1

_____    3-12-2021
                                                Date
2        Dr. Anthony D. Andre

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

51                     Case No. 2:20-cv-03888-GW-GJS
                                    DECLARATION OF DR. ANTHONY D. ANDRE

# APPENDIX A

3/10/2021



## ANTHONY D. ANDRE, Ph.D., CPE

Phone: 408.966.9355 (cell)
Phone: 408.342.9052 (office)
thehumanfactorsexpert@gmail.com
http://www.humanfactorslaw.com

## *CURRICULUM VITAE*

### EDUCATION

Ph.D.   University of Illinois at Urbana-Champaign, 1991
        *Human Factors and Ergonomics (AKA Engineering Psychology)*
        Minor: Industrial Engineering, Statistics
        Faculty Advisor: Dr. Christopher D. Wickens

M.A.   University of Illinois at Urbana-Champaign, 1989
        *Human Factors and Ergonomics (AKA Engineering Psychology)*

B.S.   University of Illinois at Urbana-Champaign, 1987
        Experimental and Cognitive Psychology
        Minor: Human Factors and Ergonomics

### CERTIFICATION

CPE    Board of Certification in Professional Ergonomics (BCPE)

### EMPLOYMENT POSITIONS

1993 - Present   Founding Principal, *Interface Analysis Associates*, Gilroy, CA and Saratoga, CA.

1993 - Present   Adjunct Professor, Departments of Industrial Engineering and Psychology, Human Factors/Ergonomics Graduate Program, *San Jose State University*

**ER125**

3/10/2021

| | |
|---|---|
| 2005 – Present | Founding Principal, Lead Human Factors and Ergonomics Expert Witness, *Human Factors Law LLC,* Gilroy, CA and Reno, NV |
| 1996 – 2007 | Senior Research Associate, *San Jose State University Foundation*, *NASA Ames Research Center* |
| 1992 – 1996 | Principal Scientist and Senior Design Researcher, Aerospace Human Factors *Western Aerospace Labs, Inc., NASA Ames Research Center* |
| 1989 – 1991 | President, *Andre Research Technologies,* Champaign, IL |

## APPOINTED or ELECTED POSITIONS

| | |
|---|---|
| 2021 - Present | Founder and Editor in Chief, *Healthcare Human Factors,* Elsevier Publishing |
| 2021 - Present | Member, Fellows Selection Committee, Human Factors and Ergonomics Society |
| 2021-Present | Head, IEA Fellows Selection Committee, Human Factors and Ergonomics Society |
| 2010 - 2011 | President, Human Factors and Ergonomics Society |
| 2015 – 2018 | Co-Founder and Co-Chair, *The ErgoX Conference* |
| 2011 – Present | Founder and Co-Chair, *International Symposium on Human Factors and Ergonomics in Health Care* (hcs2021.org) |
| 2012 – Present | Editor, *Proceedings of the International Symposium on Human Factors and Ergonomics in Health Care,* Sage Publishing |
| 2020 – Present | Founder and Editor in Chief, *Human Factors in Healthcare,* Elsevier Publishing |
| 2021 – Present | Editor, *In Pactice,* A Quarterly Column in *Ergonomics in Design*; Sage Publishing. |

## ADVISORY BOARDS

| | |
|---|---|
| 2020 – Present | Advisory Board Member, Jinfinity Precision Medicine |
| 2018 – Present | Advisory Board Member, WingoCase - Ambulant Inc. |
| 2019 – Present | Advisory Board Member, Master of Science in *Health Technology* Graduate Program, University of Illinois at Urbana-Champaign |

3/10/2021

## TEACHING EXPERIENCE

Undergraduate Courses Taught:
*-Human Cognition (Psyc 135-Dept. of Psychology)*
*-Introduction to Experimental Psychology (Psyc 103-Dept. of Psychology)*
*-Introduction to Human Factors (Psyc 173-Dept. of Psychology)*

Graduate Courses Taught:
*-Professional Ergonomics Seminar* (ISE290-Industrial & Systems Engineering Dept.)
*-User Research and Usability Testing* (ISE215-Industrial & Systems Engineering Dept.)
*-Advanced Seminar in Human Factors* (Psyc 273- Dept. of Psychology)
*-Cognitive Engineering* (ISE296G-Industrial & Systems Engineering Dept.)
*-Introduction to Ergonomics* (ISE 210- Industrial & Systems Engineering Dept.)
*-Human Factors Experiments* (ISE 212 – Industrial & Systems Engineering Dept.)
*-Research Methods* (Psyc 220- Dept. of Psychology)
*-Design for the Disabled* (Dept. of Rehabilitation Sciences)

## AWARDS/HONORS

2020          Elected Fellow, International Ergonomics Association (https://iea.cc/). *The IEA Fellowship is given to recognize extraordinary or sustained, superior accomplishments of an individual. To date, only 134 persons, worldwide, have been elected fellow.*

2019          Arnold M. Small President's Distinguished Service Award, Human Factors and Ergonomics Society. *This award recognizes individuals whose career-long contributions have brought honor to the profession and the Society. (hfes.org)*

2018          Keith Hansen Professional Outreach Award, Human Factors and Ergonomics Society.  *This award recognizes members and nonmembers who engage in significant activities that broaden awareness of the existence of the human factors/ergonomics profession and the benefits it brings to humankind.*

2016          Inaugural Award Winner, *Ergonomist Practitioner of the Year*, Presented by the Foundation for Professional Ergonomics (https://www.ergofoundation.org/). *The Foundation for Professional Ergonomics (FPE) initiated the annual award to recognize colleagues who have demonstrated outstanding contributions to the practice of ergonomics through their professional lifetime achievements and/or specific implementation projects.*

3/10/2021

| | |
|---|---|
| 2012 | Elected *Fellow,* Human Factors and Ergonomics Society. *Election to Fellow status is an honor conferred by distinguished colleagues to recognize outstanding achievement, consistently superior professional performance, exceptional contributions, personal service to the Society, and other meritorious accomplishments by Society members.* |
| 2010-2012 | Elected *President*, Human Factors and Ergonomics Society |
| 2009 | Winner of the 2009 User-Centered Design Award for the design of the Cardiac Science G3 Plus AED, Human Factors and Ergonomics Society (HFES) |
| 2009 | 2009 Outstanding Lecturer of the Year, Davidson College of Engineering, San Jose State University |
| 2008 | Certified Professional Ergonomist, Board of Certification in Professional Ergonomics (BCPE) |
| 2008 | Marquis Who's Who in America 2009 |
| 2008 | Winner, Best New Life Science Product Award, Scientist's Choice Awards 2008 (for StepOne™ Real-Time PCR System). |
| 2006 | Winner, Best *Ergonomics in Design* Article Award, for the article, "Better Taxiway Surface Markings, Safer Airports." |
| 2006 | NASA Space Act Software Award for T-NASA (ARC-15246-1) |
| 2006 | NASA Group Achievement Award, System Level Integrated Concept (SLIC) Development Team |
| 2000 | "Best of Track" award (Air Traffic Management Track) for paper presented at the 19th AIAA/IEEE Digital Avionics Systems Conference, (Hooey, Foyle, Andre, and Parke, 2000). |
| 1999 | SAE Wright Brothers Memorial Award for "An Evaluation of the Taxiway Navigation and Situation Awareness (T-NASA) System in High-Fidelity Simulation," (SAE Paper No. 985541).  This award is given to 'the best paper relating to the invention, development, design, construction or operation of an aircraft and/or spacecraft." |
| 1998 | National Aviation and Space Agency (NASA) Group Achievement Award, *Low-Visibility Landing and Surface Operations Flight Validation Team* "For significantly impacting the safety and efficiency of airport surface operations in all-weather conditions through the development, integration, and demonstration of key navigation and situation awareness technologies." |

**ER128**

3/10/2021

| | |
|---|---|
| 1996 | Industrial Designers Society of America (IDSA) Gold Award for "A Human Factors Analysis of Wayfinding at Tampa International Airport" |
| 1996 | First Recipient of the Earl Alluisi Award for Early Career Achievement, American Psychological Association (APA), Division 21 of Applied Experimental and Engineering Psychology |
| 1990 | California Department of Motor Vehicles Research Fellowship |
| 1990, 1991 | Society for Information Display (SID) Research Presentation Travel Award |
| 1990 | Transportation Research Board (TRB) and Federal Aviation Administration (FAA) National Graduate Aviation Research Award |

## DESIGN PATENTS

1999        **User Interface of a Front Control Panel**, Patent#: D412499, Patent
Assignee:        Ingersoll-Rand Company

1999        **User Interface of a Front Control Panel**, Patent#: D413589, Patent
Assignee:        Ingersoll-Rand Company

1999        **User Interface of a Front Control Panel**, Patent#: D412498, Patent
Assignee:        Ingersoll-Rand Company

1999        **User Interface of a Front Control Panel**, Patent#: D412896, Patent
Assignee:        Ingersoll-Rand Company

1999        **Housing Enclosure for a Microprocessor Controller**, Patent#: D412897,
Patent Assignee:  Ingersoll-Rand Company

## OTHER PROFESSIONAL POSITIONS

2021 - Present    Member, Fellows Selection Committee, HFES

2021 – Present    Chair, IAE Fellows Selection Committee, HFES

2017 - 2019    Annual Human Factors Training Coordinator, US Food and Drug Administration (FDA)

2019    Member, HFES Annual Meeting Optimization Task Force

2016    Member, HFES Blue Ribbon "Future of the Society" Task Force

Anthony D. Andre, Ph.D., CPE                                                                Page 5

**ER129**

3/10/2021

| | |
|---|---|
| 2012 | Member, HFES Website Redesign Task Force |
| 2011 – Present | Chair and/or Member, HFES Specialized Meetings Committee |
| 2011 | Vice-Chair, Host Committee, 2011 HFES Annual Meeting, Las Vegas, NV |
| 2010 - 2011 | President, Human Factors and Ergonomics Society |
| 2010 | Member, Technical Expert Panel on "Understanding Development Methods from Other Industries to Improve the Design of Consumer Health IT", US Agency for Healthcare Research and Quality (AHRQ) |
| 2011 | Member, Scientific Advisory and Program Board for the 1st International Conference on the Human Side of Service Engineering |
| 2010 | Member, Scientific Advisory and Program Board for the International Conference on Human Factors and Ergonomics in Healthcare |
| 2010 | Chair, Meetings Policy Committee, 2010 HFES Annual Meeting, San Francisco, CA |
| 2010 | Chair, Host Committee, 2010 HFES Annual Meeting, San Francisco, CA |
| 2009 | Chair, Policy and Planning Committee, Human Factors and Ergonomics Society |
| 2009 | Member, Executive Committee, Human Factors and Ergonomics Society |
| 2009 | Member, Collaborative Technologies Task Force, Human Factors and Ergonomics Society |
| 2009 | Member, Finance and Budget Committee, Human Factors and Ergonomics Society |
| 2009 | Member, Nominations and Elections Committee, Human Factors and Ergonomics Society |
| 2009 | Member, President's Media and Technology Uber Task Force, Human Factors and Ergonomics Society |
| 2008 | Member, Continuance of Certification Committee, Board of Certification in Professional Ergonomics (BCPE) |
| 2009 | Member, President's Media and Technology Uber Task Force, Human Factors and Ergonomics Society |

Anthony D. Andre, Ph.D., CPE                                                                 Page 6

**ER130**

3/10/2021

| | |
|---|---|
| 2009 | Member, Education Strategic Initiative Tiger Team, Human Factors and Ergonomics Society |
| 2007 | Member, Policy and Planning Committee, Human Factors and Ergonomics Society |
| 2008 | Co-Lead, Virtual HFES Task Force, Human Factors and Ergonomics Society |
| 2008 | Member, Financial Investment Sub-Committee, Human Factors and Ergonomics Society |
| 2008 | Member, Operating Rules Sub-Committee, Human Factors and Ergonomics Society |
| 2007 | Domain Leader, Internal Affairs, Human Factors and Ergonomics Society |
| 2005 | Chair, Student Affairs, Human Factors and Ergonomics Society |
| 2006 | Chair, Host Committee, Human Factors and Ergonomics Society Annual Meeting, San Francisco, CA |
| 2004 – 2018 | Faculty Adviser, HFES Student Chapter at San Jose State University |
| 2002 - 2010 | Advisory Board, Healthycomputing.com |
| 2001-2003 | Member, Society of Automotive Engineers (SAE) *Surface Operations Display Subcommittee* |
| 1998 - 2003 | Advisory Board, Typing Injury FAQ, CTD Resource Network |
| 1997 - 2003 | Editorial Board, International Journal of Aviation Psychology |
| 1997 - 2007 | Editorial Board, Journal of the Society of Human Performance in Extreme Environments. |
| 1997 - 1998 | Program Chair, Aerospace Systems Technical Group of the Human Factors and Ergonomics Society |
| 1996 - 2002 | Chair, Professional Development and Education, National Program Committee, Human Factors and Ergonomics Society |
| 1996 - 2000 | Member, Education Committee, Human Factors and Ergonomics Society |
| 1996-1999 | Education and Professional Development Chair, Annual Meeting Technical Program Committee (TPC) |

Anthony D. Andre, Ph.D., CPE                                                             Page 7

**ER131**

3/10/2021

| | |
|---|---|
| 1995 - 1999 | Member, Technical Program Committee, Human Factors and Ergonomics Society |
| 1995 - 1998 | Director, Human Factors and Ergonomics Society, Bay Area Chapter |
| 1995-1997 | Director, Bay Area HFES Local Chapter |
| 1995 -1998 | Technical Advisor and Charter Member, Society of Human Performance in Extreme Environments. |
| 1995 | Guest Editor, "Pilot Workload: Contemporary Issues" *International Journal of Aviation Psychology, Volume 5 (1)* |
| 1994 - 1996 | Human Factors and Ergonomics Society (HFES) National Speaker |
| 1994 - 2001 | Society of Automotive Engineers (SAE) National Speaker |
| 1994 - 2001 | Scientific Committee, Automation Technology and Human Performance Society |
| 1994 - 1995 | Program Chair, Visual Performance Technical Group of the Human Factors and Ergonomics Society |
| 1993 - 1996 | Member, Board of Directors, Silicon Valley Ergonomics Institute |
| 1992 - 2005 | Contributing Editor and Columnist, *Ergonomics in Design: The Magazine of Human Factors Applications.* |
| 1992 - 1996 | Head, Control-Display Evaluation Laboratory, NASA Ames Research Center, Flight Management and Human Factors Division |
| 1990 - 1996 | Secretary/Treasurer, Aerospace Systems Technical Group, Human Factors and Ergonomics Society |
| 1993 - 1994 | Member, Applied Vision/Human Factors Program Committee, Society for Information Display |
| 1990 - 1991 | President and Co-Founder, University of Illinois Student Chapter of the Human Factors Society |
| 1988 - 1991 | Head Psychology Tutor, Departments of Psychology and the Center for Sensory Impaired, University of Illinois at Urbana-Champaign |
| 1987 - 1991 | Graduate Research Assistant, Departments of Aviation, Industrial Engineering, and Psychology, University of Illinois at Urbana-Champaign |

**ER132**

3/10/2021

3/10/2021

## CONFERENCE LEADERSHIP POSITIONS

| | |
|---|---|
| 2020 | Chair and Producer: HFES Townhall Webinar: Facing the Coronavirus (COVID-19): Human Factors Considerations |
| 2020 | Chair, Producer and Presenter: COVID-19 Ergonomics Summit: Guidelines for Safe and Healthy Work or School from Home |
| 2019 | Co-Chair, Joint HFES-CIEHF Virtual Seminar on Medical Device Human Factors |
| 2014 – Present | Coordinator and Chair: Annual FDA Human Factors Workshops at the International Symposium on Human Factors and Ergonomics in Health Care |
| 2016 | Chair, HFES Annual Meeting Innovation Task Force, Human Factors and Ergonomics Society |
| 2015 – 2018 | Co-Founder and Co-Chair, The ErgoX Conference |
| 2011 – Present | Founder and Co-Chair, International Symposium on Human Factors and Ergonomics in Health Care (hcs2021.org) |
| 2006 | Host Chair, Annual Meeting of the Human Factors and Ergonomics Society |
| 2010 | Host Chair, Annual Meeting of the Human Factors and Ergonomics Society |
| 2016 | Chair, HFES Annual Meeting Task Force Chair, Human Factors and Ergonomics Society |

## OTHER PROFESSIONAL ACTIVITIES

| | |
|---|---|
| 2021 | Journal Article Reviewer, *Healthcare* |
| 2019 – Current | Journal Article Reviewer, *Ergonomics in Design* |
| 2016 – Current | Journal Article Reviewer, *Journal of Air Transportation* |
| 2016 – Current | Journal Article Reviewer, *Theoretical Issues in Ergonomics Science* |
| 2010 – Current | Submission Reviewer, Medical and Drug Delivery Device Track, HFES International Symposium on Human Factors and Ergonomics in Healthcare. |
| 2009 | Book Reviewer, Taylor and Francis Group, LLC, Publishers |

3/10/2021

| | |
|---|---|
| 2009 | Book Reviewer, Morgan Kaufmann Publishers |
| 2008 | Reviewer, CHI (Computer Human Interaction) 2009 Conference |
| 1998 - Present | Journal Article Reviewer, *International Journal of Aviation Psychology* |
| 1998 - Present | Journal Article Reviewer, *Human Factors* |
| 1995 - 2010 | Invited Lecturer, US Air Force Department of Behavioral Sciences, US Air Force Academy, Colorado Springs, CO. |
| 1999 | Session Chair, "Ergonomics in Computerized Offices," Ergocon '99, San Jose, CA |
| 1999 | Session Chair, "Surface Navigation," 10th International Symposium on Aviation Psychology, Columbus, Ohio |
| 1998 | Submission Reviewer, *International Symposium on Aviation Psychology* |
| 1998 | Session Chair, "Successful Strategies for Human Factors and Ergonomics Consultants," 42nd Annual Human Factors and Ergonomics Society Meeting, Chicago, IL. |
| 1998 | Session Chair, "Aerospace Systems," 42nd Annual Human Factors and Ergonomics Society Meeting, Chicago, IL. |
| 1998 | Session Cochair, "Transitioning From Student to Professional:  What's in Your Future?" 42nd Annual Human Factors and Ergonomics Society Meeting, Chicago, IL. |
| 1998 | Session Chair, "Interfaces for Human-Automation Interaction," Third Automation Technology and Human Performance Conference, Norfolk, VA |
| 1998 | Article Reviewer/Board Member, *Typing Injury FAQ (TIFAQ)* |
| 1997 | Book Reviewer, *The American Journal of Psychology* |
| 1997 | Journal Article Article Reviewer, *Journal of Applied Ergonomics* |
| 1996 | Journal Article Article Reviewer, *Journal of Human Performance* |
| 1996 | Session Chair, "Situation Awareness in Aviation,"  First International Conference on Engineering Psychology & Cognitive Ergonomics, Stratford-upon-Avon, UK |
| 1996 | Session Chair, "Science and Psychology," American Psychological Association Annual Convention, Toronto, Canada |

Anthony D. Andre, Ph.D., CPE                                             Page 11

**ER135**

3/10/2021

| 1996 | Article Reviewer, *Journal of the Society for Information Display* |
|------|---|

1996        Session Chair, "Cockpit Automation," Second Automation Technology and Human Performance Conference, Cocoa Beach, FLA

1995        Journal Article Article Reviewer, *International Journal of Human-Computer Interaction*

1995        Session Chair, "Graphical User Interfaces,"  Human Factors and Ergonomics Society Annual Meeting, San Diego, CA

1995        Session Chair, "Aerospace Displays,"  Human Factors and Ergonomics Society Annual Meeting, San Diego, CA

1995        Session Chair, "Air Traffic Control: Automation," 8th International Symposium on Aviation Psychology, Columbus, Ohio

1994        Session Chair, "Vigilance, memory, and mental workload,"  Human Factors and Ergonomics Society Annual Meeting, Nashville, Tennessee

1994        Session Chair, "Human Factors in Consumer Behavior and Product Design," American Psychological Association, Los Angeles, CA

1994        Session Co-Chair, "User Interface and Performance Issues," Society for Information Display Annual Meeting, San Jose, CA

1994        Session Chair, "Medical Systems" Automation Technology and Human Performance Conference, Washington, D.C.

1993        Session Chair, "Aerospace System Displays," Human Factors and Ergonomics Society Annual Meeting, Seattle, Washington

1993        Session Chair, "Training in Dynamic Environments," American Psychological Association Annual Convention, Toronto, Canada

1992        Session Co-Chair/Organizer, "Visual Requirements for Human-Vehicle Simulation," IEEE SMC Conference, Chicago, Illinois

1992        Session Chair, "Object and Graphical Displays," Human Factors and Ergonomics Society Annual Meeting, Atlanta, Georgia

**ER136**

3/10/2021

**PROFESSIONAL AFFILIATIONS** (current and past)

Human Factors and Ergonomics Society (HFES)

- -Forensics Professionals Technical Group
- -Healthcare Technical Group
- -Product Design Technical Group

Association of Aviation Psychologists (AAP)

American Psychological Association (APA), Division 21

American Psychological Society (APS)

Society of Human Performance in Extreme Environments (HPEE)

Society of Automotive Engineers (SAE)

Society for Information Display (SID)

BayCHI

Usability Professionals' Association (UPA)

Board of Certified Ergonomics Professionals (BCPE)

3/10/2021

## PUBLICATIONS

**Digital/Online**
Andre, A.D. et al. (2020). *Ergonomic Guidelines for Children Homeschooling.* Human Factors and Ergonomics Society (Download here)

**Refereed Journals / Books**
Newswanger, B., Prestrelski, S., & Andre, A.D. (2019). Human factors studies of a prefilled syringe with stable liquid glucagon in a simulated severe hypoglycemia rescue situation. *Journal of Expert Opinion on Drug Delivery*, Vol 16 (9).

Valentine, V., Newswanger, B., Prestrelski, S., Andre, A.D. & Garibaldi, M. (2019). Human Factors Usability and Validation Studies of a Glucagon Autoinjector in a Simulated Severe Hypoglycemia Rescue Situation. *Diabetes Technology and Therapeutics*, Vol 21 (9).

Andre, A.D. (2015). Prospective, open-label study to validate proper use of the Versacloz™ (clozapine) oral suspension kit by people with schizophrenia. *Patient Intelligence*, 7, 3-8.

Andre, A. D., Brand-Schieber, E., Ramirez, M., Munjal, S., & Kumar, R. (2017). Subcutaneous sumatriptan delivery devices: comparative ease of use and preference among migraineurs. *Patient preference and adherence*, *11*, 121.

Brand-Schieber, E., Munjal, S., Kumar, R., Andre, A. D., Valladao, W., & Ramirez, M. (2016). Human factors validation study of 3 mg sumatriptan autoinjector, for migraine patients. *Medical Devices (Auckland, NZ)*, *9*, 131.

Andre, A.D., Wang, C., Berry, B., & Loper, A. (2015). A Randomization, Cross-Over Comparison of Preference Between Two Once Weekly Treatment GLP-1RA Pen Injectors (Tanzeum™ and Bydureon ®) in Adults with Type 2 Diabetes Mellitus; 1138P. American Diabetes Association 75th Annual Scientific Sessions, 64(1), A293.

Estes, J., Olmos, O., Andrews, C., Andre, A.D., Chrysler, S., & Hannon, D. (2005).  Better Taxiway Surface Markings, Safer Airports: A multidisciplinary team develops markings designed to reduce the number of runway incursions. Ergonomics in Design, p13-18.

Andre, A. D., Jorgenson, D.B., Froman, J.A., Snyder, D.E., & Poole, J. E.  (2004). Automated External Defibrillator Use by Untrained Bystanders: Can the Public-Use Model Work? Prehospital Emergency Care, 8, 284-291.

Hooey, B.L., Foyle, D.C., & Andre. A.D. (2000). Integration of cockpit displays for surface operations: The final stage of human-centered design approach. SAE Transactions: Journal of Aerospace, 109, 1053-1065.

Andre, A.D. (1998). The value of workload in the design and evaluation of consumer products. In P.A. Hancock and P.A. Desmon (Eds.) Stress, Workload and Fatigue. New Jersey: Lawrence Erlbaum Associates.

Anthony D. Andre, Ph.D., CPE                                                    Page 14

**ER138**

3/10/2021

Wickens, C.D. and Andre, A.D. (1998). Psychology applied to aviation. In A. Stec and D. Bernstein (Eds.) Psychology: Fields of application, p.184-198, New Jersey: Houghton Mifflin.

Andre, A.D. and Segal, L.D. (1998, July). Design functions: The user's perspective. Ergonomics in Design. Santa Monica: HFES.

Wright, K.S. and Andre, A.D. (1997, October). Why alternative keyboards are purchased and what benefits result from their use: A Survey Study. Workplace Ergonomics, 28-32.

Andre, A.D. and Degani, A. (1997). Do you know what mode you're in? An analysis of mode errors in everyday things. In M. Mouloua and J. Koonce (Eds.) Human-Automation Interaction, p. 19-28, New Jersey: Lawrence Erlbaum Associates.

Foyle, D.C., Andre, A.D., McCann, R.S., Wenzel, E., Begault, D. and Battiste, V. (1996). Taxiway Navigation and Situation Awareness (T-NASA) System: Problem, design philosophy and description of an integrated display suite for low-visibility airport surface operations. SAE Transactions: Journal of Aerospace, 105, 1411-1418.

McCann, R.S., Foyle, D.C., Andre, A.D. and Battiste, V. (1996). Advanced navigation aids in the flight deck: Effects on ground taxi performance under low-visibility conditions. SAE Transactions: Journal of Aerospace, 105, 1419-1430.

Andre, A.D. (1996). Ergonomics certification. Workplace Ergonomics, Vol2., p.3.

Andre, A.D., and Wickens, C.D. (1995, October). When users want what's not best for them. Ergonomics in Design, 10-14.

Andre, A.D. and Hancock, P.A. (1995). Pilot workload: Contemporary issues (Editorial). The International Journal of Aviation Psychology, 5(1), 1-4.

Andre, A.D., Heers, S.T. and Cashion. P.A. (1995). Effects of workload preview on task scheduling during simulated instrument flight. The International Journal of Aviation Psychology, 5(1), 5-23.

Andre, A.D. and Segal, L.D. (Quarterly). Design Functions. Ergonomics in Design. Santa Monica: HFES.

Andre, A.D., Hancock, P.A., and Smith, K. (1993, April). Getting there from here with TravTek. Ergonomics in Design, 1 (2), 16-17.

Andre, A.D. (1993). Effective Vehicle Simulation. In E. Haug (Ed.), Concurrent engineering: Tools and technologies for mechanical system design, pp. 979-986. New York: Springer-Verlag.

Johnson, W.W., Andre, A.D. and Kruk, R.V. (1993). Visual cues in flight simulation: An evaluation of stereo effectiveness. SAE Transactions. Warrendale, PA: SAE.

**ER139**

3/10/2021

Andre, A. D. and Wickens, C. D. (1992). Compatibility and  consistency in display-control systems: Implications for aircraft decision aid design. Human Factors, 34 (6), 639-653.

Andre, A. D., Wickens, C. D., Moorman, L., and Boschelli, M. (1991). Display formatting techniques for improving situation awareness in the aircraft cockpit. The International Journal of Aviation Psychology, 1 (3), 205-218.

Andre, A. D (1991).  Human orientation and wayfinding in airport passenger terminals (Record #1298, pp. 25-32).  Transportation Research Board, NRC: Washington, DC.

Wickens, C. D. and Andre, A. D. (1990). Proximity compatibility and information display: Effects of color, space, and objectness on information integration. Human Factors, 32 (1), 61-77.

Wickens, C. D., Andre, A. D., and Haskell, I. D. (1990). Compatibility and consistency in crew station design. In E. J. Lovesey (Ed.) Contemporary Ergonomics 1990. (pp. 118-122). London: Taylor and Francis.

## CONFERENCE PRESENTATION/PROCEEDINGS (selected)

Andre, A.D., Squittieri, N, and Patil, S.  (2021). Evaluation of the Octreotide Acetate Pen Injector in a Formative Human Factors Study.  To be presented at ENDO 2021.

Andre, A.D., Garibaldi, M., Cummins, M., Prestrelski, S., & Newswanger, B. (2017). Summative Human Factors Study of a Glucagon Auto-Injector in a Simulated Severe Hypoglycemia Rescue Situation. In Proceedings of 53rd EASD Annual Meeting, Lisbon, Portugal, 2017.

Andre, A. D., Brand-Schieber, E., Ramirez, M., Munjal, S., & Kumar, R. (2017). Subcutaneous sumatriptan delivery devices: comparative ease of use and preference among migraineurs. Poster Presentation at American Headache Society, Boston, MA., 2017.

Ching, K., Andre, A.D., Crick, M., Krasner, A., De Souza, E. (2015). Biodel's Glucagon Emergency Management (GEM) Auto-Reconsistution Device Demonstrates Superior Usability Compared to Marketed Glucagon Kits in Human Factors Study. Poster Presentation at Diabetes Technology Meeting, Bethesda, MD, 2015.

Karwowski, W., Peres, S. C., Andre, A. D., Cooke, N. J., Imada, A. S., Lee, J. D., & Marras, W. S. (2014, September). The Grand Challenges for HFES and HF/E Profession the Fellows' Perspective. In Proceedings of the Human Factors and Ergonomics Society Annual Meeting (Vol. 58, No. 1, pp. 595-595). SAGE Publications.

Rantanen, E. M., Colombo, D. J., Miller, S. M., Alexander, A. L., Lacson, F. C., & Andre, A. D. (2013, September). Practicing Relevant Skills in the Classroom: Advice from Experts in the

**ER140**

3/10/2021

Industry to Professors. In Proceedings of the Human Factors and Ergonomics Society Annual Meeting  (Vol. 57, No. 1, pp. 443-446). Sage CA: Los Angeles, CA: SAGE Publications.

Brill, J.C., Andre, A.D., Beith, B., Boehm-Davis, D.A., Gawron, V.J., & Mayhorn, C.B. (2010). The Future of Human Factors Education: Practices and Needs from the Perspectives of Academia, Government, and Industry. In Proceedings of the Human Factors and Ergonomics Society Annual Meeting, Santa Monica, CA: HFES.

Cheng, V.H.L., Andre, A.D., & Foyle, D.C. (2010). Information Requirements for Pilots to Execute 4D Trajectories on the Airport Surface. AIAA (American Institute of Aeronautics and Astronautics) 48th Aerospace Sciences Meeting. Orlando, FL, Jan, 2010.

Smith, P.J., Andre, A , Spencer, A., Evans, M., & Krozel, J., & (2009). A Critique of an Operation Concept for Managing Traffic in Super Dense Operations Airspace. 28th Digital Avionics Systems Conf., Orlando,FL, Oct., 2009.

Shapiro, R. , Andre, A.D.,  Schumaker, R.M., Windell, D.T., & Schur, C.I. (2009). Toward a Stable Career in an Unstable Job Mmarket. In Proceedings of the Human Factors and Ergonomics Society Annual Meeting, Santa Monica, CA: HFES.

Smith, P. J., Spencer, A.L. Evans, M. Andre, A.D. and Krozel, J. (2009). Human factors issues in the Design of Super-Dense Operations Airspace. In Proceedings of the Human Factors and Ergonomics Society Annual Meeting. Santa Monica, CA: HFES.

Lichter, P.A., North, R., Andre, A.D., Riehl, T.H. & Andreson, S.M. (2009). System to Improve AED Resuscitation using Interactive CPR Coaching. IEEE Engineering in Medicine and Biology 31st Annual Annual International Conference.  Minneapolis, MN, Sept. 2009.

Shapiro, R., Andre, A.D., Artis, S, Agarwal, A., & Hoeft, R. (2008). The Real World HF/E: Understanding the Realities of Your First Job. In Proceedings of the Human Factors and Ergonomics Society Annual Meeting, p. 1805-1810. Santa Monica, CA: HFES.

Smith, P.J., Spencer, A., Evans, M., Krozel, J., & Andre, A (2008). Managing Arrivals in Super-Dense Operations: Guidance Based on Cognitive Walkthrough. 27th Digital Avionics Systems Conf., Minneapolis, MN, Oct., 2008.

Shapiro, R., Andre, A.D., Lund, A.M., Barlow, T., & Waxburg, S. (2007). A Guide to Successful HF/E Career Preparation: The Ultimate "Not-To-Do" List. In Proceedings of the Human Factors and Ergonomics Society Annual Meeting, p. 1486-1490. Santa Monica, CA: HFES.

Krozel, J., Mitchell, J.S.B., Prete, J., Smith, P., and Andre, A. (2007). "Designing 4-D Trajectories for Super-Dense Operations Given Weather Constraints," 26th Digital Avionics Systems Conf., Dallas, TX, Oct., 2007.

**ER141**

3/10/2021

Smith, P.J., Spencer, A., Krozel, J., Andre, A., and Mitchell, J.S.B. (2007). "Traffic Flow Management Strategies to Support Super-Dense Operations in the Terminal Area," *26th Digital Avionics Systems Conf.*, Dallas, TX, Oct., 2007.

Sweriduk, G.D., Cheng,, V.H.L., Andre, A.D. & Foyle, D.C. (2007). Automation Tools for High-Precision Taxiing. DASC *26th Digital Avionics Systems Conf.*, Dallas, TX, Oct. 21-24, 2007.

Krozel, J., Spencer, A., Smith, P., and Andre, A. (2007). "Requirements for Super-Dense Operations for the NGATS Terminal Airspace," *Integrated Communications, Navigation, and Surveillance Conf.*, Herndon, VA, May, 2007.

Krozel, J., Smith, P., Andre, A., (2007). Resource Management to Address Weather Impacts in Super-Dense Terminal Airspaces: Concept of Operations for Super-Dense Operation of the NGATS Terminal Area, Technical Report 34N0307-001-R0, Metron Aviation, Inc., Herndon, VA, March 20, 2007.

Shapiro, R., Andre, A.D., Beith, B.H., Endsley, M.R., & Naga, J.T. (2006). Preparing For Your Career: Learn From the Past 50 Years As You Prepare For the Next 50. In Proceedings of the Human Factors and Ergonomics Society Annual Meeting, p. 2301-2305. Santa Monica, CA: HFES.

McCandless, J. W., McCann, R. S., Barshi, I., Kaiser, M. K., & Andre, A.D. (2006). Panel presentation: Human factors technologies for space exploration. In proceedings of AIAA Space 2006 Conference. San Jose, CA: AIAA.

Andre, A.D., Smith, S., Spencer, A., & Krozel, J. (2005). Weathering the Storm for the Future NAS: A Human Factors Approach to a Natural Phenomenon. Proceedings of the Forteenth International Symposium on Aviation Psychology. Dayton, OH.

Devine, H., & Andre, A.D. (2005). Effect of Scroll Bar and Navigation Menu Co-Location on Web Performance 49 1454. . Proceedings of the 46th Annual Meeting of the Human Factors and Ergonomics Society, .Santa Monica, CA: Human Factors and Ergonomics Society.

Andre, A. D., Hooey, B. L, & Foyle, D. C. (2005). Capturing the Research and Development Process of Aviation Systems: Creating a Multi-Media Living Legacy. Proceedings of the 13th International Symposium on Aviation Psychology. Oklahoma City, April 18-21.

Foyle, D. C., Andre, A. D., & Hooey, B. L. (2005). Situation Awareness in an Augmented Reality Cockpit: Design, Viewpoints and Cognitive Glue. In Proceedings of the 11th International Conference on Human Computer Interaction. Las Vegas, NV.

Shapiro, R., Lund, A., Andre, A.D., English, J., & Creaser, J. (2005). Achieving Success in the HF/E Field: Expert Advice on How to Become a Future Expert! In Proceedings of the Human Factors and Ergonomics Society Annual Meeting, p. 1846-1851. Santa Monica, CA: HFES.

**ER142**

3/10/2021

Andre, A.D., Creaser, J., English, J., Lung, A., & Shapiro, R. (2004). Launching Your Career in HF/E: Guidelines for Soaring High in the Job Market. In Proceedings of the Human Factors and Ergonomics Society Annual Meeting, Santa Monica, CA: HFES.

Andre, A.D.& Kingsburg, J.R.. (2004). When Every Minute Counts, All Automatic External Defibrillators are Not Created Equal.  In Human Performance, Situation Awareness and Automation: Current Research and Trends (HPSAA II). Lawrence Erlbaum Associates: New Jersey.

Andre, A.D., Kingsburg, J.RK. and Shelden, S. (2004). Automation in Consumer Software: New Domain, Same Issues. In Human Performance, Situation Awareness and Automation: Current Research and Trends (HPSAA II). Lawrence Erlbaum Associates: New Jersey.

Kingsburg, J.R., & Andre, A.D. (2004). A Comparison of Three-Level Web Menu Navigation Structures. 48 1513. In Proceedings of the Human Factors and Ergonomics Society Annual Meeting, Santa Monica, CA: HFES.

Signor, D., Davis, P., Lozito, S., Andre, A.D., Sweet, D., Wallace, E. (2004) Efficient Air Traffic Scenario Generation. AIAA 4th Aviation Technology, Integration and Operations (ATIO) Forum, Chicago.

Baldwin, C.L., Barchi, I., McNamara, D.S., Andre, A.D., Morrow, D., Prinzo, V., & Kerns, K. (2003). Data Link Communications: Perspectives from the Air and Ground. . In Proceedings of the Human Factors and Ergonomics Society Annual Meeting, Santa Monica, CA: HFES.

Andre, A. D., Lins, J. M. C., & Wilson, J. (2003). Conveying message criticality via datalink. Proceedings of the Twelfth International Symposium on Aviation Psychology. 54-59. Dayton, Ohio: Wright State University.

Shapiro, R., Andre, A.D., Beith, B.H., Entin, E.B., & Legan, B.M. (2003). Getting Started in the Right Direction: Expert Advice for Preparing for Your Professional Career. In Proceedings of the Human Factors and Ergonomics Society Annual Meeting, Santa Monica, CA: HFES.

Krozel, J., Capozzi, B., Andre, T., and Smith, P. (2003). "The Future National Airspace System: Design Requirements Imposed by Weather Constraints", AIAA Guidance, Navigation, and Control Conference, Austin, TX.

Hooey, B. L., Foyle, D. C., & Andre, A. D. (2002). A human-centered methodology for the design, evaluation, and integration of cockpit displays. Paper to appear in proceedings of the NATO RTO SCI and SET Symposium on Enhanced and Synthetic Vision Systems. September, 10-12, 2002. Ottawa, Canada.

Andre, A.D., Foyle, D.C., & Hooey, B. L. (2002). Creating a Multi-Media Living Legacy: The T-NASA Design Technology Transfer Tool. In Proceedings of the HCI Aero Conference. AAII.

3/10/2021

Young, K.R., Shapiro, R.G., Andre, A.D., Lund, A.M., Robertson, M.M., Bass, E.J., Karsh, B., & Lin, J. (2002). Maximizing your opportunities in a competitive job market. Proceedings of the 46th Annual Meeting of the Human Factors and Ergonomics Society, . Santa Monica, CA: Human Factors and Ergonomics Society.

Shapiro, R.G., Andre, A.D., Lund, A.M., Fox, J.E., Fadden, S., & Tremer, J.D. (2001). Human Factors Career Issues and Answers: Choosing and Preparing for a Career that Works for You. Proceedings of the 46th Annual Meeting of the Human Factors and Ergonomics Society, . Santa Monica, CA: Human Factors and Ergonomics Society.

Shapiro, R.G., Andre, A.D., Sklar, A.E., Alteras-Webb, S.M., Narkevicius, J.M. (1999). Preparing for Your Professional Career: What Every Student Should Know. Proceedings of the Annual Meeting of the Human Factors and Ergonomics Society. Santa Monica, CA: Human Factors and Ergonomics Society.

Hooey, B. L., Foyle, D. C., & Andre, A. D. (2001). The design of aircraft cockpit displays for low-visibility taxi operations. In A. G. Gale (Ed.) Vision in Vehicles IX. Holland: Elsevier Science Publishers.

Purcell, K. P., & Andre, A. D. (2001). The influence of callouts on pilot visual attention to an electronic moving map. In R. S. Jensen, L. Chang, & K. Singleton (Eds.), Proceedings of the Eleventh International Symposium on Aviation Psychology. Columbus, Ohio: Ohio State University.

Hooey, B. L., Foyle, D. C., & Andre, A. D. (2000). Integration of cockpit displays for surface operations: The final stage of a human-centered design approach. SAE Transactions: Journal of Aerospace, 109, 1053-1065.

Hooey, B. L., Foyle, D. C., Andre, A. D., & Parke, B. (2000). Integrating datalink and cockpit display technologies into current and future taxi operations. Proceedings of the AIAA/IEEE/SAE 19th Digital Avionics System Conference, 7.D.2-1 - 7.D.2-8. Philadelphia, PA.

Hooey, B. L., Foyle, D. C., Andre, A. D., Purcell, K., & Dowell, S. (2000). Optimizing airport surface operations using datalink and the Taxiway Navigation and Situation Awareness (T-NASA) display suite. Proceedings of the 44th Annual Meeting of the Human Factors and Ergonomics Society. Santa Monica, CA: Human Factors and Ergonomics Society.

Banbury, S.P., Andre, A.D., & Croft, D.G. (2000). Do We "Know" All That We "Know"? The Role of Implicit Knowledge in Situation Awareness. Proceedings of the Annual Meeting of the Human Factors and Ergonomics Society. Santa Monica, CA: Human Factors and Ergonomics Society.

Purcell, K., & Andre, A.D. (2000). Effects of Visual and Audio Callouts on Pilot Visual Attention During Electronic Moving Map Use. Proceedings of the Annual Meeting of the Human Factors and Ergonomics Society. Santa Monica, CA: Human Factors and Ergonomics Society.

**ER144**

3/10/2021

Shapiro, R.G., Andre, A.D., Lund, A.M., Fox, J.E., Watts-Perotti, J., & Fadden S. (2000). Establishing a Human Factors Career in the New Millennium: Answers to Frequently Asked Questions [Panel]. Proceedings of the Annual Meeting of the Human Factors and Ergonomics Society. Santa Monica, CA: Human Factors and Ergonomics Society.

Monaghan, M.L., & Andre, A.D. (2000). Evaluating the Transparency of Web Search Engines. Proceedings of the Annual Meeting of the Human Factors and Ergonomics Society. Santa Monica, CA: Human Factors and Ergonomics Society.

Andre A D, Lund A M (1999). Managing a Human Factors/Ergonomics Group: Lessons Learned. Proceedings of the Annual Meeting of the Human Factors and Ergonomics Society. Santa Monica, CA: Human Factors and Ergonomics Society.

Shapiro, R.G., Andre, A.D., Sklar, A.E., Alteras-Webb, S.M., Narkevicius, J.M. (1999). Preparing for Your Professional Career: What Every Student Should Know. Proceedings of the Annual Meeting of the Human Factors and Ergonomics Society. Santa Monica, CA: Human Factors and Ergonomics Society.

Andre, A.D., North, R.A., Wickham, D.P., Spain, K.A. (1999). Student Internships: The Key to Your Future? Proceedings of the Annual Meeting of the Human Factors and Ergonomics Society. Santa Monica, CA: Human Factors and Ergonomics Society.

McCann, R., Foyle, D. C., Hooey, B. L., & Andre, A. D. (1999). Pilot interactions with an electronic display suite to support low-visibility taxi. In Countering the Directed Energy Threat: Are Closed Cockpits the Ultimate Answer? Third Symposium of the Human Factors & Medicine Panel. RTA: NATO, 17:1-17:13.

Graeber, D. & Andre, A.D. (1999).  Assessing Visual Attention of Pilots while using Electronic Moving Maps for Taxiing. In Proceedings of the 10th International Symposium on Aviation Psychology, pp. 791-796. Columbus, OH.

Hooey, B., Schwirzke, M., McCauley, M., Renfroe, D., Purcell, K., and Andre, A.D. (1999). Issues in the Procedural Implementation of Low-Visibility Landing and Surface Operations Displays.  In Proceedings of the 10th International Symposium on Aviation Psychology, pp. 797-803. Columbus, OH.

Appenrodt, K.W. & Andre, A.D. (1999). Comparison of wrist posture during computer mouse use with and without chair armrest. To appear in Proceedings of the Silicon Valley Ergonomics Conference & Exposition (ErgoCon '99), pp.117-125, San Jose, CA.

English, J. & Andre A.D. (1999).  Posture and Internet navigation: An observational study. In Proceedings of the Silicon Valley Ergonomics Conference & Exposition (ErgoCon '99), pp.126-135, San Jose, CA.

**ER145**

3/10/2021

Andre, A.D. (1999). Monkey See, Monkey Do:  How Visual Requirements Affect Posture and Points of Contact Among Computer Workstation Users.  In Proceedings of the Silicon Valley Ergonomics Conference & Exposition (ErgoCon '99), pp.136-138, San Jose, CA.

Chow Yu, P. & Andre, A.D. (1999). A simulator evaluation of four perspective scene viewpoints. To appear in Proceedings of the Silicon Valley Ergonomics Conference & Exposition (ErgoCon '99), pp.233-242, San Jose, CA.

McCann, R., Foyle, D,  Hooey, B. & Andre, A.D. (1999). Pilot Interactions with an Electronic Display Suite to Support Low-Visibility Taxi. In Countering the Directed Energy Threat: Are Closed Cockpits the Ultimate Answer? Third Symposium of the Human Factors and Medicine Panel, RTA:NATO.

Andre, A.D., Hooey, B., Foyle, D., and McCann, R. (1998).  Field Evaluation of T-NASA: Taxi Navigation and Situation Awareness System.  IEEE/AIAA Digital Avionics Systems Conference, Seattle, WA.

Andre, A.D. (1998). Effective use of the World Wide Web (WWW) for HF/E consultants. Proceedings of the 42nd Annual Meeting of the Human Factors and Ergonomics Society, pp. 714-718. Santa Monica, CA: Human Factors and Ergonomics Society.

Andre, A.D. & Cutler, H. (1998). Displaying uncertainty in advanced navigation systems. Proceedings of the 42nd Annual Meeting of the Human Factors and Ergonomics Society, pp. 31-35. Santa Monica, CA: Human Factors and Ergonomics Society.

Andre, A.D. & Hooey, B. (1998). The human factors of conducting field research: Lessons learned from the evaluation of T-NASA. Proceedings of the 42nd Annual Meeting of the Human Factors and Ergonomics Society, pp. 67-71. Santa Monica, CA: Human Factors and Ergonomics Society.

Andre, A.D. (1998).  From the research lab to the cockpit:  The principled development of an electronic taxi map display.  In Proceedings of the Third Automation Technology and Human Performance Conference, Norfolk, VA. (abstract only)

Andre, A.D. (1998).  You're out of the loop, so what?.  In Proceedings of the Third Automation Technology and Human Performance Conference, Norfolk, VA. (abstract only)

Cutler, H., and Andre, A.D. (1998).  Human factors guidelines for the display of uncertain information.  Silicon Valley Ergonomics Conference & Exposition (ErgoCon '98), pp. 33-41 Palo Alto, CA.

McCann, R., Hooey, B., Parke, B., Foyle, D., Andre, A.D. & Kanki, B. (1998). An evaluation of the T-NASA system in high fidelity simulation. In Proceedings of the SAE World Aviation Congress. Anaheim, CA.

**ER146**

3/10/2021

Schoenfeld, V., Shapiro, R.G., Brown, M.L., Jahns, D.W., Andre, A.D., Lund, A.M., Cooke, N.J., & Eggemeier, F. T. (1998). To Ph.D. or not to Ph.D.: That is the question! Proceedings of the 42nd Annual Meeting of the Human Factors and Ergonomics Society, pp. 1152-1156. Santa Monica, CA: Human Factors and Ergonomics Society.

Shapiro, R.G., Andre, A.D., Bertus, E., D'Souza, M., Gilbert, K., Lund, A.M., & Wicgmann, D.A. (1998). Transitioning from student to professional: What's in your future? Proceedings of the 42nd Annual Meeting of the Human Factors and Ergonomics Society, pp. 1139-1143. Santa Monica, CA: Human Factors and Ergonomics Society.

Andre, A.D. (1997). An evaluation of a next-generation visual programming interface. Proceedings of the HCI International Conference, p. 129, San Francisco, CA.

McCann, R.S., Andre, A.D., Begault, D.R., Foyle, D.C. & Wenzel, E.M. (1997). Enhancing ground taxi performance under low visibility: Are electronic moving maps the final answer? Proceedings of the 41st Annual Meeting of the Human Factors and Ergonomics Society, p. 37-41, Santa Monica, CA: Human Factors and Ergonomics Society.

Selcon, S.J., Andre, A.D., Banbury, S.J., Jordan, C.S., Tlauka, M., Walters, H., and Wickens, C. (1997). Symposium on cognitive compatibility of aircraft displays: A new approach to an old problem. Proceedings of the 41st Annual Meeting of the Human Factors and Ergonomics Society, p. 42, Santa Monica, CA: Human Factors and Ergonomics Society.

Andre, A.D. (1997). On the application of cognitive compatibility to aircraft systems design and evaluation. Proceedings of the 41st Annual Meeting of the Human Factors and Ergonomics Society, p. 43-45, Santa Monica, CA: Human Factors and Ergonomics Society.

Hutton, R., Shapiro, R., Lund, A., Gilbert, K., Green, G., Wang, J., and Andre, A.D. (1997). What they do not tell you in graduate school: Observations from the field. Proceedings of the 41st Annual Meeting of the Human Factors and Ergonomics Society, p. 883-887, Santa Monica, CA: Human Factors and Ergonomics Society.

Foyle, D.C., Andre, T.A., McCann, R.S., Wenzel, E., Begault, D. and Battiste, V. (1996). Taxiway navigation and situation awareness (T-NASA) system: Problem, design philosophy and description of an integrated display suite for low-visibility airport surface operations. SAE Aerotech '96 and AIAA Aircraft Engineering, Technology & Operations Conference, paper #96551, Los Angeles, CA.

McCann, R.S., Foyle, D.C., Andre, A.D. and Battiste, V. (1996). Advanced navigation aids in the flight deck: Effects on ground taxi performance under low-visibility conditions. SAE Aerotech '96 and AIAA Aircraft Engineering, Technology & Operations Conference, paper #96552, Los Angeles, CA.

Tu, D.S. and Andre, A.D. (1996). Integration of navigational information for aircraft ground navigation. Proceedings of the ErgoCon '96 Conference, pp. 218-221, San Jose, CA: Silicon Valley Ergonomics Institute.

3/10/2021

Mejdal, S. and Andre, A.D. (1996). An evaluation of electronic map display features for aircraft ground navigation. Proceedings of the ErgoCon '96 Conference, pp. 43-52, San Jose, CA: Silicon Valley Ergonomics Institute.

Wright, S. and Andre, A.D. (1996).  Characteristics of alternative keyboard acquisition, setup, use and benefits: A survey study. Proceedings of the ErgoCon '96 Conference, pp. 148-157, San Jose, CA:  Silicon Valley Ergonomics Institute.

Olsen, E. and Andre, A.D. (1996).  Can a driving simulator replace on-the-road occupational driving assessment? Proceedings of the ErgoCon '96 Conference, pp. 222-228, San Jose, CA: Silicon Valley Ergonomics Institute.

Andre, A.D. (1995).  Information requirements for low-visibility taxi operations: What pilots say. Proceedings of the 8th International Symposium on Aviation Psychology, pp. 484-488, Columbus, OH.

Andre, A.D. and Segal, L.D. (1995).  Human factors issues for the future general aviation flight deck.  To appear in Proceedings of the 8th International Symposium on Aviation Psychology. Columbus, OH.

Andre, A.D. and Cashion, P. (1995). Tracking hesitations as a function of task/control integration. In Proceedings of the 39th Annual Meeting of the Human Factors and Ergonomics Society, pp. 1370-1374,  Santa Monica, CA: Human Factors and Ergonomics Society.

Segal, L.D. and Andre, A.D. (1995).  Changing technology in control room operations: Is one graphical user interface worth 1000 indicators? In Proceedings of the 39th Annual Meeting of the Human Factors and Ergonomics Society, pp. 1435-1439,  Santa Monica, CA: Human Factors and Ergonomics Society.

Andre, A.D. (1995). Students on the road to somewhere.  Bulletin of the Human Factors and Ergonomics Society, 38, 1, 5.

Andre, A.D. (1995).  Ergonomics Certification:. Good idea, bad design.  In Proceedings of the ErgoCon '95 Conference (p. 346).  San Jose, CA: Silicon Valley Ergonomics Institute.

Andre, A.D. and Segal, L.D. (1995). Graphical user interface design: Promises and pitfalls.  In Proceedings of the ErgoCon '95 Conference (pp. 11-17).  San Jose, CA: Silicon Valley Ergonomics Institute.

Segal, L.D. and Andre, A.D. (1995). Introducing A.C.T.  (Activity Catalog Tool):  A software instrument for task and behavioral analyses.  In Proceedings of the ErgoCon '95 Conference (pp. 73-78).  San Jose, CA: Silicon Valley Ergonomics Institute.

3/10/2021

Andre, A.D.  (1994).  On the need to study the evolution of the older driver.  In Proceedings of the 38th Annual Meeting of the Human Factors and Ergonomics Society (pp. 152-153).  Santa Monica, CA: Human Factors and Ergonomics Society.

Andre, A.D. and Segal, L.D. (1994).  Introducing A.C.T.  (Activity Catalog Tool):  A software instrument for task and behavioral analyses.  In Proceedings of the 38th Annual Meeting of the Human Factors and Ergonomics Society.  Santa Monica, CA: Human Factors and Ergonomics Society.

Andre, A.D. (1994). Situation Awareness: The good, the bad, and the ugly. First Automation Technology and Human Performance Conference (p. 24). Washington, D.C.

Andre, A.D. (1994). The reality of IVHS: More "intelligent" vehicles requires more "intelligent" research.  First Automation Technology and Human Performance Conference (p. 94). Washington, D.C.

Wickens, C.D. and Andre, A.D. (1994).  Performance-preference dissociations.  Society for Information Display Digest (pp. 369-370).  Playa del Rey, CA: Society for Information Display.

Andre, A.D. (1993).  Re-evaluating the ecological perspective to vehicle control.  Proceedings of the 37th Annual Meeting of the Human Factors and Ergonomics Society (p. 1375).  Santa Monica, CA: Human Factors and Ergonomics Society.

Andre, A.D., and Heers, S.T.  (1993). Attention in a multi-task environment.  Proceedings of The Seventh International Symposium on Aviation Psychology. (pp. 821-826). Columbus, OH: Ohio State University.

Andre, A.D., Heers, S.T., McCann, R. and Cashion, P.  (1993).  Preview and Practice:  Effects on scheduling behavior during simulated instrument flight. Proceedings of the 37th Annual Meeting of the Human Factors and Ergonomics Society (pp. 132-136).  Santa Monica, CA: Human Factors and Ergonomics Society.

Andre, A.D., Hancock, P.A., and Caird, J.  (1993).  Cognitive and Perceptual-Motor Factors in Vehicle Operation and Simulation.  Journal of Sport and Exercise Psychology (abstract only).

Hancock, P.A., Arthur, E.J., and Andre, A.D. (1993).  Learning in Virtual Environments. Journal of Sport and Exercise Psychology (abstract only).

Andre, A.D., and Cashion, P.  (1993).  Visual scanning in the functional visual field.  1993 Society for Information Display Digest (pp. 114-117). Playa del Rey, CA: Society for Information Display.

Johnson, W.W. and Andre, A.D. (1993).  Visual cueing aids for rotorcraft landings. American Helicopter Society Conference on Flying Qualities and Human Factors (pp. 4-1 - 4-20). San Francisco, CA: American Helicopter Society.

3/10/2021

Andre, A.D. (1992).  Stimulus-response compatibility: An ecological perspective.  Canadian Society for Psychomotor Learning and Sports Psychology Annual Conference (abstract only).

Andre, A.D. (1992).  What pilots (*can*) see out the window:  Human factors research in the aircraft cockpit and beyond.  Invited Symposium Lecture presented at the Canadian Society for Psychomotor Learning and Sports Psychology Annual Conference  (abstract only).

Andre, A.D. (1992).  Quantitative layout analysis for cockpit display systems. Society for Information Display Digest (pp. 647-650). Playa del Rey, CA: Society for Information Display.

Andre, A.D. and Johnson, W.W. (1992).  Stereo effectiveness evaluation for precision hover tasks in a helmet-mounted display simulator.  In Proceedings of the IEEE International Symposium on Systems, Man and Cybernetics (Vol 2. , pp. 1136-1140). Chicago, IL: IEEE.

Johnson, W.W., Andre, A.D. and Kruk, R.V.  (1992).  Visual cues in flight simulation: An evaluation of stereo effectiveness.  In Proceedings of the SAE AEROTECH '92 Conference. Warrendale, PA: SAE.

Andre, A. D. (1991). 3D, or not 3D -- that is the question. Newsletter of the Human Factors and Ergonomics Society Visual Processing Technical Group, Vol. 12(1), 8-10.

Andre, A.D. (1991).  High tech simulator research at the University of Illinois.  The Flyer, Vol. 5 (2), 1-2.

Andre, A. D., Haskell, I., and Wickens, C. D. (1991). S-R compatibility effects with orthogonal stimulus and response dimensions. In Proceedings of the 35th Annual Meeting of the Human Factors and Ergonomics Society (pp. 1546-1550).  Santa Monica, CA: Human Factors Society.

Andre, A. D. and Koonce, J. M. (1991). Spatial orientation and wayfinding in airport passenger terminals: An environmental design perspective. In Proceedings of the 35th Annual Meeting of the Human Factors  Society.  (pp. 561-565). Santa Monica, CA: Human Factors Society.

Andre, A. D. and Wickens, C. D. (1991). Compatibility and consistency in aircrew decision aiding.  In R.J. Jensen's (ed.) Proceedings of the 6th International Symposium on Aviation Psychology. (pp. 1020-1025). Columbus, OH.

Andre, A. D. and Wickens, C. D. (1990). The influence of cognitive fidelity on spatial-motion compatibility effects. In Proceedings of the 5th Mid-Central Ergonomics/Human Factors Conference.  Dayton, OH.

Woods, D.D., Braune, R.J., Palmer, E., Rogers, W.H., Sarter, N.B., Wickens, C.D., Harwood, K., Andre, A.D., Aretz, A.J., Wiener, E.L., & Boje, E. (1990). Situation awareness in the advanced commercial aircraft cockpit. In Proceedings of the Annual Meeting of the Human Factors  Society. Santa Monica, CA: Human Factors Society.

**ER150**

3/10/2021

Andre, A. D. and Lintern, G. (1990). Part training for air-intercept control: Procedural and skill-based strategies. In Proceedings of the 5th Mid-Central Ergonomics/Human Factors Conference. Dayton, OH.

Andre, A. D. and Lintern, G. (1990). Attention Theory as a guide to part-training for instruction of Naval air-intercept control. In Proceedings of the 34th Annual Meeting of the Human Factors and Ergonomics Society. (pp. 1347-1351). Santa Monica, CA: Human Factors and Ergonomics Society.

Andre, A. D., Wickens, C. D., Moorman, L., and Boschelli, M. (1990). Display perspective, frame of reference, and directional color: Effects on situational awareness in a simulated flight task. Society for Information Display Digest (pp. 347-350). Playa del Rey, CA: SID.

Wickens, C. D., Harwood, K., Andre, A. D., and Aretz, A. (1990). Situation awareness, visual momentum, and frames of reference. In Proceedings of the 34th Annual Meeting of the Human Factors and Ergonomics Society. (pp. 23-24). Santa Monica, CA: Human Factors and Ergonomics Society.

Wickens, C.D., Andre, A.D., and Moorman, L. (1989). Planar vs. perspective representations of 3d worlds: Applications to aviation. Poster Presentation at The 33nd Annual Meeting of the Human Factors and Ergonomics Society. Santa Monica, CA: Human Factors and Ergonomics Society.

Andre, A. D. and Wickens, C. D. (1988). The interaction of spatial and color proximity in aircraft stability information displays. In Proceedings of the 32nd Annual Meeting of the Human Factors and Ergonomics Society (pp. 1371-1375). Santa Monica, CA: Human Factors and Ergonomics Society.

Wickens, C. D. and Andre, A. D. (1988). Proximity compatibility and the object display. In Proceedings of the 32nd Annual Meeting of the Human Factors and Ergonomics Society (pp. 1335-1339). Santa Monica, CA: Human Factors and Ergonomics Society.

3/10/2021

### TECHNICAL REPORTS & WHITE PAPERS (selected)

Andre, A.D., Hooey, B.L., and Foyle, D.C. (2009). Human Systems Integration Engineering Support. In M.K. Kaiser & J. McCandless (Eds.) Space Human Factors Engineering Technical Gap Analysis White Papers. NASA TM-2009-214580. Moffett Field, CA:  NASA Ames Research Center.

Andre, A.D., Hooey, B.L.. and Foyle, D.C. (2008). ASDO Seamless Transition Airspace Information Requirements and Procedural Integration: Gap Analysis. Human Centered Systems Laboratory (HCSL) Technical Report (HCSL-07-04 rev.2). Moffett Field, CA: NASA Ames Research Center.

Andre, A.D. (2003). When every minute counts, all automatic external defibrillators are not created equal.  Interface Analysis Associates: San Jose, CA.

Interface Analysis Associates (1998). Control Compatibility and Feedback: A white paper for DuraSwitch Technology. Interface Analysis Associates: San Jose, CA.

Hooey, B., Schwirzke, M.F.J., McCauley, M.E., Purcell, K.P. and Andre, A.D. (1998, October). "Initial Identification of Procedural Issues for the Future Deployment of Terminal Area Productivity (TAP) Technologies," prepared by Monterey Technologies Inc. for NASA Ames Research Center:  Moffett Field, CA.

Young, S., and Andre, A. (1998, March). "Cockpit Display of Traffic Information (CDTI) for Improved Airport Surface Situational Awareness," submitted to RTCA Special Committee 186 for inclusion in the RTCA document "Operational Concepts for CDTI Applications".

Interface Analysis Associates (1997).  Human Factors Guidelines for the Display of Uncertain Information, for Defense Research Agency, UK.  Interface Analysis Associates:  San Jose, CA..

Interface Analysis Associates (1994).  Wayfinding Information at Tampa International Airport: A Human Factors Analysis, for Joseph Maxwell Industrial Design. Interface Analysis Associates:  San Jose, CA.

Interface Analysis Associates (1997).  Control Compatibility and Feedback:  A White Paper, for DuraSwitch Technology.  Interface Analysis Associates:  San Jose, CA.

Andre, A.D. (1995).  Operational issues during low-visibility taxi operations: A field study. WAL/NASA Contractor Report.  Western Aerospace Labs, Inc: Moffett Field, CA.

Segal, L.D. and Andre, A.D. (1994).  Activity Catalog Tool (A.C.T.) v2.0 User Manual.  NASA Contractor Report CR-177634.  Moffett Field, CA: NASA ARC.

Andre, A.D., Battiste, V., Clearwater, Y., Shively, R.J., and Smith, B. (1993).  Human factors issues for emergency/police dispatch consolidation.  Army-NASA Interim Report.  Moffett Field, CA:  NASA Ames Research Center.

**ER152**

3/10/2021

Andre, A.D. and Wickens, C.D.  (1991).  A computational approach to display layout analysis. (Technical Report ARL-91-12/NASA A3I-90-1). University of Illinois Aviation Research Laboratory: Savoy, IL.

Andre, A.D. and Stokes, A.F. (1991).  Assessing the *functional* age of the *chronologically* older driver.  (Technical Report ART-CDMV-91-1). Andre Research Technologies: Champaign, IL.

Andre, A. D. and Wickens, C. D. (1990). Display-Control compatibility in the cockpit: Guidelines for display layout analysis. (Technical Report ARL-90- 12/NASA A3I-90-1). University of Illinois Aviation Research Laboratory: Savoy, IL.

Andre, A. D., Wickens, C. D., and Goldwasser, J. (1990). Compatibility and consistency in display-control systems: Implications for decision aid design. (Technical Report ARL-90-13/NASA A3I-90-2). University of Illinois Aviation Research Laboratory: Savoy, IL.

Andre, A. D., Wickens, C. D., Moorman, L., and Boschelli, M. (1990). Display formatting techniques for improving situation awareness in the aircraft cockpit. (Technical Report EPRL-90-13). University of Illinois Engineering Psychology Research Laboratory: Urbana, IL.

Andre, A. D. and Wickens, C. D. (1990). Information processing and perceptual characteristics of display design: The role of emergent features and objects. (Technical Memorandum 7-90). U.S. Army Human Engineering Laboratory: Aberdeen Proving Grounds, MD.

Eggemeier, F. T., Biers, D. W., Wickens, C. D., Andre, A. D., Vreuls, D., Billman, E. R., and Schuerren, J. (1990).  Performance assessment and workload evaluation systems: Analysis of candidate measures. (Technical Report UDR-TR-90-20A). Armstrong Aerospace Medical Research Laboratory Technical Report: Wright Patterson Air Force Base, Dayton, OH.

Andre, A. D. and Wickens, C. D. (1989).  Proximity compatibility and information display: The effects of space and color on the analysis of aircraft stall conditions. (Technical Memorandum 16-89). U.S. Army Human Engineering Laboratory: Aberdeen Proving Grounds, MD.

**ER153**

3/10/2021

## **PUBLICITY**

Quoted in an *iPadNewsDaily* article on posture and usage of an iPad (April 26, 2010)

Quoted in a *Los Angeles Times* article on the recent boom in touchscreen interfaces (Feb. 4, 2007)

The New York Times (August 5, 1999, p. D3). *Ergonomics Study Finds Hazards in Browsing Web.*

San Jose Mercury News (July 20, 1999, Section E, cover story). *Mouse Trap*

Women Connect.com Magazine (August 9, 1999). *Mouse Menace: What you don't know about point and click can hurt you.*

Wisconsin State Journal (August 13, 1999, p. 3D). *Surfing has its Dangers.*

Occupational Injury & Illness Perspectives (May, 1999, p. 5). *The Ergonomics of Web Browsing?*

CTDNEWS (April, 1999, p. 4). *Web-Surfing Postures Neither Good Nor Bad.*

Adair, B. (1993, September). *At times it seems you can't get there from here.* St. Petersburg Times, pp. 1B, 5B.

Business Week (December 9, 1996, p. 14). *From down under, neural-net PCs.*

Dietz, D. (1997, July). *A Boost for Airport Safety; Peninsula Team Creates System to Avoid Crashes.* San Francisco Chronicle, p. A11.

Smith, Z. (August 6, 1990). *Expert Says CTA's Signs Ignore One Thing: People.* Chicago Sun-Times, p. 3.

Swedlow, T. (December 3, 1996). *A New Paradigm: The Thinking Computer.* PC World.

Who Weekly, Australia (January 27, 1997). *But does it compute?*

Anthony D. Andre, Ph.D., CPE                                                                                    Page 30

3/10/2021

### SEMINARS/WORKSHOPS (selected)

*When Failure is NOT an Option: The Secrets to Successful Human Factors Validation for Combination Drug Products*
Medical Device Human Factors Workshop
San Diego, CA

*When Failure is NOT an Option: The Secrets to Successful Human Factors Validation for Combination Drug Products*
HFES Healthcare Human Factors Symposium
Baltimore, MD

*When Failure is NOT an Option: The Secrets to Successful Human Factors Validation for Combination Drug Products*
Medical Device Human Factors Workshop
San Jose, CA

*Medical Device Human Factors*
Human Factors PRIMER Workshop
San Jose, CA

Human Factors Validation Workshop
Eli Lilly, Indianapolis, IN

Genentech
South San Francisco, CA

*User Centered Design Process for Diabetes Products*
Abbot Labs
Alameda, CA

*In-Vehicle Navigation Systems: Why Human Factors?*
**Dash Navigation**
Sunnyvale, CA.

*Preventing workplace injuries: A behavioral approach.*
Zenith Insurance
San Diego, CA.

*An Introduction to Ergonomics: How to Stay Healthy and Comfortable While You Work*
Environmental Resource Management (ERM)
Walnut Creek, CA

EORM
Menlo Park, CA

*Usability Evaluation as Part of the QA Process*
Cisco Systems
San Jose, CA

Republic Indemnity

Anthony D. Andre, Ph.D., CPE                                           Page 31

**ER155**

3/10/2021

San Francisco, CA

Medical Device Beaureau of Canada
Ottowa, Canada

*Are All AEDs Alike?*
Philips Medical
Seattle, WA

*The Powerheart AED G3+: Breaking the Usability Error*
Cardiac Science
Santa Ana, CA

*Having your Cake and Eating it Too: How to Prepare for and Obtain the Usability Job of your Dreams*
Bay Area Computer Human Interaction Society (BACHI)

*Whatever happened to the "R" in RSI?*
*The Future of Ergonomics*
The California Association of Rehabilitation and Re-employment Professionals (Caarp)
San Diego, CA

*A Multi-Dimensional Perspective on Ergonomics*
*The When, Why, Who of Ergonomics*
*Educational Resources for Ergonomics*
The California Association of Rehabilitation and Re-employment Professionals (Caarp)
San Francisco, CA

*A Human-Centered Approach to the Design of Medical Systems: Principles, Guidelines, Uses and Abuses*
The Veterans Administration (VA)
Palo Alto, CA

Bay Area Rapid Transit (Bart)
Oakland, CA

*Integrating Usability Into the Product Development Process*
Applied Biosystems
Foster City, CA

*On the Usability of www.apple.com*
Apple Computer
Cupertino, CA

*Whatever happened to the "R" in RSI?*
Workshop on Preventing Disability in the Workplace
Berkely, CA

*Ergonomics Research at San Jose State University: Past Deeds and Future Needs*
Bay Area Ergonomics Study Group
Berkley, CA

*Understanding and Preventing Workplace Injuries: A behavioral approach*

Anthony D. Andre, Ph.D., CPE                                                           Page 32

**ER156**

3/10/2021

Half-day public seminar, Sacramento, CA.

*Understanding and Preventing Workplace Injuries: A behavioral approach*
Half-day public seminar, Palo Alto, CA.

*Understanding and Preventing Workplace Injuries: A behavioral approach*
Invited Presentation to the Northern California Association of Hand Therapists, Stanford University
Medical School, Palo Alto, CA.

*Understanding and Preventing Workplace Injuries: A behavioral approach*
Full-day public seminar, San Diego, CA.

*Preventing workplace injuries: A behavioral approach*
Half-day seminar presented to Zenith Insurance, San Diego, CA.

*An ecological approach to workplace ergonomics*
Half-day seminar presented to EORM at Sun Microsystems, Inc., Mountain View, CA.

*Is that product or environment REALLY ergonomic? An ecological approach to workplace ergonomics*
Half-day seminar presented at ErgoCon '98, Palo Alto, CA.

*\*Separating the Myth from Reality: An Ecological Approach to Office Ergonomics*
Invited Workshop Presented at the National Association of Rehabilitation and Reemployment
Professionals (NARPPS), Portland, OR

*\*Corporate Intranets: Usability Problems and Solutions*
Invited Presentation to Siemens Business Communications, Santa Clara, CA

*Office Ergonomics: Myths and Realities*
Invited Workshop to Republic Indemnity Insurance Corporation, San Francisco, CA

*\*An Ecological Approach to Office Ergonomics*
Invited Workshop Presented at the California Association of Rehabilitation and Reemployment
Professionals (CARRP), San Diego, CA

*\*An Ecological Approach to Office Ergonomics: Management Guidelines*
Invited Workshop to Dole Fresh Vegetables, Inc., Salinas, CA

*\*Changing Your Approach to Office Ergonomics*
Invited Workshop to Quantum Corporation, Milpitas, CA

*\*An Ecological Approach to Office Ergonomics: Employee Guidelines*
Invited Workshop to Dole Fresh Vegetables, Inc., Salinas, CA

*Is that product REALLY ergonomic? A practical and unique approach to workplace ergonomics*
Half-day Workshop presented at ErgoCon '97, Palo Alto, CA.

*\*Separating the Myth from the Reality: An Ecological Approach to Workplace Ergonomics*
Invited workshop, National Ergonomics Conference and  Exposition, Rosemont, IL.

*\*A hitchhiker's guide to the world of situation awareness research*

Anthony D. Andre, Ph.D., CPE                                                    Page 33

**ER157**

3/10/2021

Keynote address, First International Conference on Engineering Psychology and Cognitive Ergonomics, Cranfield University, Stratford-upon-Avon, England.

*Shopping for Ergonomics: A Psychological Perspective on Consumer Product Design*
Presented at the American Psychological Association (APA) Annual Convention, Los Angeles, CA

*Is that product REALLY ergonomic?*
Half-day Workshop presented at ErgoCon '96, Palo Alto, CA.

*\*Ergonomic products in the workplace: myths and realities*
Keynote address, Meeting of the California Association of Medical Transcription, San Jose, CA

*\*Ergonomics in design: An integrative perspective*
Invited colloquium, Cognitive Science Department, University of California at Los Angeles (UCLA)

*\*Ergonomic issues in the workplace: An introduction*
Invited address, Meeting of the California Association of Medical Transcription, Sacramento, CA
July, 1993

*\*The "hand" in design: Human factors issues*
Invited address to the Northern California Association of Hand Therapists, Stanford University Medical Center, Palo Alto, CA

Anthony D. Andre, Ph.D., CPE                                                                Page 34

**ER158**

3/10/2021

## PRESENTATIONS (selected)

April 1, 2020
*Children at Risk: Neck Up Check Up!*
Webinar presentation at the HFES COVID-19 Ergonomics Summit

November 14, 2019
*Human factors design and validation of packaging and package labeling*
Invited Speaker at the Pharma and Device Packaging and Labeling Conference

July 14, 2011
*What Makes a Pre-Filled Syringe Usable and Ergonomic?  Critical Human Factors Design Attributes and Interacting Factors*
Webinar presentation for the Parental Drug Association (PDA).

May 18, 2011
*Put Down that Workstation! How Software Usability and Expertise IS Office Ergonomics."*
Invited Speaker of the Bay Area Ergonomics Roundtable, Los Gatos, CA.

October 18, 2010.
*How to Obtain FDA Approval for Human Factors/Usability: What every Drug and Injection Device Company Should Know*
Presentation at The Universe of Pre-Filled Syringes and Injection Devices Conference, Las Vegas, NV.

October 18, 2010.
*What Makes a Pre-Filled Syringe Usable and Ergonomic?  Critical Human Factors Design Attributes and Interacting Factors*
Poster Presentation at The Universe of Pre-Filled Syringes and Injection Devices Conference, Las Vegas, NV.

July 30, 2010
*To Err is Human, to Foresee is Human Factors:  Developing Successful Drug Delivery Devices Through Usability Engineering*
Invited presentation to Genentech, South San Francisco, CA.

July 29, 2010
*How software usabilty, expertise and workload impact ergonomics*
Invited presentation to the Berkeley Summer Ergonomics Institute, Center for Occupational and Environmental Health, University of California at Berkeley, Berkeley, CA.

March, 2010
*To Err is Human, to Foresee is Human Factors: How to Improve Patient Safety Through Usability Engineering*
Invited presentation to the 2010 Bay Area Biomedical Engineering Conference, San Jose, CA.

July, 2008
*Deep Space Network Control Center: A User-Centered Design Approach.*
Presentation to the Human Factors Division, NASA Ames Research Center

January 21, 1999
*The Usability of Consumer Products: Why Users are the First to Know*

Anthony D. Andre, Ph.D., CPE                                              Page 35

3/10/2021

Invited presentation to the Audio Engineering Society, Chicago Chapter

November 20, 1998
*A Psychological Approach to Product Design and Evaluation*
Invited Presentation to the Undergraduate Human Factors Psychology Course, San Jose State University,
San Jose, CA


November 4, 1998
*Field Evaluation Of T-NASA: Taxi Navigation And Situation Awareness System*
Presentation at the Digital Avionis Systems Conference, Seattle, WA

November 5, 1998
*The Development of T-NASA: Design and Evaluation Philosophy*
Invited Presentation to Boeing Commercial Aerospace, Seattle, WA

October 19, 1998
*Effective use of the World Wide Web (WWW) for HF/E consultants*
Invited Presentation to the Graduate Human Factors Engineering Course, San Jose State University, San
Jose, CA

October 8, 1998
*To Ph.D. or not to Ph.D.: That is the question!*
Panel Presentation at the 42nd Annual Meeting of the Human Factors and Ergonomics Society,   Chicago,
IL

October 8, 1998
*The human factors of conducting field research: Lessons learned from the evaluation of T-NASA*
Presentation at the 42nd Annual Meeting of the Human Factors and Ergonomics Society, Chicago, IL

October 7, 1998
*Effective use of the World Wide Web (WWW) for HF/E consultants*
Invited Presentation at the 42nd Annual Meeting of the Human Factors and Ergonomics Society,
Chicago, IL


October 7, 1998
*Transitioning from student to professional: What's in your future?*
Panel Presentation at the 42nd Annual Meeting of the Human Factors and Ergonomics Society,   Chicago,
IL

October 6, 1998
*Displaying uncertainty in advanced navigation systems*
Presentation at the 42nd Annual Meeting of the Human Factors and Ergonomics Society, Chicago, IL

July 30, 1998
*High-tech hits the ground. Development and validation of a taxi navigation and situation awareness
system*
NASA Forum Presentation, Oshkosh Air Show, Oshkosh, WI

May 5, 1998

Anthony D. Andre, Ph.D., CPE                                                Page 36

**ER160**

3/10/2021

*A hitchhiker's guide to ergonomic resources on the Internet*
Presentation at ErgoCon '98, Palo Alto, CA.

May 5, 1998
*Everyday examples of human factors and ergonomics: Where theory and application meet*
Presentation at ErgoCon '98, Palo Alto, CA.

April 14, 1998
*An overview of current ergonomics research at SJSU*
Invited Presentation to the Bay Area Ergonomics Study Group, San Francisco, CA

March 28, 1998
*From the Research Lab to the Cockpit: The Principled Development of an Electronic Taxi Map Display*.
Third Automation Technology and Human Performance Conference, Norfolk, VA.

March 27, 1998
*You're Out of the Loop, So What?*. Third Automation Technology and Human Performance Conference,
Norfolk, VA.

November 7, 1997
*\*Everything you always wanted to know about human factors but were afraid to ask*
Invited Presentation to the University of Illinois Student Chapter of the Human Factors and Ergonomics
Society, Champaign, IL

October 23, 1997
*\*On Command and Spectravision Hotel Video Systems: A Usability Analysis*
Invited Presentation to On Command Corporation, San Jose, CA

October 14, 1997
*The Development of an Electronic Taxi Map Display*
Presentation at the SAE World Aviation Conference, Anaheim, CA

September, 1997
*On the application of cognitive compatibility to aircraft systems design and evaluation*
Symposium Presentation at the 41st Annual Meeting of the Human Factors and Ergonomics Society,
Albuquerque, NM

September, 1997
*What they do not tell you in graduate school: Observations from the field*
Panel Presentation at the 41st Annual Meeting of the Human Factors and Ergonomics Society,
Albuquerque, NM

May 7, 1997
*Practicing what we preach: A multidisciplinary approach to workplace ergonomics*
Presentation at ErgoCon '97, Palo Alto, CA.

May 5, 1997
*A hitchhiker's guide to ergonomic resources on the Internet*
Presentation at ErgoCon '97, Palo Alto, CA.

3/10/2021

May 1, 1997
*The design of an electronic aircraft taxi navigation display*
9th International Symposium on Aviation Psychology, Columbus, Ohio

February 13, 1997
*\*Human factors in product design*
Invited presentation to the US Air Force Department of Behavioral Sciences, US Air Force Academy, Colorado Springs, CO.

December 18, 1996
*\*Human factors in the product development process*
Invited presentation, IDEO Product Development, Palo Alto, CA.

November 22, 1996
*\*Human factors in practice: The art of psychology*
Invited colloquium, Department of Psychology, University of California at Santa Cruz

October 24, 1996
*Towards a model of cognitive compatibility in complex systems*
First International Conference on Engineering Psychology and Cognitive Ergonomics, Cranfield University, Stratford-upon-Avon, England.

September 12, 1996
*\*Human factors and ergonomics in the real world*
Invited presentation to the US Air Force Department of Behavioral Sciences, US Air Force Academy, Colorado Springs, CO.

September 6, 1996
*\*When situations demand awareness: An operator or researcher's dilemma?*
Invited panel presentation at the Human Factors and Ergonomics Society 40th Annual Meeting, Philadelphia, PA

September 6, 1996
*\*From the classroom to a career: What you'll need to know for a successful transition.*
Invited panel presentation at the Human Factors and Ergonomics Society 40th Annual Meeting, Philadelphia, PA

August 11, 1996
*\*Stimulus-response compatibility: Here, there and everywhere*
Invited address, in honor of receiving the First Annual Earl Alluisi Award for Early Career Achievement
American Psychological Association (APA) Annual Convention, Toronto, Canada

April 11, 1996
*Integration of navigational information for aircraft ground navigation*
Department of Defense Behavioral Science Symposium, US Air Force Academy, Colorado Springs, CO.

March 9, 1996
*\*Mode errors in everyday things*
Presented at the Automation Technology and Human Performance Conference, Cocoa Beach, FL

Anthony D. Andre, Ph.D., CPE                                                    Page 38

**ER162**

3/10/2021

March 7, 1996
*Towards the development of an aircraft electronic taxi map display*
Presented at the Automation Technology and Human Performance Conference, Cocoa Beach, FL

February 9, 1996
*Aviation human factors: Current and future issues*
Invited presentation to the US Air Force Department of Behavioral Sciences, US Air Force Academy,
Colorado Springs, CO.

February 8, 1996
*From alarm clocks to cockpits: An introduction to the world of human factors and ergonomics*
Invited presentation to the US Air Force Department of Behavioral Sciences, US Air Force Academy,
Colorado Springs, CO.

November 8, 1995
*Careers in human factors and ergonomics*
Invited presentation to the Los Angeles Chapter of the Human Factors and Ergonomics Society, held at
the University of Southern California (USC), Los Angeles, CA

November 3, 1995
*Situation Awareness: Why researchers should understand the former before studying the latter*
International Conference on Situation Awareness, Daytona beach, FL

October 10, 1995
*Tracking hesitations as a function of task/ control integration*
Human Factors and Ergonomics Society Annual Meeting, San Diego, CA

September 22, 1995
*Human factors in practice: The art of real-time interface design and testing*
Invited presentation to the US Air Force Department of Behavioral Sciences, US Air Force Academy,
Colorado Springs, CO.

September 21, 1995
*Interface design and usability testing: Principles and Practices*
Invited presentation to the Product Engineering Department,
Logitech, Inc., Fremont, California

September 20, 1995
*Searching the Internet for Human Factors and Ergonomics Information*
Invited presentation to the Bay Area Chapter of the Human Factors and Ergonomics Society, Apple
Computer Company, Cupertino, CA.

August 16, 1995
*Interface design and usability testing: Principles and Practices*
Invited presentation to the Engineering and Marketing Departments,
QUALCOMM Corporation, San Diego, California

August 11, 1995
*Interface design and usability testing: Myths and realities*
Invited presentation to the Industrial Design and Human Factors Departments,
Tandem Computer Corporation, Cupertino, California

Anthony D. Andre, Ph.D., CPE                                                              Page 39

**ER163**

3/10/2021

May 24, 1995
*Ergonomics certification: Just another clumsy interface?*
ErgoCon '95, San Jose, California

May 22, 1995
*Graphical user interfaces for control room operations: Promises and pitfalls*
ErgoCon '95, San Jose, California

May 9, 1995
*User interface design: Apparent simplicity, real complexity*
Invited presentation to the Northern California Section of the American Industrial Hygiene Association,
Sunnyvale, California

April 27, 1995
*Human factors issues in the future general aviation flight deck*
8th International Symposium on Aviation Psychology, Columbus, Ohio

April 25, 1995
*Information requirements for low-visibility taxi operations: What pilots say*
8th International Symposium on Aviation Psychology, Columbus, Ohio

February 21, 1995
*Effective user interface design: Apparent simplicity, real complexity*
Invited presentation, Professional Speaker Series on User Interface Design, Cadence Design Systems,
Inc., Milpitas, CA

November 16, 1994
*What's wrong with ergonomics certification*
Invited panelist, "Human Factors Certification: A Debate"
Sponsored by the Bay Area Chapter of the Human Factors and Ergonomics Society, San Jose State
University, San Jose, CA.

November 9, 1994
*Design, designers, and the search for human factors*
Invited presentation to the Industrial Design and Engineering Departments, Sun Microsystems, Inc.,
Menlo Park, CA

October 26, 1994
*On the need to study the evolution of the older driver*
Panel presentation at the Human Factors and Ergonomics Society Annual Meeting, Seattle, WA

October 18, 1994
*Human factors issues and approaches for the design of emergency dispatch environments*
Invited presentation to the Department of Emergency Services and 911 Operations,
San Francisco, CA

October 3, 1994
*Human factors in the real world*
Invited presentation to the faculty and students of the Psychology Department, University of Central
Florida, Orlando, FL

Anthony D. Andre, Ph.D., CPE                                                          Page 40

3/10/2021

September 28, 1994
*Shopping for ergonomics: Why my cart is (almost) empty*
Invited presentation, Bay Area Chapter of the Human Factors and Ergonomics Society, Cupertino, CA.

June 15, 1994
*Performance-Preference Dissociations*
Presented at the Society for Information Display (SID) International Symposium, San Jose, CA

June 9, 1994
*Disabled by Design and Design for the Disabled*
Presented at the Mid-Year Community Meeting, Department of Special Education and Rehabilitation Services, San Jose State University, San Jose, CA

April 9, 1994
*The reality of IVHS: More "intelligent" vehicles requires more "intelligent" research*
Presented at the Automation Technology and Human Performance Conference, Washington, DC

November 15, 1993
*Ergonomics in product design*
Presented to the undergraduate Industrial Design course, Art and Design Department, San Jose State University, San Jose, CA

October 15, 1993
*Preview and practice: Effects on scheduling behavior in a simulated flight task*
Presented at the Human Factors and Ergonomics Society Annual Meeting, Seattle, WA

September 18, 1993
*Automotive Ergonomics: The year in review*
Presented to the Northern California Section of the Society of Automotive Engineers (SAE), Santa Clara, CA

August 18, 1993
*Consumer product design and regulation: Challenges to the engineering psychology community*
Invited address, American Psychological Association (APA) Annual Convention, Toronto, Canada

**UNIVERSITY LECTURES**
Cal State Northridge
Cal State Long Beach
University of California, Los Angeles (UCLA)
Stanford University
University of Illinois
University of Central Florida
Old Dominion University
US Air Force Academy, Department of Behavioral Sciences
Redding University, UK
University of California, Santa Cruz
University of Southern California (USC)

3/10/2021

## THESIS ADVISING

Daniel Klahn, M.S. The Effects of Task Debriefing, 2020, San jose State University "Verbal Protocol and Researcher Presence on Subjective Ratings of Task Difficulty."

Sky Eurich, M.S. Human Factors and Ergonomics. 2019. "Drivers' Self-Perceived Performance in Automated Vehicles."

Anthony Raad, M.S. Human Factors and Ergonomics. 2019. "The Effects of Mobile Application Tutorial Type on Learnability and Engagement."

Jingwei Yang, M.S. Human Factors and Ergonomics. 2019. "Mobile Augmented Reality Application Design for Pedestrian Navigation Experience."

Elisabeth Knapen, M.S. Human Factors and Ergonomics. 2019. "Effect of Warning Design in Instructions for Use on Attention, Memory, Compliance, and Preference."

Helena Knapen, M.S. Human Factors and Ergonomics. 2019. "Effect of Contradictory Subjective Ratings on Observer Memory of the Objective Event."

Madison Boston, M.S. Human Factors and Ergonomics. 2019. "The Effectiveness of Text Message Reminder Frequency and Content on Engagement with Health Tracking."

Cornelius Nerpio, M.S. Human Factors and Ergonomics. 2017. "Optimal Placement of In-Vehicle Hud Messaging Based on Driving Performance Costs."

Samanta Ruivo, M.S. Human Factors and Ergonomics. 2016. "The Effects of Method of Control and Gaming Experience on Performance and Level of Engagement in Mobile Gaming."

Mark Garibaldi, M.S. Human Factors and Ergonomics. 2016. San Jose State University "Human Factors Evaluation of Hand Hygiene Compliance in a Healthcare Setting."

Will Valladao, M.S., Human Factors and Ergonomics, 2016, "Mesauring the Effect of Metaphorical Fuel Efficiency Gauges in Automotive Dashboard Displays."

Ryan Schabel, M.S., Human Factors and Ergonomics, 2015, "The Effects of Distraction Type and Conversation Topic on Driver Performance and Situation Awareness."

Russell Williams, M.S., Human Factors and Ergonomics, 2014, "Effects of Altering In-Vehicle Touch Screen Size and Design on Driver Performance."

Aaron Ackerman, M.S. Human Factors and Ergonomics, 2014, "Range Anxiety and Impact Awareness in Electrical Vehicle."

Dustin Vaugn Luma, M.S. Human Factors and Ergonomics, 2014, "Designing Mobile Touch Gesture Cues For Guided Instruction and Performance."

3/10/2021

Dan Nissenbaum, M.S. Human Factors and Ergonomics, 2014, "Direct and Indirect Input Modality In-Car Telematics Systems."

Soujanya Ponnada, M.S. Human Factors and Ergonomics, 2014, "Tactile Keyboard: An evaluation of typing efficieny and satisfaction on tactile interface."

Linlin Yi., M.S., Human Factors and Ergonomics, 2014, "Managing Perceived Waiting Time on Mobile Phone Travel Applications."

Keola Ching, M.S., Human Factors and Ergonomics, 2014, "Effect of IFU Formatting on User Performance with a Novel Device."

Thannie Le, M.S. Human Factors and Ergonomics, 2014, "Evaluating Gesture Vocabularies for Augmented Reality Glasses."

Carson Whitaker, M.S. Human Factors and Ergonomics, 2013, "The Influence of Voice and Touch Screen Controls on Driver Distraction, Situation Awareness, and Cognitive Load."

Eric Mahlstedt, M.S., Human Factors and Ergonomics, 2012, "The Ergonomic Risks of Brewing Beer."

Nasson Boroumand, M.S. Human Factors and Ergonoimcs, 2012, "The Effect of Page Turn Indicator Design on the Use of Two-sided Poster Instructions."

Christine Griffeth, M.S., Human Factors and Ergonomics, 2012, "Effects of Text Redundancy and Visual Cueing in Screencasts on Learning."

Katie Ek, M.S., Human Factors and Ergonomics, 2011, "Designing for conservation: How visual display of feedback motivates a change in household"

Allison Farrell, M.S. Human Factors and Ergonomics, 2011, San Jose State University "Effects of measurement integration and display media on recipe execution."

Cynthia Wolter, M.S. Human Factors and Ergonomics, 2011, San Jose State University "Identifying a better ergonomic chair design for dental hygienists."

Celeste Adamson, M.S. Human Factors and Ergonomics, 2011, San Jose State University "Improving the webinar experience: Difference in presenter movement and visual feeds."

Christopher Cabrall, M.S. Human Factors and Ergonomics, 2010, San Jose State University "Aircraft Conflict Resolution Responsibility in NEXTGEN Separation Assurance."

Ryan Palmer, M.S., Human Factors and Ergonomics, 2010, San Jose State University "Gesture Navigation: A Comparison of Spatial vs Surface Interactions."

Anthony D. Andre, Ph.D., CPE                                                                 Page 43

**ER167**

3/10/2021

Matthew Mainini, M.S., Human Factors and Ergonomics, 2009, San Jose State University "En Route Air Traffic Control Input Devices for the Next Generation."

Jennifer Williams, M.S., Psychology, 2006, San Jose State University "Comparing Speed and Time Command Formats During Taxi Operation."

Dave Zuverink, M.S., Human Factors and Ergonomics, 2006, San Jose State University "Product Design for Seniors."

Heather Devine, M.S., Human Factors and Ergonomics, 2005, San Jose State University "Effect of Scroll Bar and Navigation Menu Co-Location on Web Performance."

Kristin Huang, M.S., Human Factors and Ergonomics, 2005, San Jose State University ""Effect of ambient noise on the comprehension of synthetic speech."

Shima Kazerooni, M.S., Industrial and Systems Engineering, 2005, San Jose State University "Design for Optimal Web Navigation: Comparison between Left- and right side Menu Placement."

Michael D. Talvensaari, M.S., Human Factors and Ergonomics, 2005, San Jose State University "Thin vs. Thick Client Enterprise Web Applications: User Interface Traeoffs."

Frederick J. Weber, M.S., Human Factors and Ergonomics, 2005, San Jose State University "Effects of Processing Code on Driving Safety During Simulated Mobile Phone Use."

Mark Wehner, M.S., Human Factors and Ergonomics, 2005, San Jose State University "Visual Recall Cues for Internet Passwords."

Jennifer Rose Kingsburg, M.S., Human Factors and Ergonomics, 2004, San Jose State University "A Comparison of Three-Level Menu Navigation Structures for Web Design."

Melissa Sleeter, M.S., Human Factors and Ergonomics, 2004, San Jose State University "Driven to Distraction: When Drivers Talk on Cell Phones."

Elisa Taube, M.S., Human Factors and Ergonomics, 2004, San Jose State University "The Usability of the E-commerce Shopping Cart."

Musaed Alnaser, M.S., Human Factors and Ergonomics, 2003, San Jose State University "Effect of Chair Design On Ratings Of Discomfort."

Mandy W. Gallant, M.S., Human Factors and Ergonomics, 2003, San Jose State University "Evaluation of Electronic Text Display Modes For Small Screen Devices."

Linda Phillips, M.S., Human Factors and Ergonomics, 2003, San Jose State University "Effect of Input Device on Speed and Accuracy on Older Adults."

3/10/2021

Serena Zhao, M.S., Human Factors and Ergonomics, 2003, San Jose State University "Product Culturalization."

Susan R. Dowell, M.S., Human Factors and Ergonomics, 2002, San Jose State University "Cognitive Tunneling: Mitigating Effects of Hud Symbology Location."

Karen M. Jones, M.S., Human Factors and Ergonomics, 2002, San Jose State University "The Use of Moving Map Technology to Prevent Wire Strikes in Helicopter Flight."

Krupa Joshi Karvat, M.S., Human Factors and Ergonomics, 2002, San Jose State University "Computing Postures Observed In the Living Room: The Effects of A Keyboard Platform."

Joanne Marie Chang Lins, M.S., Human Factors and Ergonomics, 2001, San Jose State University "Coding Message Criticality Level on A Data Link Display."

Stephen Edward Sipes, M.S., Human Factors and Ergonomics, 2001, San Jose State University "Image Quality Reconstruction with Neural Networks."

Lisa Vogue-Levin, M.S., Human Factors and Ergonomics, 2001, San Jose State University "A Comparison of Mouse Wrist Supports During Computer Mouse Function."

Kathleen Appenrodt, M.S., Human Factors and Ergonomics, 1999, San Jose State University "Comparison of Wrist Posture during Computer Mouse Use with and without Chair Armrests."

Rebecca Crane, M.S., Human Factors and Ergonomics, 1999*, San Jose State University "Electromyographic Activity of the Upper Trapezius During Computer Mouse Input in Three Mouse Locations"

Jeff English, M.S., Human Factors and Ergonomics, 1999, San Jose State University "Posture and Internet Navigation:  An Observational Study."

Kevin Purcell, M.S., Human Factors and Ergonomics, 1999*, San Jose State University "Effects of Callouts on Pilot Visual Attention During Electronic Moving Map Use."

Philana Yu, Senior Honors Thesis, 1999, San Jose State University "A Comparison of Four Perspective Scene Viewpoints in a Simulated Driving Task"

David Graeber, M.S., Human Factors and Ergonomics, 1998, San Jose State University "Assessing Visual Attention of Pilots in the use of Electronic Moving Map Displays."

Henry Cutler, M.S., Human Factors and Ergonomics, 1997, San Jose State University "Human Factors Guidelines for the Display of Uncertain Information."
Michael Feary, M.S. Human Factors and Ergonomics, 1997, San Jose State University

3/10/2021

"Control-Based vs. Guidance-Based Training and Displays For Automated Vertical Flight Guidance."

David Tu, M.S., Human Factors and Ergonomics, 1997, San Jose State University
"The Integration of Navigational Information For A Simulated Aircraft Taxi Task."

Patricia A. Cashion, M.S., Human Factors and Ergonomics, 1996, San Jose State University
"Space-And Object-Based Attention In The Functional Visual Field."

Elizabeth Waller Logsdon, M.S., Human Factors and Ergonomics, 1996, San Jose State University "An Examination Of Data Link AutoLoad And Message Length."

Sig Mejdal, M.S., Human Factors and Ergonomics, 1996, San Jose State University
"An Evaluation of Electronic Map Display Features for Aircraft Ground Navigation."

Erik Olsen, M.S., Human Factors and Ergonomics, 1996, San Jose State University
"Evaluating Driving Performance on the Road and in a Simulator."

Scott Wright, M.S., Human Factors and Ergonomics, 1996, San Jose State University
"Characteristics of Alternative Keyboard Acquisition, Setup, Use and Benefits: A Survey Study."

Anthony D. Andre, Ph.D., CPE                                                    Page 46

**ER170**

3/10/2021

## COMPANY CLIENT PORTFOLIO (selected)

| | | | | |
|---|---|---|---|---|
| 2Wire | Cal OSHA | Genomic Health | Makeoverstudio.com | Sills Cummis & Gross Law |
| 3 Ring Technology | Calibra Medical | Genworth | Mannkind | Silver Hill Financial |
| 3M | California Association of Rehabilitation & Re-Employment (CARRP) | Geocast | Maple Chase | Simpatico-Lycos |
| Abbott Diabetes Care (ADC) | Cardiac Science | Georgia Pacific | McAfee | Social Concepts |
| Abbott Laboratories | Cardionet | Golden Hill Entertainment | Medtronic | SpinX |
| Abbott Vascular | Celera | Google | MedQuest | Spirent |
| Abbvie | CIDCO Communications | Guillermot | Metamorphosis, Inc. | Stephanie Barnes |
| Accept Software | Circles | Grid Data Security | Metrolink-Amtrak | Stevenson Associates |
| AcelRx | Cirrus Logic | GSK | Metron Aviation | St. Jude Medical |
| Acuson | Cisco | Hanson Medical | MicroPatent | Sun Microsystems, Inc. |
| Adaptec | Clarus | Harcourt Higher Education | Microsoft Corporation | Sun Pharma |
| Agilis | Coinstar | Healthy Computing | Mighty Words | Superior Gaming LLP |
| Alexza Molecular | Colorado MicroDisplay | Henschel L3 | The Mitre Corporation | SurgiVision, Ltd. |
| Align Technology | Command Audio | Hewlett Packard | Mixman Technologies, Inc. | Switchouse.com |
| All Covered | Commwell Medical | Honeywell | Mercedes-Benz | Synpatics |
| AltaVista | CourseSmart | Hospira | MMC Networks | Talaris |
| Altschuller Melvoin & Glasser (AM&G) | CU Medical Systems, Inc. | Hotlocker | Makeoverstudio.com | Tampa International Airport |
| Amgen | Cubic | HowToDoThings | Momenta Pharmaceuticals | Tandem Computers |
| Apotheus Laboratories, Ltd. | Dash Navigation | Hyperion Solutions | MontaVista | Tandem Medical |
| Apple, Inc. Computer | Deep Woods Technology | ICAT Logistics | Monterey Technologies | TDS Architects |
| Applied BioSystems | Defense Evaluation Research Agency (DERA), UK | IDEO Product Development | My Gazoo | Telacies |
| Applied Immune Systems (AIS) Gencell rpr | Dejima | IDT | Mylan | Telenet |
| Architectural Data Systems | DEKA | Ingersoll-Rand | National Aeronautics and Space Administration (NASA) | Telleo |
| Argos Software | DELL | Integretech | National Association of Rehabilitation | Thomson Reuters |

**ER171**

3/10/2021

| | | | Professionals in the Private Sector (NARPPS) | |
|---|---|---|---|---|
| Ariba | Department of Motor Vehicles (DMV-CA) | Intel | National Cash Register (NCR) | Thoratec Corp |
| Asante Medical | Dole Fresh Vegetables, Inc | Interact Media | National Research Counsel | TiVo, Inc. |
| Ashok Malani, Inventor | Doodle Lab | Intertop Corp. | nCircle | Tonic Industrial Design |
| AT&T | Dr. Reddy's Laboratories | Iron Will Creation | Netpulse | Transcom CRC |
| Avedyne | DuraSwitch Technology | Jansen Law | Norand Corp. | Transportation Research Board |
| Bartertrust | Ecolor | Jet Propulsion Laboratory (JPL) | Novare Medica | Tricord |
| Battelle Memorial Institute | Efusion | John Deere | Novartis | TurboGrad |
| Bay Area Rapid Transit (BART) | Enject | Johnson & Johnson | Novint | Ultriva |
| Baxter | Enterprise Risk & Opportunity Management (EROM) | Joseph Maxwell ID/Tampa International Airport | NovoNordisk | Unilife Medical |
| Bayer | Epson | Juniper Networks | Nuance | University of California, Berkeley |
| BD | Eturn | Kenworth Truck Company | Nuova | US Airforce Academy |
| Biocon | EXP Systems, Inc. | Kodak Imagination Works | Nuttall Berman Attorneys | Valeant |
| Biomarin | Extractable | Koronis Biomedical Technologies | Plantronics | Veeco |
| Biogen Idec | FanFare | Laerdal Medical | Polycom | Veterans Administration |
| Bizfinity | Federal Aviation Administration (FAA) | Lash Group | Philips Medical | Veraz |
| Bloomberg Financial | Fogdog Sports | Laureate Education Inc. | Precor | Vertex |
| BMW | Ford Motor Company | Lawrence Berkeley Labs | Pricewaterhouse Coopers | Vertical Product Development |
| Boehringer Ingelheim Pharma | Formulab Neuronetics/Richter Paradigm Corp. | Lockheed Martin | Roku | Village Buzz |
| Boeing | Freeworks.com | LogiCAD 3D | Sanofi-Aventis | Visteon |
| Booze Allen Hamilton | Fujitsu | Logitech, Inc. | Safety Syringes Inc. | VMWare |
| Business Engine | Gateway Learning Corporation | Los Angeles Unified School District (LAUSD) | Siemens | WebTV |
| Cadence | Genentech-Roche | Lutron Electronics | Silitek, Inc. | White Pajama |
| Worldheart | Wrigeley Corp | Xpherix | Zaaz | Zenith Insurance |
| Ziosoft Imaging | Zoll | Zoox | Alembic Phamraceuticals Ltd. | Aptar Cipla Midazolam |

3/10/2021

| Basic Pharma | BioHaven Pharmaceuticals, Inc. | Capillary Biomedical | EryDel SpA | Levo Therapeutics |
|---|---|---|---|---|
| Madorra | Meinntech | OrthogenRx, Inc. | Protagonist Therapeutics | Pulmatrix, Inc. |
| Samsung Research America, Inc. | Satsuma Pharmaceuticals | ScinoPharm Taiwan, Ltd | Slayback Pharma, LLC | Zydus Cadila |
| Zydus Pharmaceuticlas (USA) Inc. | ARS Pharmaceuticals, Inc. | AZTherapies | Biocorp | CeQur SA |
| CF PharmTech, Inc. | Credence MedSystems, Inc. | Dare Bioscience | EyePoint Pharmaceuticals | Immunovant |
| Impel NeuroPharma | Kezar Life Sciences | Lannett | Liquidia Technologies | MannKind Corporation |
| Mirum Pharmaceuticals | Moximed, Inc. | Outset Medical | Regeneron Pharmaceuticals | scPharmaceuticals, Inc. |
| Supernus Pharmaceuticals | US Worldmeds, Inc. | Vygoris | Xeris Pharmaceuticals | Alvotech |
| Amphivena Therapeutics, Inc. | Cosmos Technologies, Inc. | ARS Pharmaceuticals, Inc. | Axar Pharmaceuticals | BioQ Pharma, Inc. |
| Evanostics | Evofem Biosciences | Glenmark | Gynesonics | Intuitive Surgical, Inc. |
| Juno Therapeutics | Kalera Medical, Inc. | Nuvaira, Inc. | Orbicular Pharmaceutical Technologies Pvt. Ltd. | VitalConnect |
| Amphastar Pharmaceuticals | Bigfoot Biomedical | Douglas Pharmaceuticals Ltd. | Google | Janssen Pharmaceuticals |
| PureSleep | Adello Biologics | ARMO BioSciences, Inc. | Coherus BioSciences | Epilady |
| Fresenius Medical Care | Ionis Pharmaceuticals | Kashiv Pharma, LLC | LBF USA, Inc. | Nevro Corporation |
| NexMed, Inc. | Pfenex | Versartis, Inc. | Advanced Medical Optics, Inc. | Proteus Digital Health, Inc. |
| Teva Pharmaceutical Industries Ltd. | Acorda Therapeutics | Acorn | AirXpanders, Inc. | Biodel, Inc. |
| Corium International Inc. | Isis Pharmaceuticalsproteu | Synthon | Shin Nippon Biomedical Lab, Ltd. | St. Renatus, LLCT |
| Thoratec | AcelRx Pharmaceuticals | Alkermes | Apircus Biosciences | Arteysn Biosolutions |
| Bayer | Ferring Pharmaceuticals | GambroS | Par Pharmaceutical | Titan Pharmaceuticals |
| Ambulant, Inc. | Human Genome Sciences | Unlife | Bausch Health | A.P. Pharma, Inc. |
| Asante | Hansen Medical, Inc. | Hitachi | Optimal Synthesis, Inc.s | Bailey and Partners |

**ER173**

# APPENDIX B

## MATERIALS CONSIDERED[1]

## CASE FILINGS AND SIMILAR MATERIALS

Memorandum of Points and Authorities in Support of Defendants' Amended Motion to Compel Arbitration, ECF No. 84-1
Declaration of Kimberly Tobias, ECF No. 85
Exhibits to Declaration of Kimberly Tobias, ECF Nos. 85-1 through 85-62
Defendants' Notice of Motion and Motion to Compel Arbitration; Memorandum of Points and Authorities in Support Thereof, *Lee v. Ticketmaster LLC*, Case 3:18-cv-05987-VC, ECF No. 25 at 6 (N.D. Cal. Nov. 30, 2018)

## DOCUMENTS PRODUCED IN DISCOVERY

TM00000001
TM00000063
TM00000145
TM00000170
TM00000175
TM00000189
TM00000197

## DEPOSITION TRANSCRIPTS

Deposition of Kimberly Tobias, March 5, 2021

## DOCUMENTS IN THE PUBLIC DOMAIN

*Books*

Andre, A.D. and Segal, L.D. (1998, July).  Design functions: The user's perspective. Ergonomics in Design. Santa Monica: HFES.

Dumas, J. & Redish, J. (1999). *A Practical Guide to Usability Testing* (1999).

Krug, S. (2005). *Don't Make Me Think: A Common Sense Approach to Web Usability*.  New Riders: 2nd Edition.  ISBN-13: 978-0321344755.

Norman, D. (1990). *The Design of Everyday Things*, New York: Doubleday.

Pieters, R. & Warlop, L. (1999). Visual attention during brand choice: the impact of time pressure and task motivation. *International Journal of Research in Marketing, 16*, 1-16.

---

[1]  Includes all sources cited in the Declaration of Anthony D. Andre, to the extent not otherwise listed here.

Rubin, J. (1995). Handbook of Usability Testing. *Technical Communication*, *42*(2), 361.

Wickens et al., *Engineering Psychology and Human Performance* (4th ed. 2012).

*Academic Articles*

Barnett BJ, Wickens,  CD, *Display Proximity in Multicue Information Integration: The Benefits of Boxes*, Human Factors, 1988;30(1):15-24.

Beerens, Gijs & Damveld, Herman & Mulder, Max & Van Paassen, Marinus M., (2009). *Design of Forcing Functions for Identification of Human Control Behaviour*, Journal of Guidance, Control, and Dynamics, 33.

Bernard, M., Chaparro, B. and Thomasson, R., (2000). Finding Information on the Web: Does the Amount of Whitespace Really Matter, *Usability News*, 2, 1.

Buscher, G., Cutrell, E., and Morris, M., (2009). *What do you see when you're surfing? Using eye tracking to predict salient regions of web pages*. Proc. CHI, 21-30.

Drew, T., Vo, M., & Wolfe, J. (2013). *The invisible gorilla strikes again: Sustained inattentional blindness in expert observers*, Psychological Science, 24, 1848-1853.

Hick, W. (1952). *On the rate of gain of information*, Quarterly Journal of Experimental Psychology, 4:11-26.

Hyman, R. (1953). *Stimulus information as a determinant of reaction time*, Journal of Experimental Psychology, 45:188-196.

Hsieh, P., Colas, J., & Kanwisher, N. (2011). *Pop-out without awareness: unseen feature singletons capture attention only when top-down attention is available*, Psychological science, 22(9), 1220-1226.

Miller, G. A. (1956). *The magical number seven, plus or minus two: some limits on our capacity for processing information*, Psychological Review, 63(2), 81-97.

Palmer, S. (1992). *Common region: A new principle of perceptual grouping*, Cognitive Psychology, 24(3), 436-447.

Quanlong Z., Jiao, J., Ying Cao, Rynson W.H. Lau; *Proceedings of the European Conference on Computer Vision (ECCV) - Task-driven Webpage Saliency*, pp. 287-302 (2018)

Rensink, R.; O'Regan, J. Kevin; Clark, J. (1997). *To See or not to See: The Need for Attention to Perceive Changes in Scenes*, Psychological Science 8 (5), 368-373.

2

Treisman, A. & Gelade, G. (1980). Cognitive Psychology, *A feature-integration theory of attention*, Vol. 12, issue 1, pp. 97-136.

Truchard, A. and Katz-Haas, R. (1998). *Ten Guidelines for User-Centered Web Design. Usability Interface*, 5, 12-13.

Tversky, A., & Kahneman, D. (1981). *The framing of decisions and the psychology of choice*, Science, 211(4481), 453-458 (1981).

Wickens CD & Carswell CM. *The Proximity Compatibility Principle: Its Psychological Foundation and Relevance to Display Design*, Human Factors, 37(3), 473-494 (1995).

Wickens, Christopher D. & Andre, Anthony D.,  *Proximity compatibility and information display: Effects of color, space, and objectness on information integration*, Human Factors, 32 (1), at 61-77 (1990)

*Online Sources*

Mathur, A. et al., *Dark Patterns at Scale: Findings from a Crawl of 11K Shopping Websites* (Nov. 2019), https://arxiv.org/pdf/1907.07032.pdf.

Brignull, H., *Types of Dark Patterns: Roach Motel*, https://darkpatterns.org/types-of-dark-pattern/roach-motel

Danilchik, L., *Visual Salience: Evidence-Based Tips to Developing App Store Creatives*, App Store Optimization Blog (Apr. 14, 2020), https://splitmetrics.com/blog/how-to-develop-app-store-creatives-to-improve-conversion-based-on-salience/

Dooley, R.,  *Dark Patterns: How Even Savvy Users Get Tricked*, Neuromarketing https://www.neurosciencemarketing.com/blog/articles/dark-patterns.htm (describing dark patterns on Live Nation's website).

Luguri, J. & Strahilevitz, L. *Shining a Light on Dark Patterns* 1-3 (Aug. 2019 draft), https://www.oag.ca.gov/sites/all/files/agweb/pdfs/privacy/shining-a-light-on-dark-patterns.pdf

Lazarus, D. '*Dark patterns' are steering many internet users into making bad decisions*, L.A. Times (June 25, 2019), https://www.latimes.com/business/lazarus/la-fi-lazarus-dark-patterns-consumer-consent-20190625-story.html

Schade A., World Leaders in Research-Based User Experience, *The Fold Manifesto: Why the Page Fold Still Matters* (Feb. 1, 2015), www.nngroup.com/articles/page-fold-manifesto/

Vieira, T. *How deceptive UX patterns trick you into doing what companies want*, TNW (Feb. 9, 2020), https://thenextweb.com/syndication/2020/02/09/how-deceptive-ux-patterns-trick-you-into-doing-what-companies-want/.

Strategic Content, *How to Write Subheadings and Why They're Important*, https://strategiccontent.co/how-to-write-subheadings/ (last accessed Mar. 6, 2021).

Written Testimony of Justin (Gus) Hurwitz, Associate Professor of Law at the University of Nebraska School of Law, Before the United States House of Representatives Committee on Energy and Commerce Subcommittee on Consumer Protection (Jan. 8, 2020), https://docs.house.gov/meetings/IF/IF17/20200108/110351/HHRG-116-IF17-Wstate-HurwitzJ-20200108.pdf

*About – Sara Saito*, https://www.visualgarden.net/about (last accessed Nov. 23, 2020).

Emily Smith, *Ticketmaster One-Page Checkout*, http://www.imemilysmith.com/one-page-checkout (last accessed Nov. 23, 2020).

Baynard Institute, *Formatting Links for Usability* (Aug. 9, 2010), https://baymard.com/blog/formatting-links-for-usability

Norman Nielsen Group, *Guidelines for Visualizing Links* (May 9, 2004), https://www.nngroup.com/articles/guidelines-for-visualizing-links/

Yale University, *Usability & Web Accessibility:  Headings* (last accessed Feb. 2, 2021), https://usability.yale.edu/web-accessibility/articles/headings

Interaction Design Foundation, *Forcing Functions* (last accessed Feb. 2, 2021), https://www.interaction-design.org/literature/book/the-glossary-of-human-computer-interaction/forcing-functions

*CSS-Tricks:  Opacity*, https://css-tricks.com/almanac/properties/o/opacity/

Medium, *Making Light Out of Dark Patterns* (Apr. 3, 2016), https://medium.com/@doublethought/making-light-out-of-dark-patterns-a2bf5080b7a8

*Typography* (last accessed Mar. 4, 2021), https://design.ticketmaster.com/components/typography-usage/.


**OTHER SOURCES**

S.1084 – Deceptive Experiences To Online Users Reduction Act, 116th Congress (2019-2020), https://www.congress.gov/bill/116th-congress/senate-bill/1084/text

Cal. Civ. Code § 1798.140(h)

# APPENDIX C

**PRIOR DEPOSITION AND TRIAL TESTIMONY (PAST FOUR YEARS)**

| CASE NAME | VENUE | CASE NO. | YEAR |
|---|---|---|---|
| *John Gilbert v. City of Oakland* (Deposition) | Superior Court of California, County of Alameda | RG19011392 | 2021 |
| *Constance v. Walmart* (Deposition) | Circuit Court of the Tenth Judicial Circuit In And For Highlands County, Florida | 2018-CA-000056 | 2020 |
| *Grillat v. Crisis Response Company* (Deposition) | United States Department of Labor Office of Administrative Law Judges San Francisco, California | 2018-LDA-00840 | 2019-2020 |
| *Moon v. City of Carlsbad* (Deposition and Trial) | Superior Court of the State of California County of San Diego | 37-2017-00029329-CU-PO-NC | 2019 |
| *Davis v. Harley Davidson* (Deposition) | Superior Court of the State Of California County Of Alameda | RG15782921 | 2018 |

# APPENDIX D

Case 2:20-cv-03888-GW-GJS   Document 92-2 (Ex Parte)   Filed 03/19/21   Page 113 of 128
Page ID #:1694



**Ticketmaster**
Sign-In Screen

font-size: 24px;
font-weight: 600;
margin: 2px 0px;
display: inline;
line-height: 1.25;
font-family: "Averta", "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast ratio:15.13:1**
**Opacity: 1.0**

font-size: 14px;
font-weight: 400;
line-height: 1.5;
font-family: "Averta", "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast ratio:15.13:1**
**Opacity: 1.0**

font-size: 12px;
line-height: 1.25;
text-align: left;
position: relative;
font-family: "Averta", "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb (38, 38, 38);**
**Contrast ratio: 15.13:1;**
**Opacity: 1.0**

font-size: 16px;
font-family: inherit;
**color: rgb(38, 38, 38);**
**Contrast ratio:15.13:1**
**Opacity: 1.0**

font-size: 14px;
**line-height: 1.29;**
font-family: "Averta", "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast ratio:15.13:1**
**Opacity: 1.0**

font-size: 12px;
font-weight: 400;
line-height: 1.5;
text-transform: none;
font-family: "Averta", "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgba(38, 38, 38, 0.65);**
**Contrast ratio:4.81:1**
**Opacity: 0.65**

## Welcome Back

Discover millions of events, get alerts about your favorite artists, teams, plays and more — plus always-secure, effortless ticketing.

### Sign In

New to Ticketmaster? **Sign Up**

Email Address
test@email.com

Password
Password123                          HIDE

☐ Remember Me                **Forgot Password?**

By continuing past this page, you agree to the **Terms of Use** and understand that information will be used as described in our **Privacy Policy**.

**Sign in**

# APPENDIX E

Case 2:20-cv-03888-GW-GJS   Document 92-2 (Ex Parte)   Filed 03/19/21   Page 115 of 128
Page ID #:1696

## Ticketmaster
Sign-In Screen



**font-size: 24px;**
font-weight: 600;
margin: 2px 0px;
display: inline;
line-height: 1.25;
font-family: "Averta", "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast ratio:15.13:1**

**font-size: 14px;**
font-weight: 400;
line-height: 1.5;
font-family: "Averta", "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast ratio:15.13:1**

**font-size: 14px;**
font-weight: 600;
text-decoration: none;
cursor: pointer;
transition: color 0.3s ease 0s,
text-decoration 0.3s ease 0s;
**color: rgb(2, 108, 223);**
**Contrast ratio:4.98:1**

**font-size: 12px;**
line-height: 1.25;
text-align: left;
position: relative;
font-family: "Averta", "Helvetica Neue", Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast ratio:15.13:1:**

**font-size: 46px;**
margin: 2px 0px;
display: inline;
line-height: 1.25;
font-weight: 600;
font-family: "Averta", "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(0, 255, 255);**
**Contrast ratio: 4.03:1**

# Welcome Back

# Sign In

**font-size: 16px;**
font-family: inherit;
**color: rgb(38, 38, 38);**
**Contrast ratio:15.13:1**

New to Ticketmaster? Sign Up

**line-height: 1.5;**
font-weight: 400;
font-size: 16px;
font-family: "Averta", "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(235, 235, 235);**
**Contrast ratio:13.47:1**

Discover millions of events, get alerts
about your favorite artists, teams,
plays and more — plus always-
secure, effortless ticketing.

Email Address

test@email.com

Password

Password123                    HIDE

**font-size: 14px;**
line-height: 1.29;
font-family: "Averta", "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast ratio:15.13:1**

☐ Remember Me

Forgot Password?

**font-size: 14px;**
font-weight: 600;
line-height: 1.25;
text-decoration: none;
transition: color 0.3s ease 0s, text-decoration 0.3s ease 0s; font-family: inherit;
cursor: pointer;
**color: rgb(2, 108, 223);**
**Contrast ratio:4.98:1**

By continuing past this page, you agree to the **Terms of Use** and understand that
information will be used as described in our **Privacy Policy.**

Sign in

**font-size: 12px;**
font-weight: 400;
line-height: 1.5;
text-transform: none;
font-family: "Averta", "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgba(38, 38, 38, 0.65);**
**Contrast ratio:4.81:1**

**font-family: inherit;**
font-weight: 600;
font-size: 14px;
line-height: 2.43;
text-align: center;
cursor: pointer;
**color: rgb(255, 255, 255);**
**Contrast ratio:4.98:1**

**font-size: 12px;**
font-weight: 600;
line-height: 1.25;
text-decoration: none;
transition: color 0.3s ease 0s, text-decoration 0.3s ease 0s;
display: inline-block;
**color: rgb(2, 108, 223);**
**Contrast ratio:3.63:1**

Case 2:20-cv-03888-GW-GJS   Document 92-2 (Ex Parte)   Filed 03/19/21   Page 116 of 128
Page ID #:1697

# Ticketmaster
## Sign-Up Screen



**font-size: 46px;**
margin: 2px 0px;
display: inline;
line-height: 1.25;
font-weight: 600;
font-family: "Averta", "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(0, 255, 255);**
**Contrast ratio 4.03:1**

**font-size: 24px;**
font-weight: 600;
margin: 2px 0px;
display: inline;
line-height: 1.25;
font-family: "Averta", "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast ratio:15.13:1**

**font-size: 14px;**
font-weight: 400;
line-height: 1.5;
font-family: "Averta", "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast ratio:15.13:1**

**font-size: 14px;**
font-weight: 600;
text-decoration: none;
line-height: 1.25;
cursor: pointer;
transition: color 0.3s ease 0s,
text-decoration: color 0.3s ease 0s;
**color: rgb(2, 108, 223);**
**Contrast ratio:4.98:1**

**line-height: 1.5;**
font-weight: 400;
font-size: 16px;
font-family: "Averta", "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(235, 235, 235);**
**Contrast ratio:13.47:1**

**font-size: 12px;**
line-height: 1.25;
text-align: left;
position: relative;
font-family: "Averta", "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast ratio:15.13:1**

**font-size: 16px;**
font-family: inherit;
font-size: 16px;
**color: rgb(38, 38, 38);**
**Contrast ratio:15.13:1**

**font-size: 14px;**
line-height: 1.15;
font-family: "Averta", "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast ratio: 15.13:1**

**font-size: 12px;**
font-weight: 400;
line-height: 1.5;
text-transform: none;
font-family: "Averta", "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgba(38, 38, 38, 0.65);**
**Contrast ratio:4.81:1**

**font-size: 12px;**
font-weight: 600;
line-height: 1.25;
text-decoration: none;
transition: color 0.3s ease 0s, text-decoration 0.3s ease 0s;
display: inline-block;
**color: rgb(2, 108, 223);**
**Contrast ratio:3.63:1**

**font-family: inherit;**
font-weight: 600;
font-size: 14px;
line-height: 2.43;
text-align: center;
cursor: pointer;
**color: rgb(255, 255, 255);**
**Contrast ratio:4.98:1**

## Sign Up
Already have a Ticketmaster Account? Sign In

### Your All-Access Pass

This is it — millions of live events, up to the minute alerts for your favorite artists and teams and, of course, always safe, secure ticketing.

Email Address

test@email.com

Password

Password123                                    HIDE

First Name                     Last Name

Firstname                      Lastname

Country of Residence           Zip/Postal Code

United States                  90210

By continuing past this page, you agree to the Terms of Use and understand that information will be used as described in our Privacy Policy

Next

Case 2:20-cv-03888-GW-GJS    Document 92-2 (Ex Parte)    Filed 03/19/21    Page 117 of 128
Page ID #:1698

# Ticketmaster
## Footer



**font-size: 16px;**
font-weight: 600;
line-height: 1.4;
font-family: Averta,Helvetica Neue,
Helvetica,Arial,sans-serif;
**color: rgba(255, 255, 255, 1);**
**Contrast ratio: 15.29:1**

**font-size: 14px;**
font-weight: 400;
line-height: 1.5;
text-transform: none;
font-family: "Averta", "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(255, 255, 255);**
**Contrast ratio: 15.29:1**

**font-size: 16px;**
font-weight: 600;
line-height: normal;
text-transform: uppercase;
margin-bottom: 8px;
**color: rgba(255, 255, 255, 0.7);**
**Contrast ratio: from 6.11:1 to 5.07:1**

**font-size: 16px;**
line-height: normal;
font-weight: 400;
text-transform: none;
**color: rgb(255, 255, 255);**
**Contrast ratio: From 4.65:1 to 3.56:1**

**font-size: 14px;**
font-weight: 600;
line-height: 2.43;
font-family: inherit;
**color: rgb(2, 108, 223);**
**Contrast ratio:4.98:1**

**Helpful Links**
My Account
Ticket Your Event
Refunds and Exchanges
Get Help
Sell
Gift Cards
N.Y. Registered Brokers
Do Not Sell My Information

**Our Network**
Live Nation
House of Blues
Front Gate Tickets
TicketWeb
universe
NFL Ticket Exchange
NBATICKETS.com
NHL Ticket Exchange

**About Us**
Who We Are
Ticketmaster Blog
Ticketing 101
Privacy Policy
Work With Us
Across the Globe
Innovation

**Friends & Partners**
American Express
Allianz
AWS

Get Our App

**SIGN IN. GO LIVE**
Discover recommended events, and breeze through checkout.     Sign In

By continuing past this page, you agree to our    Terms of Use.      © Ticketmaster 2021    United States

Help Us Improve

**font-size: 12px;**
font-weight: 400;
line-height: 1.5;
text-transform: none;
font-family: Averta,Helvetica Neue,
Helvetica,Arial,sans-serif;
**color: rgb(255, 255, 255);**
**Contrast ratio:5.05:1**

**font-size: 12px;**
font-weight: 600;
line-height: 1.5;
padding-left: 8px;
font-family: Averta,Helvetica Neue,
Helvetica,Arial,sans-serif;
**color: rgba(255, 255, 255, 1);**
**Contrast ratio:5.05:1**

**font-size: 12px;**
font-weight: 400;
line-height: 1.5;
text-transform: none;
font-family: Averta,Helvetica Neue,Hel-
vetica,Arial,sans-serif;
**color: rgb(255, 255, 255, 1);**
**Contrast ratio:5.05:1**

**font-size: 12px;**
font-weight: 600;
line-height: 1.4;
font-family: Averta,Helvetica Neue,
Helvetica,Arial,sans-serif;
**color: rgb(255, 255, 255);**
**Contrast ratio:5.05:1**

Image!

Case 2:20-cv-03888-GW-GJS   Document 92-2 (Ex Parte)   Filed 03/19/21   Page 118 of 128
Page ID #:1699

## Ticketmaster Mobile
Sign-Up Screen

**font-size: 20px;**
font-weight: 600;
line-height: 1.25;
text-transform: none;
font-family: Averta, "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

**font-size: 14px;**
font-weight: 400;
line-height: 1.5;
font-family: Averta, "Helvetica Neue",
Helvetica, Arial, sans-serif;
text-size-adjust: 100%;
display: inline-block;
margin: 2px 0px 32px;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

**font-size: 14px;**
font-weight: 600;
line-height: 1.25;
font-family: inherit;
text-decoration: none;
transition: color 0.3s ease 0s, text-deco-
ration 0.3s ease 0s;
display: inline-block;
appearance: none;
border: 0px;
outline: 0px;
background: transparent;
padding: 0px;
cursor: pointer;
**color: rgb(2, 108, 223);**
**Contrast Ratio: 4.98:1**

**font-size: 12px;**
line-height: 1.25;
text-align: left;
position: relative;
margin-bottom: 6px;
font-family: Averta, "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

**font-size: 16px;**
line-height: normal;
font-family: inherit;
background-color: rgb(255, 255, 255);
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

**font-size: 14px;**
line-height: 1.15;
font-family: Averta, "Helvetica Neue",
Helvetica, Arial, sans-serif;
margin: 0px 12px;
text-size-adjust: 100%;
cursor: pointer;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

**font-size: 12px;**
font-weight: 600;
line-height: 1.25;
display: inline-block;
font-family: Averta, "Helvetica Neue", Helvet-
ica, Arial, sans-serif;
text-decoration: none;
transition: color 0.3s ease 0s, text-decora-
tion 0.3s ease 0s;
background-color: transparent;
**color: rgb(2, 108, 223);**
**Contrast Ratio: 4.98:1**

**font-size: 12px;**
font-weight: 400;
line-height: 1.5;
font-family: Averta, "Helvetica Neue",
Helvetica, Arial, sans-serif;
text-transform: none;
**color: rgba(38, 38, 38, 0.65);**
**Contrast Ratio: 7:1**

**font-size: 14px;**
font-weight: 600;
line-height: 2.43;
font-family: inherit;
text-align: center;
cursor: pointer;
**color: rgb(255, 255, 255);**
**Contrast Ratio: 4.98:1**



ER187

Case 2:20-cv-03888-GW-GJS   Document 92-2 (Ex Parte)   Filed 03/19/21   Page 119 of 128
Page ID #:1700

# Ticketmaster Mobile
Sign-In Screen

**font-size: 20px;**
font-weight: 600;
line-height: 1.25;
text-transform: none;
font-family: Averta, "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

**font-size: 14px;**
font-weight: 400;
line-height: 1.5;
font-family: Averta, "Helvetica Neue",
Helvetica, Arial, sans-serif;
text-size-adjust: 100%;
display: inline-block;
margin: 2px 0px 32px;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

**font-size: 14px;**
font-weight: 600;
line-height: 1.25;
font-family: inherit;
text-decoration: none;
transition: color 0.3s ease 0s, text-deco-
ration 0.3s ease 0s;
display: inline-block;
appearance: none;
border: 0px;
outline: 0px;
background: transparent;
padding: 0px;
cursor: pointer;
color: rgb(2, 108, 223);
**Contrast Ratio: 4.98:1**

## Sign In

New to Ticketmaster? Sign Up

**font-size: 12px;**
line-height: 1.25;
text-align: left;
position: relative;
margin-bottom: 6px;
font-family: Averta, "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

Email Address

johnsmith@test.com

**font-size: 16px;**
line-height: normal;
font-family: inherit;
background-color: rgb(255, 255, 255);
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

Password

Password1234?                    HIDE

**font-size: 14px;**
line-height: 1.29;
font-family: Averta, "Helvetica Neue",
Helvetica, Arial, sans-serif;
margin-left: 7px;
cursor: pointer;
text-align: left;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

☐ Remember Me                    Forgot Password?

**font-size: 12px;**
font-weight: 400;
line-height: 1.5;
font-family: Averta, "Helvetica Neue",
Helvetica, Arial, sans-serif;
text-transform: none;
margin-bottom: 24px;
**color: rgba(38, 38, 38, 0.65);**
**Contrast Ratio: 7:1**

By continuing past this page, you agree to the **Terms of Use**
and understand that information will be used as described in
our **Privacy Policy**.

**font-size: 14px;**
font-weight: 600;
line-height: 1.25;
text-decoration: none;
font-family: inherit;
display: inline-block;
appearance: none;
border: 0px;
outline: 0px;
background: transparent;
padding: 0px;
cursor: pointer;
text-transform: none;
margin: 0px;
**color: rgb(2, 108, 223);**
**Contrast Ratio: 4.98:1**

**font-size: 12px;**
font-weight: 600;
line-height: 1.25;
text-decoration: none;
text-transform: none;
font-family: Averta, "Helvetica
Neue", Helvetica, Arial, sans-serif;
**color: rgb(2, 108, 223);**
**Contrast Ratio: 4.98:1**

Sign in

**font-size: 14px;**
font-weight: 600;
line-height: 2.43;
font-family: inherit;
text-align: center;
cursor: pointer;
**color: rgb(255, 255, 255);**
**Contrast Ratio: 4.98:1**

# Live Nation Mobile
## Sign-Up Screen



**font-size: 14px;**
font-weight: 400;
line-height: 1.5;
text-transform: none;
font-family: Averta, "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

**font-size: 20px;**
font-weight: 600;
line-height: 1.25;
text-transform: none;
font-family: Averta, "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

**font-size: 14px;**
font-weight: 600;
line-height: 1.25;
text-decoration: none;
display: inline-block;
appearance: none;
border: 0px;
outline: 0px;
background-color: transparent;
padding: 0px;
cursor: pointer;
font-family: inherit;
margin: 0px;
**color: rgb(44, 179, 173);**
**Contrast Ratio 2.57:1**

**font-size: 14px;**
font-weight: 400;
line-height: 1.5;
margin: 2px 0px 32px;
display: inline-block;
font-family: Averta, "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

**font-size: 16px;**
line-height: inherit;
font-family: inherit;
background-color: rgb(255, 255, 255);
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

**font-size: 12px;**
line-height: 1.25;
text-align: left;
position: relative;
margin-bottom: 6px;
font-family: Averta, "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast Ratio 15.13:1**

**font-size: 12px;**
font-weight: 600;
line-height: 1.25;
text-transform: none;
text-decoration: none;
display: inline-block;
**color: rgb(44, 179, 173);**
**Contrast Ratio 2.57:1**

**font-size: 14px;**
line-height: 1.15;
font-family: Averta, "Helvetica Neue",
Helvetica, Arial, sans-serif;
margin: 0px 12px;
text-size-adjust: 100%;
cursor: pointer;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

**font-size: 14px;**
font-weight: 600;
line-height: 2.43;
font-family: inherit;
text-align: center;
cursor: pointer;
background-color: rgb(44, 179, 173);
**color: rgb(255, 255, 255);**
**Contrast Ratio: 2.57:1**

**font-size: 12px;**
font-weight: 400;
line-height: 1.5;
font-family: Averta, "Helvetica Neue", Helvet-
ica, Arial, sans-serif;
text-transform: none;
margin-bottom: 24px;
**color: rgba(38, 38, 38, 0.65);**
**Contrast Ratio: 7:1**

### Sign Up
Powered by *ticketmaster*

Already have a Live Nation Account? **Sign In**
You can also use your Ticketmaster account

Email Address
johnsmith@email.com

Password
Password1234?                                    HIDE

First Name                    Last Name
John                          Smith

Country of Residence          Zip/Postal Code
United States                 90210

By continuing past this page, you agree to the **Terms of Use**
and understand that information will be used as described in
our **Privacy Policy**.

**Next**

Case 2:20-cv-03888-GW-GJS    Document 92-2 (Ex Parte)    Filed 03/19/21    Page 121 of 128
Page ID #:1702

# Live Nation Mobile
Sign-In Screen



**font-size: 20px;**
font-weight: 600;
line-height: 1.25;
text-transform: none;
font-family: Averta, "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

**font-size: 14px;**
font-weight: 400;
line-height: 1.5;
text-transform: none;
font-family: Averta, "Helvetica
Neue", Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

**font-size: 14px;**
font-weight: 600;
line-height: 1.25;
text-decoration: none;
display: inline-block;
appearance: none;
border: 0px;
outline: 0px;
background: transparent;
padding: 0px;
cursor: pointer;
font-family: inherit;
margin: 0px;
**color: rgb(44, 179, 173);**
**Contrast Ratio 2.57:1**

**font-size: 14px;**
font-weight: 400;
line-height: 1.5;
margin: 2px 0px 32px;
display: inline-block;
font-family: Averta, "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

**font-size: 12px;**
line-height: 1.25;
text-align: left;
position: relative;
margin-bottom: 6px;
font-family: Averta, "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast Ratio 15.13:1**

**font-size: 16px;**
line-height: normal;
font-family: inherit;
background-color: rgb(255, 255, 255);
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

**font-size: 14px;**
line-height: 1.29;
font-family: Averta, "Helvetica Neue",
Helvetica, Arial, sans-serif;
margin-left: 7px;
cursor: pointer;
text-align: left;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

**font-size: 14px;**
font-weight: 600;
line-height: 1.25;
text-decoration: none;
font-family: inherit;
display: inline-block;
appearance: none;
border: 0px;
outline: 0px;
background: transparent;
padding: 0px;
cursor: pointer;
text-transform: none;
margin: 0px;
**color: rgb(2, 108, 223);**
**Contrast Ratio: 4.98:1**

**font-size: 12px;**
font-weight: 400;
line-height: 1.5;
font-family: Averta, "Helvetica
Neue", Helvetica, Arial, sans-serif;
text-transform: none;
margin-bottom: 24px;
**color: rgba(38, 38, 38, 0.65);**
**Contrast Ratio: 7:1**

**font-size: 12px;**
font-weight: 600;
line-height: 1.25;
text-transform: none;
text-decoration: none;
display: inline-block;
**color: rgb(44, 179, 173);**
**Contrast Ratio 2.57:1**

**font-size: 14px;**
font-weight: 600;
line-height: 2.43;
font-family: inherit;
text-align: center;
cursor: pointer;
background-color: rgb(44, 179, 173);
**color: rgb(255, 255, 255);**
**Contrast Ratio: 2.57:1**

**Ticketmaster Mobile**
Place Order Screen



A

B

C

D



# Ticketmaster Mobile
Place Order Screen

# A

font-size: 28.8px;
font-weight: normal;
color: rgb(255, 255, 255);
Contrast Ratio: 4.93:1

font-size: 19.2px;
line-height: 1;
font-weight: normal;
color: rgb(38, 38, 38);
Contrast Ratio: 15.13:1

font-size: 32px;
line-height: 1.2;
font-weight: bold;
color: rgb(38, 38, 38);
Contrast Ratio: 15.13:1

font-size: 62.5%;
line-height: 1.4;
background-color: #edf4fc;
color: rgb(38, 38, 38);
Contrast Ratio 13.65:1

font-size: 25.6px;
font-weight: 600;
line-height: 1.2;
color: #262626;
background-color: #fff;
color: rgb(38, 38, 38);
Contrast Ratio: 15.13:1

font-size: 14px;
line-height: 1.5;
font-family: Averta, "Helvetica Neue",
Helvetica, Arial, sans-serif;
color: rgb(38, 38, 38);
Contrast Ratio: 15.13:1

font-size: 25.6px;
line-height: 1.4;
margin-bottom: 10px;
font-weight: bold;
color: rgb(38, 38, 38);
Contrast Ratio: 15.13:1

font-size: 22.4 px;
line-height: 1.4;
background-color: #026cdf;
color: rgb(255, 255, 255);
Contrast Ratio: 4.98:1

font-size: 28.8px;
line-height: 1.2;
font-weight: bold;
color: rgb(38, 38, 38);
Contrast ratio : 15.13:1

font-size: 12px;
line-height: 1.5;
font-family: Averta, "Helvetica Neue", Hel-
vetica, Arial, sans-serif;
color: rgb(38, 38, 38);
Contrast ratio : 15.13:1

font-size: 22.4px;
line-height: 1.4;
color: rgb(2, 108, 223);
Contrast Ratio: 4.98:1



Case 2:20-cv-03888-GW-GJS    Document 92-2 (Ex Parte)    Filed 03/19/21    Page 124 of 128
Page ID #:1705

# Ticketmaster Mobile
Place Order Screen

# B



**font-size: 14px;**
line-height: 1.5;
font-family: Averta, "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

**font-size: 16px;**
line-height: 1.25;
text-align: left;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

**font-size: 25.6px;**
font-weight: bold;
line-height: 1.4;
margin-bottom: 10px;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

# Ticketmaster Mobile
Place Order Screen

# C

**font-size: 25.6px;**
font-weight: bold;
line-height: 1.4;
margin-bottom: 10px;
color: rgb(38, 38, 38);
**Contrast Ratio: 15.13:1**

### Recommended: Protect Your Ticket Purchase

Get reimbursed up to 100% with Event Ticket Protector for an additional CA $7.09/ticket. If you can't attend this event for a covered reason, including covered illness*, airline delays, traffic accidents and more, you can be reimbursed for your ticket cost and eligible fees up to a maximum of $1,000 CAD. Terms, conditions and exclusions apply. See full Coverage Details.

**font-size: 22.4px;**
line-height: 1.4;
font-family: "Averta","Helvetica Neue",Helvetica,Arial,sans-serif;
**color: rgb(2, 108, 23);**
**Contrast ratio : 4.98:1**

**font-size: 22.4px;**
line-height: 1.4;
font-family: "Averta","Helvetica Neue",Helvetica,Arial,sans-serif;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

* Event Ticket Resale Protector is offered and underwritten by CUMIS General Insurance Company, a member of The Co-operators group of companies and administered by Allianz Global Assistance. Allianz Global Assistance is a registered business name of AZGA Service Canada Inc. and AZGA Insurance Agency Canada Ltd.
If selected, the insurance charge will be billed separately by CUMIS General Insurance Company for Event Ticket Protector insurance. By clicking Yes, you authorize Ticketmaster to send your name, address, and credit card information to CUMIS General Insurance Company who will charge your credit card. Applicable provincial sales tax will be applied. Confirmation of purchase and policy of insurance will follow by email from Allianz Global Assistance within 48 hours. All coverage is subject to the terms and conditions of the policy. Please note that you may cancel your purchase and receive a refund within 10 days from the date of purchase provided the published event date has not passed, you have not attended the event, or incurred a claim. See Privacy Policy. Quebec Residents.

*Information re. COVID-19: When considering the purchase of a policy, please note that event ticket insurance does not cover claims or financial losses related to epidemics or pandemics. For the sake of clarity, the fear of contracting coronavirus is not covered by any event ticket insurance policy. Please review the policy details for more information.

**font-size: 16px;**
line-height: 1.4;
font-family: "Averta","Helvetica Neue",Helvetica,Arial,sans-serif;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

Selection Required

# Ticketmaster Mobile
## Place Order Screen

# D



font-size: 22.4px;
line-height: 1.4;
font-family: "Averta","Helvetica
Neue",Helvetica,Arial,sans-serif;
**color: rgb(27, 121, 30);**
**Contrast Ratio: 2.82:1**

font-size: 22.4px;
font-weight: bold;
line-height: 1.4;
font-family: "Averta","Helvetica
Neue",Helvetica,Arial,sans-serif;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 14.0:1**

font-size: 22.4px;
line-height: 1.4;
font-family: "Averta","Helvetica
Neue",Helvetica,Arial,sans-serif;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 14.0:1**

font-size: 22.4px;
font-weight: 600;
line-height: 1.4;
font-family: "Averta","Helvetica
Neue",Helvetica,Arial,sans-serif;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 10.62:1**

font-size: 22.4px;
font-weight: 600;
line-height: 1.4;
text-align: left;
text-decoration: none;
font-family: "Averta","Helvetica
Neue",Helvetica,Arial,sans-serif;
**color: rgb(2, 108, 223);**
**Contrast Ratio: 3.50:1**

font-size: 16px;
font-weight: 600;
line-height: 1.4;
margin-top: 24px;
font-family: "Averta","Helvetica
Neue",Helvetica,Arial,sans-serif;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 10.62:1**

font-size: 28.8px;
font-weight: bold;
line-height: 38px;
text-align: center;
text-decoration: none;
font: inherit;
**color: rgb(255, 255, 255);**
**Contrast Ratio: 1.24:1**

font-size: 25.6px;
line-height: 1.4;
font-family: "Averta","Helvetica
Neue",Helvetica,Arial,sans-serif;
**color: rgb(114, 114, 114);**
**Contrast Ratio: 3.38:1**

font-size: 32px;
line-height: 1.4;
font-weight: 600;
width: 60%;
text-align: right;
font-family: "Averta","Helvetica Neue",Helveti-
ca,Arial,sans-serif;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 14.0:1**

## Action Button in ACTIVE State

font-size: 25.6px;
font-weight: bold;
line-height: 36px;
text-align: center;
cursor: pointer;
font: inherit;
**color: rgb(255, 255, 255);**
**Contrast Ratio: 3.05:1**

**Note:** This image depicts a checkbox for the Terms of Use. I understand this feature was only introduced fairly recently.

Case 2:20-cv-03888-GW-GJS   Document 92-2 (Ex Parte)   Filed 03/19/21   Page 127 of 128
Page ID #:1708



## Live Nation Desktop
### Sign-Up Screen

**font-size: 46px;**
font-weight: 600;
line-height: 1.25;
margin: 2px 0px;
display: inline;
font-family: "Averta", "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(225, 29, 57);**
**Contrast Ratio: 3.99:1**

**font-size: 16px;**
font-weight: 400;
line-height: 1.5;
font-family: "Averta", "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(235, 235, 235);**
**Contrast Ratio: 13.47.1**

**font-size: 14px;**
line-height: 1.29;
text-align: left;
font-family: "Averta", "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast Ratio:15.13:1**

**font-size: 14px;**
font-weight: 400;
line-height: 1.5;
text-transform: none;
font-family: Averta, "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

**font-size: 20px;**
font-weight: 600;
line-height: 1.25;
text-transform: none;
font-family: Averta, "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

**font-size: 14px;**
font-weight: 600;
line-height: 1.25;
font-family: inherit;
margin: 0px;
**color: rgb(44, 179, 173);**
**Contrast Ratio: 2.57:1**

**font-size: 14px;**
line-height: 1.5;
margin: 2px 0px 32px;
font-family: "Averta", "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast Ratio:15.13:1**

**font-size: 12px;**
line-height: 1.25;
text-align: left;
margin-bottom: 6px;
font-family: "Averta", "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(38, 38, 38);**
**Contrast Ratio:15.13:1**

**font-size: 16px;**
line-height: normal;
font-family: inherit;
background-color: rgb(255, 255, 255);
**color: rgb(38, 38, 38);**
**Contrast Ratio: 15.13:1**

**font-size: 14px;**
font-weight: 600;
line-height: 1.25;
font-family: inherit;
margin: 0px;
**color: rgb(2, 108, 223);**
**Contrast Ratio: 4.98:1**

**font-size: 12px;**
font-weight: 400;
line-height: 1.5;
text-transform: none;
margin-bottom: 24px;
font-family: "Averta", "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgba(38, 38, 0.65);**
**Contrast Ratio:4.81:1**

**font-size: 12px;**
font-weight: 600;
line-height: 1.25;
text-transform: none;
font-family: "Averta", "Helvetica Neue",
Helvetica, Arial, sans-serif;
**color: rgb(44, 179, 173);**
**Contrast Ratio: 2.57:1**

**font-size: 14px;**
font-weight: 600;
line-height: 2.43;
font-family: inherit;
text-align: center;
cursor: pointer;
background-color: rgb(44, 179, 173);
**color: rgb(255, 255, 255);**
**Contrast Ratio: 2.57:1**

### Welcome Back

Discover millions of events, get alerts about your favorite artists, teams, plays and more — plus always-secure, effortless ticketing.

## Sign In

Powered by *ticketmaster*

New to Live Nation? **Sign Up**

You can also use your Ticketmaster account

**Email Address**

johnsmith@email.com

**Password**

••••••••••••   SHOW

☐ Remember Me      **Forgot Password?**

By continuing past this page, you agree to the **Terms of Use** and understand that information will be used as described in our **Privacy Policy.**

**Sign In**

Case 2:20-cv-03888-GW-GJS   Document 92-2 (Ex Parte)   Filed 03/19/21   Page 128 of 128
Page ID #:1709

# Live Nation Desktop
## Footer

font-size: 1.5em;
line-height: 1.4285em;
font-family: Live Nation Sans,Proxima Nova,Helvetica Neue, Helvetica,Arial,sans-serif;
**color: rgb(186, 186, 186);**
**Contrast: 9.06:1**

font-size: 18px;
line-height: 1em;
text-align: left;
font-family: Live Nation Sans,Proxima Nova,Helvetica Neue,Helvetica, Arial,sans-serif;
**color: rgb(255, 255, 255);**
**Contrast: 13.20:1**

font-size: 32.7px;
font-weight: 400;
line-height: 45px;
margin-bottom: 16px;
margin-top: 12px;
text-transform: uppercase;
font-family: alternate-gothic-no-3-d, Helvetica Neue,Arial,sans-serif;
**color: rgb(243, 243, 243);**
**Contrast:15.84:1**

font-size: 1em;
line-height: 19px;
font-family: Live Nation Sans, Proxima Nova,Helvetica Neue, Helvetica,Arial,sans-serif;
**color: rgb(255, 255, 255);**
**Contrast:17.58:1**

font-size: 14.2px;
line-height: 17px;
font-family: Live Nation Sans, Proxima Nova,Helvetica Neue, Helvetica,Arial,sans-serif;
**color: rgb(243, 243, 243);**
**Contrast:15.84:1**



font-size: 12.6px;
line-height: 1.4285em;
margin-right: 25px;
font-family: Live Nation Sans, Proxima Nova,Helvetica Neue, Helvetica,Arial,sans-serif;
**color: rgb(243, 243, 243);**
**Contrast:15.84:1**

font-size: 14.2px;
line-height: 17px;
text-decoration: underline;
font-family: Live Nation Sans, Proxima Nova,Helvetica Neue, Helvetica,Arial,sans-serif;
**color: rgb(243, 243, 243);**
**Contrast:15.84:1**

font-size: 12.6px;
line-height: 1.4285em;
text-decoration: none;
text-transform: uppercase;
font-family: Live Nation Sans, Proxima Nova,Helvetica Neue, Helvetica,Arial,sans-serif;
**color: rgb(243, 243, 243);**
**Contrast:15.84:1**

1   QUINN EMANUEL URQUHART &
2   SULLIVAN, LLP
       Frederick A. Lorig (Bar No. 057645)
3      fredlorig@quinnemanuel.com
4      Kevin Y. Teruya (Bar No. 235916)
       kevinteruya@quinnemanuel.com
5      Adam B. Wolfson (Bar No. 262125)
6      adamwolfson@quinnemanuel.com
       William R. Sears (Bar No. 330888)
7      willsears@quinnemanuel.com
8   865 South Figueroa Street, 10th Floor
    Los Angeles, California 90017-2543
9   Telephone:  (213) 443-3000
10  Facsimile:   (213) 443-3100
    (additional counsel listed on signature page
11  of Plaintiffs' Opposition to Defendants'
    Amended Motion to Compel Arbitration)
12
    Attorneys for Plaintiffs Mitch Oberstein, Gary
13  Matty, and Sophie Burke, on behalf of
    themselves and all those similarly situated
14

15

16              **UNITED STATES DISTRICT COURT**

17              **CENTRAL DISTRICT OF CALIFORNIA**

18

19

20  Mitch Oberstein, Gary Matty, and Sophie      | Case No. 2:20-cv-03888-GW-GJS
    Burke, on behalf of themselves and all
21  those similarly situated,
                                                  **DECLARATION OF ADAM B.**
22              Plaintiffs,                        **WOLFSON IN SUPPORT OF**
                                                  **PLAINTIFFS' OPPOSITION TO**
23  v.                                            **DEFENDANTS' AMENDED**
                                                  **MOTION TO COMPEL**
24  Live Nation Entertainment, Inc., and         **ARBITRATION**
    Ticketmaster LLC,
25                                                The Honorable George H. Wu
                Defendants.
26

27

28

WOLFSON DECLARATION ISO PLAINTIFFS'
OPPOSITION TO DEFENDANTS' AMENDED
MOTION TO COMPEL ARBITRATION
CASE NO. 2:20-CV-03888-GW-GJS

**ER198**

1    I, Adam B. Wolfson, declare as follows:

2    1.    I am a partner at the law firm of Quinn Emanuel Urquhart & Sullivan,

3    LLP, attorneys for Plaintiffs Mitch Oberstein, Gary Matty, and Sophie Burke

4    (together, "Plaintiffs").  I am an attorney in good standing in the State of California.

5    I am making this Declaration in support of Plaintiffs' Opposition to Defendants'

6    Amended Motion to Compel Arbitration, and have personal knowledge of the facts

7    set forth below; if called upon to do so, I can and will competently testify thereto.

8    2.    Attached hereto as **Exhibit A** is a true and correct copy of

9    correspondence between counsel for Plaintiffs and counsel for Defendants, dated

10   May 28, 2020.

11   3.    Attached hereto as **Exhibit B** is a true and correct copy of Live Nation

12   Entertainment, Inc.'s Form 10-K, dated March 1, 2021 and available at

13   https://investors.livenationentertainment.com/sec-filings/all-sec-

14   filings/content/0001335258-21-000009/0001335258-21-000009.pdf.

15   4.    Attached hereto as **Exhibit C** is a true and correct copy of the domain

16   statistics for livenation.com provided by domain.com, dated June 29, 2020.

17   5.    Attached hereto as **Exhibit D** is a true and correct copy of the

18   Declaration of Kimberly Tobias that was previously filed in *Himber v. Live Nation*

19   *Worldwide, Inc.*, 16-cv-05001-JS-GRB, ECF No. 34 (E.D.N.Y. Sept. 11, 2017)

20   6.    Attached hereto as **Exhibit E** is a true and correct copy of the

21   Ticketmaster U.S. Customer Service Contact page, dated February 27, 2021, and

22   accessed by clicking the "email" link in the Live Nation Terms of Use.

23   7.    Attached hereto as **Exhibit F** is a true and correct copy of a redline

24   showing the changes to Ticketmaster's Terms of Use between December 7, 2018

25   and June 25, 2019.

26   8.    Attached hereto as **Exhibit G** is a true and correct copy of the transcript

27   of the deposition of Kimberly Tobias, dated March 5, 2021.

28   9.    Attached hereto as **Exhibit H** is a true and correct copy of the court's

1

WOLFSON DECLARATION ISO PLAINTIFFS'
OPPOSITION TO DEFENDANTS' AMENDED
MOTION TO COMPEL ARBITRATION
CASE NO. 2:20-CV-03888-GW-GJS

1  order denying defendants' motion to compel arbitration, and granting in part and
2  denying in part defendants' motion to dismiss in *Staley v. Gilead Scis., Inc.*, Case
3  3:19-cv-02573-EMC, ECF No. 558 at 14  (N.D. Cal. Mar. 12, 2021).

4      10.    Attached hereto as **Exhibit I** is a true and correct copy of the
5  "Ticketmaster Terms of Use," which were accessed from within the United
6  Kingdom on or around February 3, 2021.

7      11.    Attached hereto as **Exhibit J** is a true and correct copy of the domain
8  statistics for ticketmaster.com provided by domain.com, dated June 29, 2020.

9      12.    Attached hereto as **Exhibit K** is a true and correct copy of the
10 Declaration of Kimberly Tobias in Support of Defendants' Motion to Compel
11 Arbitration, which was previously filed in *Lee v. Ticketmaster LLC*, Case 3:18-cv-
12 05987-VC, ECF No. 26 (N.D. Cal. Nov. 30, 2018), and which was previously
13 marked as Exhibit 11 at the deposition of Kimberly Tobias.

14     13.    Attached hereto as **Exhibit L** is a true and correct copy of a screenshot
15 that was previously filed as "Exhibit O" to the Declaration of Kimberly Tobias in
16 Support of Defendants' Motion to Compel Arbitration, which was previously filed
17 in *Lee v. Ticketmaster LLC*, Case 3:18-cv-05987-VC, ECF No. 26-15 (N.D. Cal.
18 Nov. 30, 2018), and which was previously marked as Exhibit 10 at the deposition of
19 Kimberly Tobias.

20     14.    Attached hereto as **Exhibit M** is a true and correct copy of a document
21 produced in discovery bearing Bates Nos. TM00000001-TM00000004, and which
22 was previously marked as Exhibit 14 in the deposition of Kimberly Tobias.

23     15.    Attached hereto as **Exhibit N** is a true and correct copy of a document
24 produced in discovery bearing Bates No. TM00000199.

25     16.    Attached hereto as **Exhibit O** is a true and correct copy of a document
26 produced in discovery bearing the Bates Nos. TM00000063-TM00000064, and
27 which was previously marked as Exhibit 12 in the deposition of Kimberly Tobias.

28     17.    Attached hereto as **Exhibit P** is a true and correct copy of a typography

WOLFSON DECLARATION ISO PLAINTIFFS'
OPPOSITION TO DEFENDANTS' AMENDED
MOTION TO COMPEL ARBITRATION
CASE NO. 2:20-CV-03888-GW-GJS

**ER200**

1    guide provided by Ticketmaster Design, dated March 19, 2021.

2         18.    Attached hereto as **Exhibit Q** is a true and correct copy of a document

3    produced in discovery bearing Bates Nos. TM00000170-TM00000174, and which

4    was previously marked as Exhibit 5 in the deposition of Kimberly Tobias.

5         19.    Attached hereto as **Exhibit R** is a true and correct copy of a document

6    produced in discovery bearing Bates Nos. TM00000145-TM00000152.

7         20.    Attached hereto as **Exhibit S** is a true and correct copy of Defendants'

8    Reply in Support of Motion to Compel Arbitration, which was previously filed in

9    *Dickey v. Ticketmaster, LLC*, Case No. 2:18-cv-09052-GHW-GJS, ECF No. 29

10   (C.D. Cal. Feb. 8, 2019).

11

12        I declare under penalty of perjury that the foregoing is true and correct.

13   Executed on March 19, 2021

14

15                                    */s/ Adam B. Wolfson*

16                                       Adam B. Wolfson

17

18

19

20

21

22

23

24

25

26

27

28

                                               WOLFSON DECLARATION ISO PLAINTIFFS'
                              3                OPPOSITION TO DEFENDANTS' AMENDED
                                               MOTION TO COMPEL ARBITRATION
                                               CASE NO. 2:20-CV-03888-GW-GJS